## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————— )
)
JUAN CARLOS MONTOYA,               )
on behalf of himself and          )
all others similarly situated,    )
)
        Plaintiffs,              )
)     Civil Action No. 1:16-cv-10095-PBS
v.                                )
)
CRST EXPEDITED, INC. and          )
CRST INTERNATIONAL, INC.,         )
)
        Defendant.               )
———————————————————— )

### PLAINTIFFS' REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION ON CLAIMS UNDER IOWA WAGE LAWS PURSUANT TO FED. R. CIV. P. 23 AND COLLECTIVE ACTION CERTIFICATION PURSUANT TO 29 U.S.C. § 216(b)

Defendants' opposition to Plaintiffs' motion for class certification focuses on the propriety of collective action certification pursuant to 29 U.S.C. § 216(b). But in their attempts to demonstrate that CRST's compensation policies and practices do not violate the FLSA, they reinforce Plaintiffs' case for class certification under Rule 23. The claims asserted by Plaintiff Montoya on behalf of the class are susceptible to classwide proof. None of the so-called individual inquiries that may be required to prove liability and/or damages overwhelm the common legal issues. Moreover, a class action is superior because if the claims asserted by Plaintiff Montoya in this action are not allowed to proceed on a class and/or collective basis, the policies and practices that he challenges will never be subject to legal scrutiny, and will continue unabated.

1

# ARGUMENT

**I.**   **Defendants have not demonstrated that the claims asserted in this case could or should be tried on an individual basis under settled Rule 23 precedent.**

Of the six requirements for class certification under Rule 23(a) and (b)(3), Defendants cede numerosity and commonality to Plaintiffs, recognizing the futility of disputing these issues. The bulk of Defendants' arguments as to the other four requirements are merits-based, and must be rejected as a basis for denying class certification. Their remaining arguments do not pass muster. First Circuit precedent requires this Court to reject Defendants' efforts to recast the common questions raised by Plaintiffs as individual questions so as to defeat predominance. Similarly, First Circuit precedent requires this Court to reject Defendants' arguments with respect to typicality, adequacy, and superiority.

**A.**   **Predominance. The distinct legal and factual questions associated with each phase of CRST's Driver Training Program are not "questions affecting only individual members" within the meaning of Rule 23.**

Throughout their opposition, Defendants return to the flawed argument that Rule 23(b)(3)'s predominance requirement is not met because (1) not all drivers completed all four phases, and (2) the claims associated with one phase are distinct from the claims associated with other phases. But Defendants make no attempt to demonstrate, because they cannot, how the passage of a driver from one phase to the next might alter the liability determination for the prior phase.

Plaintiffs' claims relating to CRST's liability for failing to pay its drivers any wages at all during Phase 1 training or Phase 2 orientation are straightforward claims for unpaid wages that rise and fall on a common legal theory: that putative class members

2

were, in fact, employees of CRST during those phases and that the hours spent in "training" in Phase 1 and "orientation" in Phase 2 was compensable working time. Defendants have not identified any defense to its Phase 1 liability that might be unique to drivers who dropped out during Phase 1, drivers who dropped out after Phase 1, or drivers who advanced to Phase 2.

CRST's liability for minimum wage violations and unlawful deductions during Phase 3, when putative class members are paired with a lead driver, is not dependent on any facts associated with drivers' subsequent participation in Phase 4. Defendant has not identified any defense to its Phase 3 liability that might be unique to drivers who failed to complete Phase 3; to drivers who dropped out after Phase 3 (as did Plaintiff Montoya); to drivers who dropped out during Phase 4; or to drivers who completed Phase 4.  Moreover, during Phase 4, drivers continued to suffer the same injuries as those in Phase 3, including minimum wage violations resulting from mileage-based pay, unlawful deductions, and the failure to pay wages free and clear.

