# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                       )
JUAN CARLOS MONTOYA,                   )
on behalf of himself and               )
all others similarly situated,         )
                                       )
                    Plaintiff,         )
                                       )        Civil Action
          v.                           )        No. 16-10095-PBS
                                       )
CRST EXPEDITED, INC., and CRST         )
INTERNATIONAL, INC.,                   )
                                       )
                    Defendants.        )
_____)
```

## MEMORANDUM AND ORDER

May 24, 2018

Saris, C.J.

## INTRODUCTION

Plaintiff Juan Carlos Montoya alleges that Defendants CRST Expedited, Inc., and CRST International, Inc. (collectively, "CRST"), underpaid their long-haul truck drivers, misled them regarding the costs of driver training, and imposed excessive charges to recoup those costs in violation of the federal Fair Labor Standards Act ("FLSA") and Iowa law. Plaintiff has filed motions asking the Court to certify a collective action under the FLSA and three classes for the state-law claims.

After hearing, Plaintiff's motion to certify the FLSA collective action (Dkt. No. 72) is **ALLOWED**. The motion to certify the proposed Iowa wage class (Dkt. No. 72) is **ALLOWED IN PART** and **DENIED IN PART**. The motion to certify a consumer-fraud class (Dkt. No. 95) is **ALLOWED IN PART** and **DENIED IN PART**. The motion to certify the Iowa usury class (Dkt. No. 95) is **ALLOWED IN PART** and **DENIED IN PART**.

**FACTUAL BACKGROUND**

The following facts are drawn from the First Amended Complaint and materials in the class-discovery record.

## I.   Complaint

Montoya, a Boston resident, worked for Defendants as a truck driver in late 2014. Defendants are Iowa corporations that transport goods in interstate commerce.

Montoya's complaint asserts four theories of liability. Count I alleges that CRST violated the FLSA, 29 U.S.C. § 201, et seq., because it failed to pay drivers at least minimum wage for all hours worked, took unlawful deductions from drivers' pay, and did not pay drivers' wages "free and clear." Count II alleges that this conduct also runs afoul of Iowa's wage laws, including the Iowa Wage Payment Collection Law, Iowa Code § 91A.1, et seq., and the Iowa minimum wage law, Iowa Code § 91D.1.

Count III arises under the Iowa Private Right of Action for Consumer Frauds Act ("Consumer Frauds Act"), Iowa Code § 714H.1, et seq. It alleges that CRST engaged in a variety of consumer frauds, such as misleading drivers about "free" training, charging drivers more than their actual costs for educational programs, and failing to disclose the training program's high dropout rate. The complaint also challenges CRST's collection tactics. Count IV asserts that Defendants violated the Iowa usury law, Iowa Code § 535.2, by requiring drivers to sign contracts that provided for a higher rate of interest (18 percent or more per year) than the law permitted (between 3.5 and 7.25 percent annually).

Plaintiff seeks to certify four classes:

- Count I (a collective action under the FLSA): All individuals who have participated as contract drivers in any phase of CRST's Driver Training Program, at any time since December 22, 2013.

- Counts II and III (classes under Iowa's wage laws and Consumer Frauds Act): All individuals who have participated as contract drivers in any phase of CRST's Driver Training Program, at any time since January 21, 2014.

- Count IV (a class under Iowa's usury law): All individuals who have signed pre-employment contracts and/or driver employment contracts with CRST that have provided for an

interest rate on amounts owed at a rate higher than the maximum
lawful rate of interest determined by the Iowa Superintendent of
Banking (ranging between 3.5 percent and 7.25 percent per annum)
at any time since January 21, 2006.

## II. **Driver Training Program**

CRST recruits drivers like Montoya by promising "free,"
"sponsored," or "cover[ed]" commercial driver's license ("CDL")
training, as well as sign-on bonuses. New recruits must complete
a four-phase Driver Training Program.

### A. Phase 1

Prior to Phase 1, CRST recruiters arrange for drivers'
transportation to the Phase 1 facility. Drivers must later repay
this cost as an "advance." On the first day of Phase 1, drivers
are required to sign a Pre-Employment Driver Training Agreement
("Training Agreement").

Phase 1 consists of driver training at an educational
facility. Specifically, it involves a learner's permit course
for drivers who lack such a permit, followed by one or two weeks
of "truck-driving school" to obtain a CDL. Between 50 and 60
percent of those enrolled in the Driver Training Program attend
Phase 1 training in Cedar Rapids, Iowa, at the North American
Driver Training Academy ("NADTA"). NADTA is owned by Admiralty
Holdings, which also owns the two CRST Defendants. The remaining

drivers attend one of approximately 12 other schools with which CRST has contracted.

B.    Phase 2

Phase 2 consists of an orientation program held at a CRST facility. In this phase, drivers fill out paperwork and provide CRST with required documentation, such as I-9 Forms, CDLs, Social Security cards, and birth certificates. They also must take a drug test, pass a physical examination, and complete a skills assessment. Drivers attend training sessions on a variety of topics, including driver wellness, filling out time logs, transporting hazardous materials, customer service, truck maintenance, and harassment prevention.