In other words, "[D]efendants [must] incorrectly assume that a class member who is injured for only a part of the class period did not suffer [the same] injury." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015). And if that is not the basis for Defendants' position, then Plaintiffs are at a loss in terms of understanding their argument. Rule 23 requires an evaluation of whether "questions of law or fact" that are common to the class predominate over "questions affecting only individual members." A question that affects only a subset of class members is not an "individual" question within the meaning of Rule 23. "After all, Rule 23(b)(3) requires merely that common

issues predominate, not that ***all issues*** be common to the class." *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003) (emphasis added).

Even if Defendants were able to assert defenses that truly are only applicable to a subset of the putative class, that would not be sufficient to defeat predominance. *See DaSilva v. Border Transfer of MA, Inc.*, No. CV 16-11205, 2017 WL 5196382, at *11 (D. Mass. Nov. 9, 2017) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036 (2016)).  This Court has at its disposal numerous case management tools for handling precisely this procedural challenge. *Smilow*, 323 F.3d at 39-40 (internal citations omitted).

> **B.   Predominance. The applicability of Iowa's Wage Payment Collection Law is a merits question that can be resolved on a classwide basis.**

Defendants assert that the question of whether Iowa's Wage Payment Collection Law applies to all CRST drivers turns on the extent to which a driver is physically located in Iowa when he or she transacts business for CRST. As Plaintiffs spell out in their prior briefing, *see* ECF No. 72 at 12-13 & 17, this is an unduly narrow interpretation of *Runyon v. Kubota Tractor Corp.*, 653 N.W.2d 582, 585 (Iowa 2002). Plaintiffs intend to make the case at summary judgment for the application of the IWPCL to ***all*** CRST drivers, precisely because ***all*** CRST drivers transact substantial business in Iowa by virtue of CRST directing and supervising their work from there. In any case, this is a merits question that should not be resolved at the class certification stage.

C.   **Predominance. Common questions that can be answered using classwide proof overwhelm individual questions.**

Each and every one of the claims asserted by Plaintiffs, regardless of the Driver Training Program Phase with which it is associated, meet the test for predominance.

### 1.   Failure to pay drivers during Phase 1

Defendants assert that this Court can, based on the record before it, make a determination that the putative class members were not CRST employees, and therefore CRST was not required to pay them wages. In making this argument, Defendants have essentially ceded that the common questions asserted by Plaintiffs can be answered using classwide proof. This Court, therefore, must find predominance satisfied with respect to the Phase 1 claims. "When, as here, 'the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—[an alleged] failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047 (2016) (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 107 (2009)) (alterations in original).[1]

### 2.   Failure to pay drivers during Phase 2

As with Plaintiffs' claims for unpaid wages during Phase 1 truck driving school, Defendants assert that this Court can make a legal determination on the record before it as to the compensability of time spent by putative class members in Phase 2 orientation.

---

[1]      Defendants mistakenly suggest that Plaintiffs' Phase 1 claims for unpaid wages relate in some way to the amount of debt that is owed upon dropping out, or completing Phase 1. They do not, and the dissimilarities identified are entirely irrelevant to these claims.

Ironically, the Ninth Circuit case cited by Defendants for the proposition that training

pay is not compensable *also* stands for the proposition that the compensability of

orientation pay is appropriately decided on a classwide basis. *Nance v. May Trucking

Co.*, 685 Fed. Appx. 602, 604-605 (9th Cir. 2017). There, the trial court certified class

claims for the trucking company's policy of not paying drivers for a mandatory three-

day orientation. *Id.* Notably, the Ninth Circuit had no issues referring to the practice of

not paying drivers for orientation as a "policy." *Id.* Nor, apparently, did the trial court

when it certified the class, a determination which cuts straight through Defendants'

argument to the contrary. The trial court in *Nance* then granted partial summary

judgment for the defendant. The Ninth Circuit affirmed summary judgment decision

**with respect to the class claims**, because it found that the drivers were merely "job

applicants." *Id.* In other words, for the same reasons cited *supra*, this claim is ideally

suited for class certification and determination at summary judgment. Plaintiffs intend

to proffer classwide evidence that putative class members were employees and not job

applicants within the meaning of the FLSA at summary judgment.