At some point before Phase 3, drivers must sign a Driver Employment Contract ("Employment Contract"). The precise timing of when the Employment Contract gets signed remains unclear on this record. Some students may sign it at the end of Phase 1. Others, like Montoya, sign it at the end of Phase 2.

C.    Phase 3

After completing orientation, drivers are placed on CRST's payroll, which initiates Phase 3. Phase 3 consists of approximately 28 days of driving with a "lead driver" who has at least six months of driving experience.

D.    Phase 4

Upon entering Phase 4, drivers are paired with a "co-driver" for the remaining seven to nine months of their contract terms.

III. **Training Agreement and Employment Contract**

The Training Agreement and Employment Contract are both standardized documents that CRST uses nationwide. The Training Agreement designates which educational facility a driver will attend, describing the facility as an "independent contractor" that is a "separate non CRST affiliated" entity. This agreement also explains that if a driver satisfies certain preconditions, CRST will advance certain of the driver's Phase 1 and Phase 2 expenses, such as travel, lodging, and tuition, subject to the repayment conditions discussed below.

The lodging cost is based on an average for all participants in the Driver Training Program and does not change based on the actual cost of lodging provided to a particular driver. Similarly, the tuition fees, which range between $3,950 and $6,500,[1] are based on averages that take into account all of CRST's costs associated with the Driver Training Program, including meals, housing, transportation, advertising, recruiting, signing bonuses, and other costs. CRST actually pays

_____

[1]     In 2014, CRST converted its Employment Contracts from eight-month to 10-month terms, simultaneously increasing the tuition fee from $3,950 to $6,500. Drivers who attend NADTA, CRST's "in-house" driver education school, are charged $4,700 if they drop out during Phase 1.

the third-party schools between $1,400 and $2,500 per student. It does not disclose those actual costs to drivers.

In the Training Agreement, the driver acknowledges that all of these advances "will equal or exceed the sum of $2,000." The driver agrees that if he is dismissed or withdraws prior to completing Phase 3, he must repay the advances with interest "at a rate equal to the lesser of 1.5 [percent] per month or the maximum rate permitted by applicable federal and state usury laws."

In addition, the Training Agreement previews the terms of the Employment Contract that drivers must sign. The Employment Contract contemplates two scenarios for repayment of the advances. In one, so long as the driver remains employed by CRST, the company will deduct up to $40 per week from the driver's paycheck until the Phase 1 expenses (but not tuition), plus interest, are repaid in full. The other scenario arises when the driver breaches the Employment Contract or is terminated for cause. Under those circumstances, the driver immediately owes CRST between $3,950 and $6,500 for tuition at the educational facility, plus any remaining Phase 1 expenses, plus interest.

The Employment Contract authorizes CRST to deduct these amounts from any compensation owed to the driver or to employ a collection agency to enforce the obligation. It also contains a

non-competition agreement that prohibits drivers from working for any CRST competitor in the United States for the term of the contract or until the driver repays any amounts owed to CRST.

## IV. Drivers' Wages and Deductions

During Phases 1 and 2, CRST does not consider drivers to be employees and does not pay them. During Phases 3 and 4, CRST employs a "team driver" model, in which two drivers take turns either driving the truck, or spending time in the sleeper berth or passenger seat. This tag-team approach is necessary to comply with federal regulations limiting the amount of time a driver is permitted to be "on duty."

Team drivers are paid using a "split mileage" formula. For example, new drivers entering Phase 3 are paid 25 cents per mile; so, if a driving team completes a 2,000-mile trip, each driver gets credit for 1,000 miles (regardless of how many miles each drove) and earns $250. During Phase 4, drivers' per-mile rates periodically increase until CRST converts them to a "per diem" program, which reduces their per-mile rate by 12 cents and shifts some of their compensation to non-taxable "reimbursements."

Based on CRST payroll records, Montoya has calculated the hourly pay rate that he and three other opt-in plaintiffs received over the course of several weeks in 2014 and 2015.

Those hourly rates range from $0 to $7.19 per hour depending on several variables.

During Phase 3, CRST also deducts the cost of a mandatory drug test from drivers' pay. Then, in Phase 4, CRST begins deducting $40 per week from drivers' pay to recoup the aforementioned Phase 1 "advances" for housing, lodging, and the mandatory physical examination. In addition, the company permits drivers during Phases 3 and 4 to request advances on future wages to cover living expenses; if allowed, each advance comes with a $4 fee, which is also deducted from the driver's pay.

As mentioned, during Phases 3 and 4, CRST does not deduct the "tuition" advance of $3,950 to $6,500. That debt comes due only if the driver fails to complete Phase 3 or Phase 4, at which point it is counted against any owed wages and, typically, sent to collections.

## V.   Collections, Interest Rates, and Other Practices

CRST generally seeks to collect debt from drivers in two scenarios. The first is when a driver completes some of the Driver Training Program and signs the Employment Contract, but does not complete the contract's eight- or 10-month term. In this scenario, the company seeks to recoup the $3,950 to $6,500 tuition fee, along with any other outstanding advances for items like transportation and lodging. The second is when a driver drops out during Phase 1. Here, the company seeks to collect

outstanding advances, but not tuition -- unless the student attended NADTA, in which case the company demands a $4,700 tuition fee.