### 3.   Mileage-based pay during Phases 3 & 4

Defendants impliedly assert that Plaintiffs have failed to meet their initial burden

under Rule 23 with respect to their mileage-based claims because they have only

demonstrated that "Montoya and three other drivers may, in certain discrete instances,

have received less than the minimum wage." Def's Br., ECF No. 116, at 21. Defendants

argue that because "the practices [Plaintiff] identifies would violate the law only if they

caused a driver to be paid less than the minimum wage during a particular pay period,"

predominance cannot exist because calculations are required to demonstrate a minimum wage violation, which implicates both liability and damages. *Id.* at 22-23. Defendants further state in their argument regarding collective action certification that "[t]he need for such calculations refutes any claim that the policy is unlawful on its face, and highlights the individualized inquiry that would be required to determine on a case-by-case basis whether a putative class member was paid an appropriate wage for a particular pay period." *Id.* at 7, n. 1.

Defendants' position borders on the absurd; it would insulate employers from minimum wage liability any time the employer was clever enough to avoid having a written policy broadcasting that "we pay less than the minimum wage per hour." Here, where the compensation policy is plainly uniform, and where Plaintiffs have demonstrated that this uniform pay policy results in unpaid minimum wages in at least some workweeks, Plaintiffs do not need to present evidence of a policy that is unlawful on its face without any need for "calculations."

Defendants' position is also contrary to First Circuit law. As noted in Section I.A., *supra*, putative class members do not need to have been injured for the entire class period. In other words, if the same CRST policy or practice resulted in thousands of CRST drivers being paid at a wage rate less than the minimum wage, but only in one pay period, that would be sufficient to establish predominance. Indeed, it is precisely the purpose of the class action mechanism to recover damages for small injuries that would otherwise go unlitigated. Further, it would be sufficient for purposes of predominance if the pay period in which the minimum wage violation occurred were

different for each class member. Defendants have not cited any First Circuit case law suggesting otherwise, nor are Plaintiffs aware of any such case law.

Defendants do cite *Cole v. CRST, Inc.*, 2012 WL 4479237 (C.D. Cal. Sept. 27, 2012), for the proposition that the plaintiff there failed to demonstrate that "CRST has a general policy of not paying minimum wage to their drivers." *Cole*, however, is readily distinguishable. First, the plaintiff there did not pursue FLSA-based claims, but rather California wage law claims. It is not clear from the reported decision whether the plaintiff there asserted *any* similar legal theories to Plaintiff Montoya. There is no discussion of (1) the method for determining an hourly rate of pay for purposes of compliance with the FLSA (or a state law that incorporates by reference the FLSA), (2) CRST's legal obligation under the FLSA to define a workweek and to keep records sufficient to determine whether at least the minimum wage has been paid for all hours worked in a workweek, or (3) whether sleeper berth time is compensable working time. Without knowing the legal theories of liability asserted, it is impossible to determine whether the court's reasoning has any relevance to the present matter. Second, the *Cole* court found a lack of commonality, which Defendants here have not pressed. Third, the *Cole* court relied on *Wal-Mart Stores, Inc. v. Dukes* as its guide to the commonality inquiry, without the benefit of the Supreme Court's subsequent interpretation of *Wal-Mart* in *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047 (2016).