CRST automatically sends drivers two letters seeking to collect these debts before turning over the accounts to a third-party debt collector. Both letters convey that CRST will not release the driver's diploma or other school records until the company is paid in full. The letters also state that if the driver cannot afford to pay the full debt immediately, CRST will "accept monthly payments at 18 [percent] interest."

CRST does not allow drivers to obtain certificates verifying their completion of training until they have satisfied any debts or completed their term of employment. Similarly, NADTA will not provide drivers with a certificate of graduation unless they sign an Employment Contract or pay off the applicable tuition debt. And if another company calls CRST seeking to verify a former driver's employment, CRST will state that the indebted driver remains under contract to CRST.

If the driver does not make arrangements to pay within six to nine weeks, CRST sends the account to a third-party debt collector. Between January and July 2017, CRST undertook collection efforts on around 7,500 to 8,000 drivers' accounts, collecting approximately $250,000. During this span, 26 drivers paid their contract debt in full.

The record further shows that, between December 2013 and April 2017, 23,340 individuals started Phase 1 of the Driver Training Program, while 13,306 signed Employment Contracts (at whatever point prior to Phase 3). CRST acknowledges that, by the end of Phase 4, the turnover rate for its drivers is high: For every 100 trucker jobs CRST needs to fill, it must hire 160 drivers. This statistic is not disclosed to drivers.

## VI.  **Montoya and Other Plaintiffs**

Montoya worked for CRST from approximately October to December 2014. His Phase 1 training took place in Marine City, Michigan. On October 13, 2014, he signed a Training Agreement that bound him, upon breach or termination, to pay CRST $3,950, plus advances for training expenses, plus interest. On the same day, he signed an Assignment of Wages and Payroll Deduction Agreement, permitting CRST to recover its advances by deducting $40 per week from his future earnings.

Montoya then traveled to Cedar Rapids, Iowa, for Phase 2 orientation. On October 28, 2014, Montoya signed an Employment Contract requiring him, upon breach or termination, to pay CRST $6,500, plus the other amounts discussed above. Montoya was not paid wages during Phases 1 and 2.

Upon entering Phase 3, Montoya started earning 25 cents per split mile, in accordance with CRST's standard pay schedule for new drivers. So, for example, in November 2014, Montoya logged a

1,871-mile trip from Cedar Rapids, Iowa, to Portland, Oregon.
After splitting those miles with the other driver on his team,
Montoya got credit for 935.5 miles. At 25 cents per mile, this
trip paid Montoya $233.88. Montoya's per-mile rate did not
change during the course of his employment with CRST. His last
trip for the company was in late November 2014, apparently while
he was still in Phase 3 of the training program.

With respect to minimum wage, the payroll statement
covering Montoya's trip from Cedar Rapids to Portland reflects
that he worked 33 hours during the relevant pay period. During
this period, Montoya also recorded 15.61 hours of "excess"
sleeper-berth time (i.e., time in excess of eight hours per day
spent in the sleeper berth of the truck). If Montoya is correct
that such "excess" sleeper-berth time is compensable, then his
total number of compensable hours jumps to 48.61 hours. Measured
against his pay of $333.88 ($233.88 for miles driven, plus a
$100 signing bonus), Montoya earned an hourly rate of $6.87.

Records from other opt-in plaintiffs evince more
straightforward theories of minimum-wage violations. For
instance, an August 4, 2015, payroll statement for Clarence
Johnson, Jr., shows that he drove 1,182 miles at a rate of 25
cents per mile; this resulted in total earnings of $295.51 for
46.25 hours worked -- an hourly rate of $6.39. Similarly, on a
payroll statement dated April 2, 2015, opt-in plaintiff Ronnie

Fogarty, Jr., earned $178.50 for 31 hours worked -- an hourly rate of $5.76.

Montoya's payroll records also reflect various deductions from his wages. For example, his November 11, 2014, statement shows a $40 deduction for a drug test, followed by a $10 deduction for the same purpose on his November 20, 2014, statement. A payroll statement dated January 20, 2015, reflects deductions totaling $527.50, although the purpose of those deductions is not clear from the face of the document.

After he quit, CRST sent Montoya a letter dated January 30, 2015, seeking to collect $7,027.50. That total included $6,500 for training, $320 for housing, $157.50 for transportation, and a $50 processing fee. The letter provides two options: (1) "[r]eturn to work for CRST and fulfill the remaining terms of your contract," or (2) pay the $7,027.50, either in full or in monthly installments at 18 percent interest. The letter warns Montoya that, absent action, the account would go to collections on February 13, 2015. Instead, on that date, CRST sent another letter containing the same demands. This letter said Montoya's account would go to collections on February 27, 2015.

The record also contains a series of invoices sent to Montoya later that year and into 2016. For instance, an invoice dated February 22, 2016, shows that Montoya's balance had grown to $8,528.24. An invoice the following month showed a lower

balance, apparently the result of CRST changing Montoya's
training fee from $6,500 to $3,950.

**DISCUSSION**

## I.    FLSA Collective Action

### A.    Legal Standard

The FLSA provides that employers must pay their employees
"at least a minimum wage for all hours worked." Dooley v.