In *Tyson Foods*, the Supreme Court clarified that "a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Id.* at 1036. What doomed the

plaintiffs in *Wal-Mart* was that the "common policy" was allowing discretion by local supervisors. *Id.* In *Tyson Foods*, by contrast, "the parties [did] not dispute that there are important questions common to all class members, the most significant of which is whether time spent donning and doffing the required protective gear is compensable work under the FLSA." *Id.* "The underlying question in *Wal–Mart*, as here, was whether the sample at issue could have been used to establish liability in an individual action. Since the Court held that the employees [in *Wal-Mart*] were not similarly situated, none of them could have prevailed in an individual suit by relying on depositions detailing the ways in which other employees were discriminated against by their particular store managers." *Id.* "*Wal–Mart* does not stand for the broad proposition that a representative sample is an impermissible means of establishing classwide liability." *Id.*

Here, as in *Tyson*, Plaintiffs have established that classwide liability for the challenged practices may be determined by (1) deciding the numerous common legal and factual questions by reference to CRST's written compensation policies, CRST's uniform contracts and other paperwork that putative class members must sign, and Rule 30(b)(6) testimony, with limited or no need for representative evidence, and (2) applying those legal determinations to payroll and hours of service records to identify and quantify instances of minimum wage damages for a given employee – whether by the workweek or by the hour.

To the extent that Defendants' argument collapses to an argument that Plaintiffs cannot prove that all putative class members have been injured, that is not a dispositive issue in the First Circuit. "[E]xcluding all uninjured class members at the certification

stage is almost impossible in many cases, given the inappropriateness of certifying what

is known as a 'fail-safe class'—a class defined in terms of the legal injury." *In re Nexium*,

777 F.3d at 22. To the extent that there may be putative class members who were always

paid at a wage rate greater than the minimum wage during Phase 3 or Phase 4, which

Plaintiffs assert is highly unlikely, "it is simply not possible to entirely separate the

injured from the uninjured at the class certification stage. And as the Supreme Court

noted in *Amgen,* 'Rule 23 grants courts no license to engage in free-ranging merits

inquiries at the certification stage.'" *In re Nexium*, 777 F.3d at 22 (quoting *Amgen, Inc. v.*

*Connecticut Ret. Plans & Trust Funds*, 133 S.Ct. 1184, 1194–95 (2013)). Indeed, the fact that

"calculations" must be made to determine if policy or practice resulted in a violation of

the law in no way defeats predominance.

> But *New Motor Vehicles* did not impose a requirement that the injury
> determination must be completed by the class-certification stage—only that
> "the district court [have] enough information to
> evaluate *preliminarily* whether the proposed model will be able to establish .
> . . which consumers were impacted by the alleged antitrust violation and
> which were not." *Id.* (emphasis added). Uninjured members of the putative
> class would be identified in the liability proceedings later in the case . . .

*In re Nexium*, 777 F.3d at 24.

Plaintiffs have submitted evidence that more than suffices to demonstrate that

CRST's policy of paying by the split-rate-mile, its failure to define a workweek, its

resulting failure to keep accurate records of hours worked and compensation paid for

each workweek, and its failure to make any effort to ensure that its drivers were paid at

least the minimum wage for all hours worked in a workweek, has resulted in minimum

wage violations for Plaintiff Montoya and the three opt-in plaintiffs, using the only data

that Defendants have produced to Plaintiffs or submitted in its briefing. *See* Schwab

Aff., ECF No. 74, at 15-18. This is true even when compensable working time is limited

to time spent "driving" and time spent "on-duty, not driving," as Defendants argue is

appropriate. *Id.*

"Once plaintiffs have made their initial showing [that a proposed class satisfies

the Rule 23 requirements], defendants have the burden of producing sufficient evidence

to rebut the plaintiff's showing." *In re Nexium*, 777 F.3d at 27. Defendants here have

submitted *no* evidence demonstrating that there are putative class members without

minimum wage violations at some point during the class period.[2] Defendants list nine

factual circumstances that affect how much a driver is paid, *see* Def's Br. at 9-10, but

point to no one person for whom these factors have always resulted in minimum wage

compliance. Defendants do not even bother to explain if any of these nine factual

circumstances could conceivably guarantee a pay rate greater than the minimum wage

for all workweeks. For this reason alone, their argument must fail.