Liberty Mut. Ins. Co., 307 F. Supp. 2d 234, 241 (D. Mass. 2004)
(citing 29 U.S.C. § 206(a)). Currently, the federal minimum wage
is $7.25 per hour. 29 U.S.C. § 206(a)(1). The FLSA also requires
employers to pay wages "free and clear," which means employers
are prohibited from charging employees for certain expenses "if
such expenses would drive the employee's pay below minimum
wage." United States v. Gordon, 852 F.3d 126, 139 n.14 (1st Cir.
2017), cert. denied, 138 S. Ct. 256 (2017); see 29 C.F.R. §
531.35 (noting that wages "cannot be considered to have been
paid by the employer and received by the employee unless they
are paid finally and unconditionally").

The FLSA gives employees the option of banding together to
enforce these rights through a collective action. See 29 U.S.C.
§ 216(b). "Section 216(b)'s affirmative permission for employees
to proceed on behalf of those similarly situated must grant the
court the requisite procedural authority to manage the process
of joining multiple parties in a manner that is orderly,

sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure." Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989).

In exercising this "procedural authority," some courts have developed a two-step process to certify a group of collective-action plaintiffs. See, e.g., Cunha v. Avis Budget Car Rental, LLC, 221 F. Supp. 3d 178, 181 (D. Mass. 2016); Trezvant v. Fidelity Employer Servs. Corp., 434 F. Supp. 2d 40, 43 (D. Mass. 2006). But there is nothing talismanic about the two-step process, particularly because the First Circuit has never required it. Accordingly, in this case, because of the need for class discovery on the motion to certify under Rule 23, the Court consolidated the two steps. See Prescott v. Prudential Ins. Co., 729 F. Supp. 2d 357, 366 (D. Me. 2010) (recognizing that "courts sometimes do skip the first stage of the certification process when extensive discovery has taken place"). After significant class discovery, the Court now must address the core concern of Section 216(b): Have the potential members of the collective-action group shown that they are "similarly situated" for purposes of the FLSA?

Although the parties nominally agree that this is the standard, Defendants at oral argument urged the Court to probe deeper and determine whether plaintiffs have asserted a viable FLSA violation before certifying the collective action. That is

not the law. Section 216(b) permits a collective action "by any one or more employees for and [on] behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). The statute only requires plaintiffs "to put forth some evidence that the legal claims and factual characteristics of the class in [the] case are similar."[2] <u>Trezvant</u>, 434 F. Supp. 2d at 44. "At this procedural stage, the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." <u>Lynch v. United Servs. Auto. Ass'n</u>, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007). <u>See</u> <u>Young v. Cooper Cameron Corp.</u>, 229 F.R.D. 50, 54 (S.D.N.Y. 2005) ("The focus of this inquiry . . . is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are 'similarly situated' under

---

[2]    Although the issue has not been squarely raised and the Court does not decide it here, this is a "less stringent" standard than the one imposed by Rule 23. <u>O'Brien v. Ed Donnelly Enters., Inc.</u>, 575 F.3d 567, 584-85 (6th Cir. 2009), <u>abrogated on other grounds by</u> Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663 (2016). <u>See also</u> <u>Knepper v. Rite Aid Corp.</u>, 675 F.3d 249, 257 (3d Cir. 2012) (describing how drafters of modern Rule 23 "disclaimed any intention for the new opt-out rule to affect [Section] 216(b)"); <u>Grayson v. K Mart Corp.</u>, 79 F.3d 1086, 1096 (11th Cir. 1996) ("[I]t is clear that the requirements for pursuing a § 216(b) class action are independent of, and unrelated to, the requirements for class action under Rule 23 of the Federal Rules of Civil Procedure."); <u>but see</u> <u>Espenscheid v. DirectSat USA, LLC</u>, 705 F.3d 770, 771-72 (7th Cir. 2013) (Posner, J.) ("[T]here isn't a good reason to have different standards for the certification of the two different types of action, and the case law has largely merged the standards, though with some terminological differences."). The Supreme Court has not weighed in. <u>See</u> <u>Tyson Foods, Inc. v. Bouaphakeo</u>, 136 S. Ct. 1036, 1045 (2016) (assuming, without deciding, "that the standard for certifying a collective action under the FLSA is no more stringent than the standard for certifying a class" under Rule 23).

29 U.S.C. § 216(b) with respect to their allegations that the law has been violated."). See also 7B Charles Alan Wright et al., Federal Practice and Procedure § 1807 (3d ed. 2018) (comparing collective-action framework with Rule 23). Thus, even though the Court may consider the legal issues during certification of the collective action, the focus remains squarely on whether the claimants are "similarly situated." 29 U.S.C. § 216(b).

B.   Factual Basis for Certifying Collective Action

The key collective-action question, then, is whether the potential members of the group have shown that they are "similarly situated" for purposes of the FLSA. The Court finds they have. The record demonstrates that, for purposes of the three proposed FLSA theories (minimum wage violations, unlawful wage deductions, and "free and clear" violations), Montoya is similarly situated to the group of individuals who participated as contract drivers in CRST's Driver Training Program since December 22, 2013.