Plaintiffs have further submitted evidence, in the form of an admission of

Defendants, that no putative class member was paid for time recorded as "sleeper

berth" or other "off-duty" time and that this resulted in none of those hours being paid.

---

[2]      Defendants requested four months to oppose this motion to analyze its data. *See* Hearing
Transcript (Sept. 26, 2017), *attached as* Exhibit A, at 11:14. Not only have they not submitted "15 good
examples," *id.* at 11:5, of employees who were always paid at least the minimum wage, they seem to
be asserting that it is not possible to do so based on the nature of the records it keeps. This is itself a
blatant violation of the FLSA, and Plaintiffs, therefore, may take advantage of the *Mt. Clemens*
burden-shifting framework, should it become necessary. *See Tyson Foods*, 136 S. Ct. at 1047 ("The
Court in *Mt. Clemens* held that when employers violate their statutory duty to keep proper records,
and employees thereby have no way to establish the time spent doing uncompensated work, the
'remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against
making' the burden of proving uncompensated work 'an impossible hurdle for the employee.'").

Pls' Br., ECF No. 72 at 13. Plaintiffs assert that much of this time, including all sleeper berth time, is compensable working time as a matter of law, and that damages for each individual class member can be readily determined from CRST's hours of service logs.

The Court need not and should not decide this common legal issue on class certification, as it is a merits issue. *See Tyson Foods*, 136 S. Ct. at 1047. Plaintiffs intend to affirmatively move for summary judgment on this issue at the appropriate time in the litigation. Plaintiffs also intend to affirmatively move for summary judgment on the question of whether CRST's compensation scheme allows CRST to take advantage of a "weekly measuring rod." *See Norceide v. Cambridge Health All.*, 814 F. Supp. 2d 17, 22 (D. Mass. 2011). If not, then those hours that constitute working time that went unpaid by CRST must be compensated at the full federal minimum wage of $7.50 per hour.

Notwithstanding the lack of binding authority about the compensability of sleeper berth time in the First Circuit, Defendants make a merits-based argument by citing a single reported decision from the Ninth Circuit, which affirmed the trial court's reliance on federal regulations as persuasive authority. *Nance*, 685 Fed. Appx. at 605. The trial court in that case, however, purported to rely on USDOL's Field Operations Handbook, which it cites for the proposition that sleeper berths on a moving vehicle are "adequate facilities furnished by the employer" for purposes of 29 C.F.R. § 785.41. *Nance v. May Trucking Co.*, No. 3:12-CV-01655-HZ, 2014 WL 199136, at *7 (D. Or. Jan. 15, 2014) (quoting USDOL Field Operations Handbook ("FOH"), Chapter 31, Section 31b09(a) (Dec. 15, 2000)). The trial court did ***not*** address the prerequisite found in the very next sentence of the FOH, which clearly states: "Berths in trucks are regarded as adequate

sleeping facilities for the purposes of 29 CFR 785.41 and 29 CFR 785.22. However, this rule applies to sleeping berth time of truck drivers or helpers *only when they are on continuous tours of duty*." FOH at § 31b09(a) (emphasis added). Because Defendants seem to be taking the position in this litigation that their drivers are not on duty for 24 hours or more, *see* Defs' Br. at 11 n.2, they cannot take advantage of USDOL's position on this matter. Moreover, deference to USDOL would require a finding that 29 CFR 785.22 also applies to truck drivers, *see* FOH at 31b09 & 31b12, which would, at the very least, limit the number of sleeper berth hours that CRST could have lawfully excluded from compensable work time to 8 and no more.