In large part, this is because Montoya, like the broader group, was subject to a set of standard policies or practices for new drivers that raise common legal questions. The standard policies and practices include:

- The terms of the Training Agreement and Employment Contract, which bind drivers to work for CRST for eight or 10 months while repaying certain expenses advanced by

CRST, or else owe CRST thousands of dollars for tuition and training expenses, plus interest.

- The practice of treating Phase 1 and Phase 2 drivers as unpaid trainees.

- The practice of paying "team drivers" in Phase 3 and Phase 4 according to a "split mileage" pay scale starting at 25 cents per mile.

- The company's position that sleeper-berth time is never compensable.

- The practice of deducting costs for training, drug tests, physical examinations, transportation, and lodging from drivers' wages.

These policies and practices, in turn, raise several common legal questions, including:

- Are Phase 1 and Phase 2 drivers properly categorized as employees or non-employees?

- Are wage deductions for CRST's up-front costs for a driver's training, drug tests, transportation, and lodging lawful under the FLSA?

- When such deductions occur, do drivers receive their wages "free and clear" under the FLSA?

- When, if ever, during a long-haul "team driver" trip can the non-driving partner be considered "on duty"?

- When, if ever, is sleeper-berth time compensable under the FLSA?

- Under a piece-rate pay system, what is the proper temporal unit for measuring compliance with the minimum hourly wage requirement of the FLSA?

The Court finds that Plaintiff has made a substantial showing that these legal issues are likely to be shared between Montoya and the proposed group of opt-in plaintiffs.

Accordingly, the proposed opt-in plaintiffs are similarly situated for purposes of an FLSA collective action.

Defendants' arguments to the contrary are unavailing. Their most compelling point is that even if CRST drivers sometimes were not paid minimum wage, an individualized inquiry would be required to identify those instances. But claimants are similarly situated in challenging the standardized policies and practices governing the Driver Training Program. This is true even if their individual damages must be separately calculated. Such calculations do not necessarily defeat a "similarly situated" finding. See O'Brien, 575 F.3d at 585-86 (requiring district court to conduct "a collection of individualized analyses" to ascertain FLSA wage liability); see also Lupien v. City of Marlborough, 387 F.3d 83, 88 (1st Cir. 2004) (observing, in FLSA case, that issues of liability and remedy are "analytically distinct").

The same reasoning applies with respect to any potential "free and clear" violations. A "free and clear" violation would occur if an employer-required deduction (e.g., for the cost of "tools of the trade") brought an employee's wage below the statutory minimum. See 29 C.F.R. § 531.35. Much like a straight minimum-wage violation, ascertaining whether a "free and clear" violation occurred will require some amount of individualized arithmetic. But that does not necessarily make the drivers any

less "similarly situated" with respect to their challenge to CRST's pay practices.

Defendants also point out that there are four phases to CRST's Driver Training Program and that a majority of the potential collective-action group members did not complete all four. So, for example, Defendants argue that Phase 1 and Phase 2 drivers are "non-employee trainees" under the six-factor test of Reich v. Parker Fire Protection District, 992 F.2d 1023, 1026 (10th Cir. 1993), and therefore need not be paid under the FLSA. However, Defendants do not posit a scenario in which applying the Reich factors would yield different results for individual drivers -- for instance, where Montoya would be considered a trainee in Phases 1 and 2, but another opt-in plaintiff would be considered an employee during these phases, or vice versa.

It is true that Montoya left the program during Phase 3, raising the question of whether he can be similarly situated to drivers who completed Phase 4 and "graduated" from the program (and therefore never were subject to efforts to collect tuition debts). However, Montoya was not paid during Phases 1 and 2, and he was paid according to a compensation system during Phase 3 that allegedly resulted in minimum wage violations, unlawful wage deductions, and "free and clear" violations. He therefore suffered the full panoply of the proposed group's alleged harms

asserted under the FLSA, despite the fact that he did not graduate from Phase 4.

Finally, Defendants describe a variety of fact-specific scenarios (such as experience-based pay, per-diem pay, and payroll advances) that may determine how much a driver was paid during a particular pay period. However, they do not suggest that these intricacies could not be accounted for via existing payroll records should the case reach the damages phase. Further, based on the record currently before the Court, it does not appear that the complexity of CRST's compensation system makes it any less uniformly applied.

For these reasons, Plaintiff's motion to certify a collective action under the FLSA is **ALLOWED**.

## II. Class Certification on State Law Claims

To certify a class under Federal Rule of Civil Procedure 23, the Court first must undertake a "rigorous analysis" to determine whether Plaintiff has satisfied "the four threshold requirements" of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. In re Nexium Antitrust Litig., 777 F.3d 9, 17 (1st Cir. 2015) (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013)). The First Circuit also requires that a putative class be "ascertainable" by reference to "objective criteria." Id. at 19. In this case,

Defendants do not dispute numerosity, commonality, or ascertainability.

Typicality requires that the class representative's "injuries arise from the same events or course of conduct as do the injuries of the class," but his claims need not be "identical to those of absent class members." In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. 17, 23 (D. Mass. 2008). The touchstone is "whether the putative class representative can fairly and adequately pursue the interests of the absent class members without being sidetracked by her own particular concerns." Id.