### 4.     Unlawful deductions during Phases 3 & 4

Defendants assert, without any additional analysis, that their "similarly situated" analysis under 29 USC § 216(b) demonstrates that individualized questions predominate over class questions with respect to the deductions that Plaintiffs assert are unlawful. That argument is, in a nutshell, that "different deductions present different legal issues." Def's Br. at 14. Defendants further note that "[t]he payroll documents in evidence indicate that while opt-in plaintiffs Hollingsworth and Fogarty were subject to over a dozen different types of deduction, Montoya was subject to just five." *Id.*

Defendants implicitly acknowledge, however, that each deduction presents common legal issues. For example, the lawfulness of deductions taken by CRST for purposes of repaying itself for Phase 1 "advances" could be determined by this Court, or a jury, in one fell swoop, by a determination that drivers were CRST employees during Phase 1. If they were employees, the deductions for Phase 1 "advances" that are

common to all putative class members are not lawful. To the extent that Defendants
have defenses unique to certain subsets of class members, this does not defeat
predominance.  *See DaSilva*, 2017 WL 5196382, at *11. Moreover, the fact that there are
different merits issues as to different deductions does not defeat predominance; what is
relevant is that the legal and factual issues raised as to each deduction are common.

If drivers were ***not*** employees during Phase 1, then the common legal questions
regarding pre-employment advances are (1) whether they were truly for the benefit of
the employee, and (2) the extent to which they exceed CRST's reasonable cost of those
advances.  If Defendants can make the determination that 29 CFR §§ 531.29-531.33 do
not apply here on a classwide basis, or that the "amounts deducted for transportation
are the amounts actually incurred" on a classwide basis, then this Court can make that
determination as well. Or this Court may reach a contrary conclusion. Plaintiffs have
met their burden of demonstrating that common legal issues bind together the class.

### 5.    Failure to pay wages free and clear during Phases 3 & 4

Lastly, Plaintiffs assert a claim that during any pay period when a driver was paid
wages, but under the threat and obligation to repay CRST for Phase 1 advances that had
not already been repaid, their wages in that pay period were not paid "free and clear."
Defendants misunderstand this argument when they counter by suggesting that drivers
who complete Phase 4 are not similarly situated to drivers who do not. *See* Defs' Br. at
16. Even drivers who ultimately complete Phase 4 were paid wages prior to that point
under threat of legal action to collect their debt of $3,950/$6,500.

Because CRST never took payroll deductions from drivers for the $3,950/$6,500 charged to putative class members as "tutition," but rather used the charge to coerce drivers to work for CRST for 8/10 months, Plaintiffs assert that the amount of a student's outstanding debt always exceeded their weekly wages up until the point when they were released from their Driver Employment Contract. The damages for this violation of the FLSA would be the amount of the debt, to the extent that the debt was not a lawful "advance." The common legal questions, therefore, are (1) whether the $3,950/$6,500, or any component of that charge, was an expense paid by CRST that it could lawfully shift to its employees to bear, and (2) whether any other "advance" that CRST actually deducted from payroll was a lawful deduction. The common legal questions presented by (2) are identical to those asserted in Section I.A.4., *supra*.

The common legal questions presented by (1) require an analysis of the basis for the $3,950/$6,500 charge, which Defendants admit is common to the class. Even if putative class members are not employees during Phase 1, Iowa wage laws and the FLSA prohibit CRST from using its normal costs of doing business, such as hiring recruiters, and its alleged opportunity costs for placing lead drivers with student drivers, as a weapon to indenture its drivers. The Court need not and should not decide this issue on the merits now, however, but rather at summary judgement.

**D.    Typicality. Defendants erroneously focus on the typicality of Plaintiff Montoya's "experience" as opposed to the typicality of his claims.**

First, Defendants argue that Montoya is not typical of the class for reasons thoroughly refuted in Section I.A., *supra*. Nothing about the experience of having advanced from Phase 1 to Phase 2, or from Phase 2 to Phase 3, or from Phase 3 to Phase

4, implicates Plaintiffs' theory of liability, or Defendants' defenses, for claims associated with each phase. Like all putative class members, Plaintiff Montoya was not paid wages during Phase 1 trucking school. His interest in prosecuting a claim for wages during that time period is legally identical to that of all other putative class members.  Like all putative class members who advanced to Phase 2, Plaintiff Montoya was not paid wages during a two-to-three-day mandatory orientation. His interest in prosecuting a claim for wages during that time period is legally identical to that of the other putative class members who participated for any portion of time in Phase 2. Like all putative class members who advanced to Phase 3, Plaintiff Montoya was paid per mile at the same contract student rate of 25 cents per split-rate mile. His interest in prosecuting a claim for minimum wage violations during this time period is legally identical do that of all other putative class members who participated in Phase 3.