Adequacy occasions a two-part inquiry. Guckenberger v. Boston Univ., 957 F. Supp. 306, 326 (D. Mass. 1997). First, the Court must determine "whether any potential conflicts exist between the named plaintiffs and the prospective class members." Id. (quoting In re Bank of Boston Corp. Sec. Litig., 762 F. Supp. 1525, 1534 (D. Mass. 1991)). Second, it must ask "whether the named plaintiffs and their counsel will prosecute their case vigorously." Id.

In this case, Plaintiff also must meet the two additional requirements of Rule 23(b)(3): predominance and superiority. Predominance requires Plaintiff to demonstrate "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R.

Civ. P. 23(b)(3). Predominance does not require an absence of individual issues. See Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 40 (1st Cir. 2003) (noting, under Rule 23, that "[t]he individuation of damages in consumer class actions is rarely determinative" to class-certification question). If predominance is initially satisfied, but individual issues later threaten to overwhelm the case, the Court has "management tools at its disposal" -- such as decertification or the appointment of a special master -- to deal with that scenario. See Garcia v. E.J. Amusements of New Hampshire, Inc., 98 F. Supp. 3d 277, 290-91 (D. Mass. 2015).

Superiority means "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Relevant considerations include: (1) the class members' interests in individually controlling separate actions; (2) the extent and nature of any pre-existing litigation begun by or against class members; (3) the desirability, vel non, of concentrating the litigation in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

Where, as here, the parties contest certain legal and factual premises relevant to the Rule 23 inquiry, it may be appropriate for the Court to "probe behind the pleadings" to "formulate some prediction as to how specific issues will play

out in order to assess whether the proposed class meets the legal requirements for certification." <u>In re New Motor Vehicles Canadian Exp. Antitrust Litig.</u>, 522 F.3d 6, 17 (1st Cir. 2008) (quotation marks omitted). "In performing this predictive function" and exercising its "broad discretion" over class certification, the Court must appraise the plaintiff's evidence "critically," while taking care not to "allow[] the defendant to turn the class-certification proceeding into an <u>unwieldy</u> trial on the merits." <u>Id.</u> (emphasis in original). Often the Rule 23 analysis will "overlap with some critical assessment regarding the merits of the case." <u>Id.</u>

   A.   <u>Iowa Wage Law Claim</u>

   Plaintiff seeks to certify the following class under Iowa's wage laws: All individuals who have participated as contract drivers in any phase of CRST's Driver Training Program, at any time since January 21, 2014. He argues that the same practices that allegedly violate the FLSA -- failure to pay minimum wage, unlawful wage deductions, and failure to pay wages "free and clear" -- also run afoul of Iowa's wage laws.

   However, determining whether Iowa's wage law applies to CRST drivers writ large presents a major roadblock to certifying the class that Montoya proposes. Iowa law defines "employer" as a person or entity "who in this state employs for wages a natural person." Iowa Code § 91A.2(4). The Iowa Supreme Court

has said that the "statute's focus is not on an individual employee's state of residence or an employer's home office but whether the employee is 'employed in this state for wages by an employer.'" Runyon v. Kubota Tractor Corp., 653 N.W.2d 582, 585 (Iowa 2002) (quoting Iowa Code § 91A.2(3)). The focus of the term "employ," in turn, is "only the actual engagement of services in the transaction of business." Id. at 586. Thus, a regional sales manager was covered by Iowa's wage laws, even though he worked out of his home in Missouri, because "he transacted substantial business and routinely performed services on behalf of [the defendant company] within Iowa's borders." Id.

Plaintiff has not convincingly demonstrated that CRST's long-haul truck drivers typically fall within this definition. Plaintiff points out that most CRST drivers pass through Iowa, typically on Interstate 80, during their coast-to-coast trips, and many come to Cedar Rapids for a variety of other work-related reasons. The record also indicates that drivers are likely to interface with CRST's Iowa-based dispatchers, human resources staff, and payroll departments in the normal course of business. But without more, these interactions are not enough to satisfy Runyon for the entire proposed class of drivers. In other words, individual issues would overtake common ones.

One potential subclass would consist of drivers who attended Phase 1 or Phase 2 sessions in Iowa. These drivers

apparently performed relatively standardized tasks in Iowa for readily ascertainable periods of time (one to three weeks for Phase 1, and approximately three days for Phase 2). The common question of whether these drivers fall within the Runyon standard raises few, if any, individual issues. Phase 1 and Phase 2 drivers were not paid at all. If the law required them to be paid, no math is necessary to determine that a minimum-wage violation occurred. Accordingly, for this narrower subclass, the Court finds that common legal and factual questions exist, and they predominate over individual issues.

The remaining Rule 23 elements, less vigorously disputed, can be dealt with in the express lane. The Court finds that Montoya fits the bill of typicality for this smaller group because it appears he "can fairly and adequately pursue the interests of the absent class members without being sidetracked by [his] own particular concerns." In re Credit Suisse-AOL, 253 F.R.D. at 23. Specifically, Montoya, like many other drivers, attended the Phase 2 program in Iowa.