Like all putative class members who advanced to Phase 3 or 4, Plaintiff Montoya had multiple deductions taken from his pay for Phase 1 "advances," in his case a total of $50 for a mandatory DOT drug test. CRST aggressively pursued repayment of all other Phase 1 advances through its Driver Collections Department after Montoya quit the program. Montoya, therefore, has suffered similar legal injuries to any putative class member who completed Phase 4. The only significant differences are that some drivers have had a greater share of their Phase 1 "advances" deducted from their pay through payroll deductions and a lesser share pursued through Driver Collections.

These differences, however, do not make Plaintiff Montoya an inadequate class representative. The typicality inquiry is focused on legal *claims*, not on "whether

aspects of Montoya's experience overlap with some aspects of the experience of some other drivers." Def's Br. at 24.  To the contrary, "[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016) (quoting *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016)); *see also Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) ("Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice.").

Here, Plaintiff Montoya challenges a common set of policies and practices that are clearly articulated. *See* Pls' Br., ECF No. 72, at 3. The fact that drivers who completed Phase 4, unlike Plaintiff Montoya, would have had the remainder of their Phase 1 debt forgiven does not mean that Plaintiff Montoya cannot represent their interests in recovering the deductions taken unlawfully from their pay, their interests in recovering minimum wages owed to them during Phase 3 and Phase 4, or their interests in recovering wages that were not paid free and clear. Indeed, Plaintiff Montoya has a strong, demonstrated interest in doing so. Defendants are disingenuous at best when they argue that "Montoya offers no reason to think his experience was typical of other drivers" with respect to mileage-based pay resulting in minimum wage violations. *Id.* at 24. In fact, Plaintiff Montoya has articulated multiple theories of minimum wage violations that would result in minimum wage violations for all putative class members

who drove during Phase 3 or 4, not to mention the three opt-in plaintiffs for whom

Plaintiff Montoya has provided data-based evidence of minimum wage violations

resulting from his legal theories.

In evaluating typicality, this Court should "bear[] in mind that if class certification

is denied, it is exceedingly unlikely that individual class members will pursue their

claims to recovery, given the economics of litigation in this field." *Swack v. Credit Suisse*

*First Boston*, 230 F.R.D. 250, 263 (D. Mass. 2005) (applying this rationale in its typicality

analysis). As in that case, the Court should find typicality satisfied here.

### E. Superiority. Thousands of individual lawsuits based on the same claims and legal theories would not be more efficient than a class action.

Superiority "ensures that resolution by class action will 'achieve economies of

time, effort, and expense, and promote . . . uniformity of decision as to persons similarly

situated, without sacrificing procedural fairness or bringing about other undesirable

results.'" *In re Relafen Antitrust Litig.*, 218 F.R.D. 357, 346 (D. Mass. 2003) (quoting

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997)). Defendants challenge

superiority using the same arguments that they advance with respect to predominance

and typicality, but they do not actually explain how it is that a single lawsuit

challenging the practices specifically identified by Plaintiffs is less efficient or

economical than thousands of individual lawsuits, or a single lawsuit comprising an

equal number of individual plaintiffs. Even where "manageability of th[e] case will be

difficult," a class action is frequently superior to the alternatives. *In re Pharm. Indus.*

*Average Wholesale Price Litig.*, 252 F.R.D. 83, 107 (D. Mass. 2008).