Although Montoya's Phase 1 training was not in Iowa, typicality "does not require that the representative plaintiff's claims be identical to those of absent class members." Id. Rather, "[t]he typicality inquiry 'is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit

of their own goals.'" Hochstadt v. Boston Scientific Corp., 708 F. Supp. 2d 95, 103 (D. Mass. 2010) (quoting In re Prudential Ins. Co. of Am. Sales Practice Litig., 148 F.3d 283, 311 (3d Cir. 1998)). Here, both Montoya and the subclass have an interest in convincing the Court to interpret Iowa's wage laws to cover their early involvement in the Driver Training Program. Thus, Montoya's interests closely align with those of the narrowed class.

With respect to adequacy, Defendants point to nothing in the record, other than what has already been discussed, that indicates the potential for conflict, and they do not challenge the bona fides of Montoya's counsel. Accordingly, Plaintiff has satisfied the adequacy prong.

Finally, a class action is a superior method for resolving this wage dispute. In light of the common questions already discussed, class treatment is more efficient and will promote uniformity of decision as to the drivers' wage claims. Moreover, the potential class members are unlikely to bring individual claims due to the relatively low monetary amounts involved. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997) (noting superiority requirement's concern with "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all" (internal quotation marks omitted)).

Accordingly, Montoya's motion to certify a class bringing claims under Iowa's wage laws is **ALLOWED IN PART**, with respect to drivers who attended Phase 1 or Phase 2 programs in Iowa.[3] The motion is otherwise **DENIED**.

B.    Iowa Consumer Frauds Act Claim

Plaintiff next seeks to certify a class for alleged consumer frauds: All individuals who have participated as contract drivers in any phase of CRST's Driver Training Program at any time since January 21, 2014. Defendants challenge certification on the grounds of predominance, typicality, adequacy, and superiority.

The crux of Defendants' argument against predominance is that even if CRST committed acts proscribed by the Consumer Frauds Act, the drivers would also have to demonstrate that these acts or practices resulted in an "ascertainable loss of money or property" by Montoya and each member of the proposed class. See Iowa Code Ann. § 714H.5(1) ("A consumer who suffers an ascertainable loss of money or property as the result of a prohibited practice or act in violation of this chapter may

---

[3]    The Court hastens to point out that prosecuting the minimum-wage claims via a "hybrid" collective-action and Rule 23 class creates the potential for "serious case management issues and the possibility of confusion relating to notice." 7B Charles Alan Wright et al., Federal Practice and Procedure § 1807 (3d ed. 2018). To forestall any such issues, the Court may consider bifurcating the claims or some other procedural step.

bring an action at law to recover actual damages."). Because potential class members will have to prove that they actually lost money as a result of CRST's alleged consumer frauds, Defendants argue that individualized inquiries will be necessary and will predominate.

Plaintiff's Consumer Frauds Act claim encompasses a long list of allegedly unfair or deceptive acts or practices.[4] Although some components of the claim present a more obvious "ascertainable loss" than others, they all generally revolve around the concept of false advertising: Drivers joined CRST based on promises of "free," "cover[ed]," or "sponsored" training. After taking advantage of that promised opportunity, drivers discovered that CRST required them to pay back tuition and/or training expenses through wage deductions and/or collections efforts. In Plaintiff's phrasing, the drivers did not get what they bargained for.

Any driver who repaid training-related expenses through wage deductions and/or was subject to collections efforts for such costs suffered an "ascertainable loss" under the Consumer Frauds Act. With the class cabined to include only those

---

[4]    Specifically: (1) misleading advertising, (2) charging drivers more for driver training schools than CRST pays and failing to disclose that fact to drivers, (3) failing to disclose the Driver Training Program dropout rate to drivers, (4) CRST's collections practices, (5) refusing to release drivers' driver training school diplomas, (6) aggressively enforcing the contractual non-competition agreement, and (7) charging a usurious interest rate.

29

drivers, individual issues will not predominate because the amount of the alleged loss should be readily apparent from payroll records or other financial documentation.

However, at least some drivers were never subject to wage deductions or collections efforts (for instance, a driver who left during Phases 1 or 2). Plaintiff has not demonstrated how he could prove such a driver suffered an "ascertainable loss" under Iowa law without individual issues overwhelming common ones.

Defendants also argue that because there is no evidence that CRST made representations of "free" training to any class members aside from Montoya, this cannot be a common issue that predominates over individual issues. However, there is evidence that CRST made promises of "sponsored" or "cover[ed]" training on widely available platforms, including on its website and in its welcome packet for new drivers. Semantics aside, the core theory remains the same: CRST misled drivers about the true costs of the Driver Training Program, in violation of the Consumer Frauds Act. That theory, on its face at least, is amenable to class-wide testing. See Amchem Prods., 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); Lannan v. Levy & White, 186 F. Supp. 3d 77, 90 (D. Mass. 2016) (finding predominance satisfied for consumer-

fraud class based on defendant's "standardized conduct"). It also resembles a theory under which a Consumer Frauds Act class has previously been certified. See Kelly v. Phiten USA, Inc., 277 F.R.D. 564, 567-68 (S.D. Iowa 2011) (certifying class of consumers who purchased defendant's products based on false advertising that products "provid[ed] certain health benefits").