The reason for this omission is that the real-world alternative to a class action here is a handful of individual lawsuits brought by drivers lucky enough to find a legal aid or *pro bono* lawyer to take their case, which CRST can settle out without risking an adverse ruling by a judge on the merits or changing its practices. This alternative may be superior in terms of CRST's sizable profits, but it is decidedly not superior within the meaning of Rule 23.

II.     **Plaintiffs have more than met their burden under 29 U.S.C. § 216(b) and therefore a collective action should also be certified.**

Defendants' arguments against collective action certification under 29 U.S.C. § 216(b) are fully addressed by Plaintiffs in Section I, *supra*. Their only significant argument unique to the FLSA is this: Plaintiffs have failed to identify a single common policy that violates the FLSA. But Plaintiffs are not required to submit sufficient evidence to **prove** an FLSA violation, even at stage two of certification. *See, e.g.*, *Yayo v. Museum of Fine Arts*, No. CIV.A. 13-11318-RGS, 2014 WL 2895447, at *4 (D. Mass. June 26, 2014).

Although Defendants do everything possible to obscure this fact, a common policy that violates the FLSA is readily defined here: "The Fair Labor Standards Act required that defendants pay plaintiffs a minimum of [] per hour. *See* 29 U.S.C. § 206. Defendants were obligated to pay the workers at least the equivalent of the minimum wage, ***even though in the form of a piece-rate wage*** as opposed to an hourly wage. In addition, the Act obligated defendants to prepare and maintain individual records documenting the hours that each worker worked." *Bueno v. Mattner*, 829 F.2d 1380, 1386 (6th Cir. 1987) (emphasis added). CRST cannot hide behind its claim that its payroll system is

complicated. It may be complicated, but it is classwide and Plaintiffs have shown how it can be parsed to support their minimum wage theories. Nor can CRST hide behind its assertion that its compensation policy was not **intended** to deprive drivers of the minimum wage violations. "[T]he fact that there may have been occasions when drivers did not receive minimum wage does not mean that these instances were the result of a policy or plan by CRST to avoid paying minimum wage." Defs' Br. at 10. But CRST's intent is irrelevant to establishing the fact of an FLSA violation. Nor can CRST shift their burden for compliance onto the drivers by claiming that drivers may submit their time sheets at different times. The FLSA places responsibility for ensuring that employees are paid at least the minimum wage – timely – squarely on the shoulders of employers.

Defendants cite to two meal break cases for the proposition that courts may deny certification where "the plaintiffs had not presented sufficient evidence of a *corporate policy* to require work without pay." Defs' Br. at 7-8 (internal citation omitted). But those cases turn in large part on the question of whether and when employees were actually performing work-related activities during their breaks and how to determine that on a classwide basis. Here, records of all work exist or can be constructed, and there are no discretionary elements to be determined, *i.e.* this Court does **not** need to engage in an inquiry as to what drivers were doing when confined to the sleeper berth.

## CONCLUSION

For the above reasons, as well as the reasons set forth in Plaintiffs' prior briefing, *see* ECF No. 27, 58, and 72, Plaintiffs respectfully request that the Court certify the requested class and collective actions.

Respectfully submitted,

JUAN CARLOS MONTOYA, on behalf of
himself and all others similarly situated,

By their attorneys,


/s/ Rachel Smit
Hillary Schwab, BBO #666029
Rachel Smit, BBO #688294
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3260
www.fairworklaw.com
Email: hillary@fairworklaw.com,
rachel@fairworklaw.com

Andrew S. Schmidt, Esq.
Peter G. Mancuso, Esq.
*Admitted pro hac vice*
Andrew Schmidt Law, PLLC
97 India Street
Portland, ME 04101
207-650-0320
Email: andy@maineworkerjustice.com,
peter@maineworkerjustice.com


Dated:  February 23, 2018

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of this document to be served via
electronic filing on all counsel of record on February 23, 2018.


 /s/ Rachel Smit
Rachel Smit