The modified class also satisfies typicality, adequacy, and superiority. Defendants make only a passing effort to dispute these elements. Montoya satisfies the typicality requirement for the reason just discussed. Whether the precise language was "free," "sponsored," or "cover[ed]," Montoya, like the other putative class members, claims to have been harmed by the misrepresentation about the true cost of the Driver Training Program. The Court therefore finds that Montoya fits the bill of typicality.

With respect to adequacy, as above, Defendants point to nothing in the record portending conflict, and they do not challenge the bona fides of Montoya's counsel. Plaintiff has satisfied this element. Further, a class action is a superior method for resolving the consumer-fraud claim for the same reasons as the Iowa wage law claim. Consequently, Plaintiff's motion to certify a class under the Iowa Consumer Frauds Act is **ALLOWED IN PART**, with respect to drivers who faced training-

related wage deductions and/or collections. It is otherwise
**DENIED**.

C.   <u>Iowa Usury Law Claim</u>

Finally, Plaintiff seeks to certify the following class
asserting claims under the Iowa usury law: All individuals who
have signed pre-employment contracts and/or driver employment
contracts with CRST that have provided for an interest rate on
amounts owed at a rate higher than the maximum lawful rate of
interest determined by the Iowa Superintendent of Banking
(ranging between 3.5 percent and 7.25 percent per annum) at any
time since January 21, 2006.

Plaintiff's position is that the 1.5 percent monthly
interest called for in the Training Agreement and Employment
Contract imposes an annual interest rate of 18 percent -- well
in excess of Iowa's maximum allowable rate, which since 2006 has
not exceeded 7.25 percent. Defendants argue that this claim
fails as a matter of Iowa law because all the elements of a
usury claim must exist at the inception of the contract, and
here, both relevant contracts limit the interest to "the maximum
rate permitted by applicable federal and state usury laws." They
also argue that the predominance, superiority, typicality, and
adequacy requirements are not met.

A usury claim under Iowa law has four elements: (1) a loan
or forbearance, either express or implied, of money or of

32

something circulating as such; (2) an understanding between the parties that the principal shall be repayable absolutely; (3) the exaction of a greater profit than is allowed by law; and (4) an intention to violate the law. Kaiser Agr. Chems., Inc. v. Peters, 417 N.W.2d 437, 441 (Iowa 1987) (citing State ex rel. Turner v. Younker Bros., Inc., 210 N.W.2d 550, 555 (Iowa 1973)). The Iowa Supreme Court has held that "a creditor need not actually receive the amount charged in excess of the statutory ceiling to violate the [usury] statute." Id. Defendants rely heavily on language the Kaiser Court used to support this holding, specifically, the notion that the elements of a usury claim "must exist at the inception of the contract, since a contract which in its inception is unaffected by usury cannot be invalidated by a subsequent usurious transaction." Id.

Based on this language, Defendants posit that a creditor could comply with the usury statute by entering into a contract that provides a legal interest rate on a given debt, only to actually seek to collect a usurious interest rate on that debt. That is effectively what Defendants did here, by prescribing an interest rate in the Training Agreement and Employment Contract capped at "the maximum rate permitted by applicable federal and state usury laws," only to later send collection letters demanding 18 percent interest.

It is worth noting that Kaiser did state that a usury claim
requires the unlawful interest rate to "exist at the inception
of the contract." Id. At this stage, whether the transactions
alleged comport with Iowa law is a question common to the
proposed usury class. Perhaps Defendants will ultimately prevail
in their view of Iowa law. But this question is best answered
via a motion for summary judgment, not at class certification.

Given the centrality of this legal question to the merits
of Plaintiff's usury claim, it is perhaps unsurprising that
Defendants have not identified any individual questions that
threaten its predominance. With one caveat. Defendants point out
that over 5,000 members of the putative class have no claim
under the usury statute because they completed the driver
training program and CRST therefore never sought to collect
interest from them. Indeed, CRST never sought to collect a
usurious interest rate from the Phase 4 graduates. Without the
collection letter, the only documents in play are the Training
Agreement and Employment Contract. These contracts are, by their
text, not usurious because they cap the interest rate at the
federal and state maximums. Therefore, the Phase 4 graduates are
eliminated from the proposed class.

Defendants also nominally challenge the usury class on the
grounds of typicality, adequacy, and superiority, but they do
not develop these arguments in any meaningful way, and these

elements do not require further discussion. The Court finds Plaintiff has satisfied them for reasons already discussed.

Accordingly, Plaintiff's motion to certify a class asserting claims under Iowa's usury law is **ALLOWED IN PART**, with respect to the class of drivers who signed the Training Agreement and/or the Employment Contract, received a collection letter, and did not complete Phase 4. It is otherwise **DENIED**.

### ORDER

For the reasons given, Plaintiff's motion to certify a collective action under the FLSA (Dkt. No. 72) is **ALLOWED**. The motion regarding the proposed Iowa wage class (Dkt. No. 72) is **ALLOWED IN PART** and **DENIED IN PART**. The motion to certify a consumer-fraud class (Dkt. No. 95) is **ALLOWED IN PART** and **DENIED IN PART**. The motion to certify a usury class (Dkt. No. 95) is **ALLOWED IN PART** and **DENIED IN PART**.


/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge