# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                       )
JUAN CARLOS MONTOYA,                   )
on behalf of himself and              )
all others similarly situated,        )
                                       )
                  Plaintiff,           )
                                       )
v.                                     )          Civil Action
                                       )          No. 16-10095-PBS
CRST EXPEDITED, INC. and              )
CRST INTERNATIONAL, INC.,             )
                                       )
                  Defendants.          )
_____)

## MEMORANDUM AND ORDER

September 6, 2019

Saris, C.J.

## INTRODUCTION

Juan Carlos Montoya, a long-haul truck driver, alleges that Defendants CRST Expedited, Inc. and CRST International, Inc. underpaid their drivers, misled drivers regarding the costs of driver training, and imposed excessive charges to recoup those costs in violation of the federal Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"), and Iowa law. Montoya brings claims under the FLSA (Count I), Iowa wage law (Count II), the Iowa Consumer Frauds Act (Count III), and Iowa usury law (Count IV). The Court has certified a collective action under the FLSA and three Rule 23 classes for the state-law claims (Docket No.

1

131). The parties now cross-move for partial summary judgment. Defendants seek summary judgment in part on Counts II, III, and IV, and move to narrow the scope of Count I. Montoya moves for summary judgment as to liability on Counts I, II, and III. After hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** CRST's motion for summary judgment (Docket No. 146) and **ALLOWS IN PART** and **DENIES IN PART** Montoya's motions for summary judgment (Docket Nos. 150 and 153).

## BACKGROUND

Unless otherwise noted, the following facts are undisputed.

## I.   CRST's Business Model

CRST Expedited, Inc., CRST International, Inc., and the North American Driver Training Academy ("NADTA") are part of a family of companies that provide trucking services across North America. CRST International, Inc. is a shared services company which provides management services to other CRST companies, while CRST Expedited, Inc. is a long-haul truck carrier which trains people who have never driven a truck before (collectively, "CRST"). NADTA is CRST's own truck driver training school. CRST is incorporated in Iowa and headquartered in Cedar Rapids, Iowa. CRST's human resources and payroll functions are conducted out of Cedar Rapids. CRST is a profitable company.

CRST uses a team-driving approach in which two drivers are assigned to each truck. The United States Department of Transportation ("DOT") regulations specify that a driver may only drive during a period of fourteen consecutive hours after coming on duty following ten consecutive hours off duty. See 49 C.F.R. § 395.3(a). A driver may drive a total of eleven hours during the fourteen-hour period. Id. Under a team-driver approach, driver A drives or performs other work duties while driver B is off duty and resting in the sleeper berth or passenger seat. After driver A has exhausted his on-duty or driving time, the drivers switch and this cycle continues until the truck gets from its origin to its destination. Thus, the team-driver approach allows CRST "to run goods all the way across the country in half the time it takes either a solo team . . . or a company that only assigns one driver to the truck" without violating DOT regulations. Docket No. 151-5 at 12:12-25.

Team driving is "very arduous." Docket No. 151-2 at 65:5. Drivers are in close contact with another person for a long period of time, they do not have much privacy, the truck is in close-to-continuous motion, and the drivers typically go home only once every three weeks or so (whereas, for other trucking companies, drivers can be home at least every week). CRST has difficulty recruiting experienced truck drivers. CRST also has a high employee turnover rate of approximately 160% per year,

3

i.e., for every one hundred truck driving jobs CRST needs to fill each year, it must hire one hundred and sixty drivers. Docket No. 151- 2 at 73:12-73:24. To ensure that it has a sufficient supply of drivers, CRST operates a driver training program. This program only trains drivers who have the intention of becoming employees with CRST. Without the driver training program, CRST likely could not operate as currently configured because it would not have a large enough supply of experienced drivers willing to do team-driving.

## II.   Recruitment

CRST recruits drivers from across the country. CRST's advertisements and recruiting materials advertise "sponsored" or "covered" truck driver training to receive a commercial driver's license ("CDL") and job placement. One advertisement states: "No experience? No Problem! Get paid to train. In as little as three weeks of sponsored training at an approved CRST facility, you'll be on the road, traveling the country, as a professional truck driver." Docket No. 151-7 at 1. Another states: "See the country on our dime. And we'll even cover training." Docket No. 151-7 at 6. In 2013, Montoya received a handwritten postcard from a CRST recruiter which stated in part: "Free CDL training & sign on bonuses!" Docket No. 148-4.

When a potential driver expresses interest in the CRST program, the company sends the individual a welcome packet. The

welcome packet states that CRST "has opportunities for everyone, including: Individuals who need training in order to obtain a Class A CDL." Docket No. 151-9 at 1. Under the heading "Summary of Benefits of Driving for CRST Expedited" the packet states, "CRST will pay the fee for your CDL license – CDL A permit and CDL A License." Id. at 4. Additionally, it states:

> CRST will pre-pay all your school expenses – CRST will pre-pay your tuition and as long as you work for CRST for 10 months, you will not have to repay that tuition! CRST will also prepay your transportation, lodging, physical, and drug-screen. After you have been employed for 6 weeks, you repay these expenses over time as a payroll deduction of $40 per week.

Id. The packet does not disclose the cost of tuition, repayment terms, or the required non-competition provision if a student does not drive with CRST for ten months.

Under the heading "How to Get Your Class A CDL With CRST," the welcome packet lays out two ways for new drivers to pay for training: (1) "Company-sponsored training to get your CDL with an [sic] 10-month contract" or (2) "Prepayment plan to get your CDL with no contract and a higher starting rate of pay." Id. at 5. The packet describes the first option as follows:

> If you need to obtain your class A CDL, but lack the funds to do so, we offer an outstanding company-sponsored training program. With no credit checks! In return, we ask that you work for CRST Expedited for ten months. At the end of ten months, you are free to stay or leave, it's that simple. You will sign an [sic] 10-month contract and be what we call a "contract" student. CRST will not deduct the cost of your training from your paychecks.

5

Id. The packet proceeds to list payroll deductions drivers should expect if they choose this option, including the cost of the bus ticket to school, the DOT-required physical and drug screen, lodging, and a $50 processing fee. The packet explains that the items listed are "paid for by CRST up front," "[p]aycheck deductions will begin after your sixth week of employment with CRST," and "total payroll deductions will not exceed $40 per week for all of these items combined." Id. With respect to the second, prepayment option, the packet explains that the student pays $6,500 prior to starting driver school and "[i]n return, [the driver does] not have to sign any contract and . . . will start driving at a higher rate of pay than a contract student." Id.

## III. **Driver Training Program**

CRST requires most prospective hires to complete its four-phase driver training program.[1] As an overview, Phase 1 consists of a two-to-three day course for drivers to receive their commercial learner's permits (for those who do not already have

---

[1]    Drivers who have already obtained a CDL and have recent and relevant driving experience are not required to participate in the driver training program or sign the pre-employment agreement and driver employment contract. Drivers who obtained training elsewhere and have a CDL but do not have recent driving experience, are required to go through a refresher course, and sign the pre-employment agreement and driver employment contract. For example, Montoya obtained a CDL in 2012, but at the time of his application to CRST in 2014 he did not have recent driving experience. He was still required to sign the pre-employment agreement but only had to participate in a two-week refresher course rather than the three-week driver training school before continuing on to Phase 2.

one) and then approximately two-and-a-half more weeks of school
to earn their CDLs. During Phase 2, drivers attend a CRST-run
orientation at a CRST facility, conducted by CRST employees. The
orientation, which lasts two-and-a-half to three-and-a-half
days, covers CRST policies and procedures, including a road
test. Drivers are <u>not</u> compensated for time spent in either Phase
1 or Phase 2. Upon successful completion of Phases 1 and 2, CRST
puts the driver on payroll, which initiates Phase 3. Phase 3
consists of approximately twenty-eight days of team-driving
where a new driver is matched with a "lead driver" who has at
least six months of driving experience. When the lead driver
determines that the student driver is ready, the student driver
advances to Phase 4 and is matched with a co-driver. Phase 4
consists of an additional (approximately) nine months of team-
driving under contract with CRST. Overall, from November 11,
2013 through March 31, 2017, 25,796 drivers started Phase 1 and
only 5,360 drivers completed Phase 4 of the driver training
program.

  **A.    Phase 1: Driver Training School**

     Before a driver starts Phase 1, CRST initiates several
hiring checks pursuant to DOT and internal hiring guidelines,
including a motor vehicle check, an employment history check,
and a criminal background check. Drivers then attend Phase 1
training at either the CRST-affiliated NADTA in Cedar Rapids,

Iowa, or at an independent certified driver training school with whom CRST partners. Drivers are most frequently sent to NADTA.

Regardless of whether the prospective drivers attend NADTA or the independent driver training schools, CRST recruiters arrange for and pay to transport drivers to Phase 1 training. CRST also provides and pays for drivers' housing during Phase 1. As explained in the CRST welcome packet, in order to go through a driver training program, whether NADTA or the independent driver training schools, prospective drivers must bring with them a driver's license, social security card, immigration documentation, if applicable, "employment documentation," a voided check for direct payroll transfers, and an original birth certificate or passport. Docket No. 151-9 at 6.

1.   *Phase 1 Content*

To receive a CDL in any state, a driver must test for and obtain a commercial learner's permit, hold the learner's permit for a minimum of fourteen days, and then take the test for the CDL. Although states may develop their own tests for commercial learner's permits and licenses, the Federal Motor Carrier Safety Administration sets the minimum standards for testing requirements. The training provided to drivers during Phase 1 is designed to provide them with the knowledge and skills needed to meet the federal CDL testing requirements. Student drivers

receive essentially the same training at any good driving school.

CRST has developed its own curriculum for Phase 1 which is used at NADTA. The classroom training at NADTA includes lessons on federal and state regulations; compliance, safety, and accountability; safe operations; tractor and trailer knowledge; inspections; defensive driving; and personal safety. Phase 1 also includes behind-the-wheel training in which students practice the concepts learned in the classroom. This includes inspections; basic control of equipment; backing, proper set-ups, turns, shifting, coupling and uncoupling; defensive driving; and driving in rural, city, and interstate conditions. CRST shares this curriculum with the driver training schools and "strongly encourage[s]" them to use it. Docket No. 151-2 at 42:23-43:11.

### 2.   *Independent Driver Training Schools*

Independent driver training schools provide training to any driver who wishes to obtain a CDL, not just those individuals seeking employment with CRST. However, CRST has entered into agreements with the schools that address payment, training requirements, hiring, and employment requirements for CRST-affiliated student drivers. CRST's standard agreement with the driver training schools states that the schools will provide a training program with "[c]lassroom and skill facilities,

9

including the training equipment, approved by CRST," and medical providers to administer the DOT-required drug tests and physical examinations. Docket No. 151-14 at 1. Under the heading "Non-Competition," the agreement provides that "[t]he School understands that upon completion of CRST's in-house orientation program, the graduating students will be subject to an [sic] 10-month employment contract." Docket No. 151-14 at 3. The agreement states that the schools also "agree that Students referred to the School[s] by CRST will not be subject to solicitation by other motor carriers interviewing Students at the School[s] for potential truck driving jobs." Docket No. 151-14 at 4. The agreement also provides that "Students not meeting the minimum hiring standards set by CRST shall be brought to the attention of the School Manager, who will dismiss the students from the School." Docket No. 151-14 at 7.

As to fees, CRST will only pay the driver training schools for "completed" students, i.e., those who have successfully completed the training program, obtained a Class A CDL, "[a]rrived at a CRST Orientation facility," and "[s]uccessfully passed the CRST road and written tests, drug test . . . , agility test, and, further, meet the CRST hiring standards and job description." Docket No. 151-14 at 2. The amount that CRST pays driver training schools per "completed" student driver

ranges from $1,400 to $2,500. Since December 2013, the amount
CRST pays NADTA per student has ranged from $1,450 to $2,150.

### 3.   Pre-Employment Agreement

At the beginning of Phase 1, at both NADTA and the
independent driver training schools, student drivers sign a pre-
employment driver training agreement, which governs Phases 1 and
2 of the program. The pre-employment agreement states that
student drivers are not employees and will not be paid for
Phases 1 and 2. It also states that if the driver satisfies the
preliminary requirements for training, CRST will pay, on behalf
of the driver, subject to repayment conditions, "(a) the tuition
charged by the Educational Facility for Student to attend Phase
1, (b) Student's Lodging Cost, (c) Student's Transportation
Cost; and (d) Student's DOT physical and drug screen."[2] Docket
No. 151-15 ¶ 9.  Additionally, if the student driver
successfully completes Phase 1, CRST will advance the lodging
costs and transportation costs for the student driver to attend
Phase 2. Student drivers are notified in the pre-employment
agreement that the amount advanced by CRST in Phases 1 and 2
"will equal or exceed the sum of $2,000." Id. ¶ 11(a).

---

[2]     The lodging cost charged to each driver is an "average" cost of lodging
and does not change based on the actual cost for lodging at that particular
training location, except for drivers who attend training in California. See
Docket Nos. 151-8, 151-43.

The pre-employment agreement provides that if the driver is dismissed or withdraws from the training program during Phases 1 or 2, then he owes the costs advanced by CRST subject to an interest rate "equal to the lesser of 1.5% per month [18% per year] or the maximum rate permitted by applicable federal and state usury laws."[3] Id. ¶ 11(b).

Additionally, student drivers learn in the pre-employment agreement that they will be required to sign a driver employment contract before Phase 3 in order to be employed by CRST. The pre-employment agreement provides that if the driver does not complete the ten-month period of employment required by the driver employment contract (i.e., Phases 3 and 4 of the driver training program), then the driver will owe and immediately must pay to CRST: $6,500 for the driver training school,[4] plus the amounts advanced by CRST on behalf of the driver for the DOT physical and drug screen, lodging costs, and transportation

---

[3]    If the student driver attended Phase 1 at NADTA, then the "tuition" the driver owes to CRST is $4,700. If the student driver attended Phase 1 at an independent driver training school, then CRST does not attempt to collect any tuition from the student, only the other training-related expenses advanced by CRST.

[4]    Montoya refers to this fee as "tuition" but CRST denies that the $6,500 is "tuition" to attend the driver training schools. The $6,500 differs from the $4,700 charged as "tuition" to students who drop out of NADTA before Phase 3. Once student drivers sign the driver employment contract – whether they attended NADTA or an independent driver training school – they are charged $6,500 for training in addition to other expenses if they do not complete Phases 3 and 4.

costs incurred during Phase 1.[5] This total sum owed is subject to the same interest provision in the pre-employment agreement. Prospective drivers do not appear to receive a copy of the actual driver employment contract at the time they have to sign the pre-employment agreement.

Finally, the pre-employment agreement prohibits the driver training school from giving to any student or third party any information related to a student driver's grades, transcripts, or completion of the training until CRST gives the school written notification that the student driver fulfilled his obligations to CRST, including paying all debt owed. For example, if an employer calls to verify the education of a driver who has completed Phase 1 but has not paid CRST the amounts owed, then CRST will not verify their education. It also will not verify the education status of someone who has completed Phase 2 but has not yet signed a driver employment contract with CRST or paid off his debt to CRST. If the driver attends training at NADTA, one of the graduation requirements is that he sign the driver employment contract on the last day of Phase 1. NADTA will not provide a driver with a certificate of

---

[5]     Previously, the driver employment contract was eight months long and charged student drivers $3,950 plus expenses and interest if they did not complete the four-phase program. The contract term was increased from eight months to ten months and from $3,950 to $6,500 on October 27, 2014. These changes were based on an internal analysis by CRST which determined its cost per student to get a contract student through its entire four-phase driver training program was $6,509.

graduation unless he has either signed a driver employment contract with CRST or paid off the debt owed to NADTA for the driver training school.[6] The parties dispute how much time a student driver has to review the pre-employment agreement at the driver training school before he must decide whether to sign.

### 4.   Other Phase 1 Paperwork

During Phase 1 student drivers must also sign an assignment of wages and payroll deduction agreement authorizing CRST to deduct $40 per week from future wages and a release agreement authorizing CRST to request background information from a consumer reporting agency.

Student drivers who need to obtain commercial learner's permits begin Phase 1 in Iowa where they attend a Sunday night welcome meeting. At the meeting, permit students complete the pre-employment agreement and a change of domicile form, and must also sign a letter confirming, "that _____ has accepted employment as a truck driver for CRST Expedited, Inc., subject to specific requirements outlined on the attached domicile form," which include obtaining a Class A CDL license, "[s]uccessfully completing CRST's driver orientation course,"

---

[6]    Similarly, if a driver fails to complete Phases 3 or 4 and has not paid off his debt to CRST, the company will not verify the driver's successful completion of driver training school to a prospective employer or allow a driver to obtain a certificate verifying his completion of driver training school. CRST has instituted legal action against other employers in the trucking industry that have attempted to hire drivers who have completed Phase 1 and/or Phase 2 with CRST but have either not paid off the debt they owe, or not completed their ten-month employment term.

and passing the DOT physical and drug test. Docket No. 151-20 at 1-2.

**B.    Phase 2: CRST Orientation**

After Phase 1, drivers attend CRST's orientation, which is held at a CRST facility, in order to be hired by CRST. Nearly all drivers who complete Phase 2 are hired. For example, from November 11, 2013 through March 31, 2017, of the 13,127 drivers who completed Phase 2 training, 13,037 began employment with CRST. Drivers are not paid for the time they spend in orientation, but CRST advances the costs of housing and transportation for Phase 2.

*1.    Phase 2 Content*

Phase 2 is held primarily in a classroom. The orientation program is always run by CRST employees who use the same materials at every training facility. The orientation is two-and-a-half to three-and-a-half days long depending upon the driver's experience. During the additional day of the three-and-a-half-day orientation, new drivers receive more extensive safety training on topics like hours of service, wellness, and whistleblowing. Approximately 70% of drivers attend the three-and-a-half-day version.

The parties dispute how much of the Phase 2 content is CRST-specific as opposed to universally applicable in the trucking industry. Generally, the orientation consists of new

15

hire paperwork; DOT physicals and drug screenings; information about pre-trip inspections and trip planning; the CRST-specific "Smith System" for driving; training on the Whistleblower Act; training on hours of service and use of the system employed by CRST to log hours; an agility test; briefings from CRST departments regarding hazardous materials, wage rates, safety, customer service, driver benefits and payroll, and student lead driver expectations; training on employment policies; and issuances of employee ID cards and other employment documents.

During orientation, all drivers are also given a new hire packet with health insurance information and acknowledgements regarding CRST employment policies, including a document entitled "Employee Acknowledgements" requiring an "Employee Signature." Docket No. 151-31. The driver handbook states: "You begin your career at CRST with an orientation program emphasizing safety." Docket No. 151-32. It also states: "We are pleased you have become part of our corporation. It is our belief that you will find your employment/contracting with this company to be challenging and rewarding . . . ." Docket No. 151-32.

### 2.   *Driver Employment Contract*

If a driver attends Phase 1 at NADTA, then he must sign a driver employment contract as a condition of graduation. Other

drivers sign the contract at orientation. The term of employment under the contract is ten months.

The contract contains the same payment provisions for amounts owed as the pre-employment agreement.[7] The contract states that the driver acknowledges CRST advanced, in accordance with the pre-employment agreement, "the payment of certain tuition, lodging, transportation and other expenses and fees incurred by" the driver during Phases 1 and 2. Docket No. 151-25 ¶ 7. CRST will deduct up to $40.00 per week from the driver's paycheck as repayment to CRST for these advances. These deductions will continue throughout the driver's employment term until the driver "pays in full the principal amount plus interest accruing at the rate equal to the lesser of 1.5% per month or the maximum rate permitted by applicable federal and state usury laws." Id. at ¶ 7(a).

Additionally, the driver employment contract states that if the driver breaches or is terminated, then the driver will owe and immediately must pay to CRST: (i) $6,500, (ii) the amounts advanced by CRST not yet repaid via paycheck deductions, and (iii) interest "at a rate equal to the lesser of 1.5% per month

---

[7]     However, during the transition from the eight-month/$3,950 contract to the ten-month/$6,500 contract in October of 2014, some individuals, including Montoya, may have signed the old pre-employment agreement but the new driver employment contract.

or the maximum rate permitted by applicable federal and state usury laws." Id. at ¶ 7(b).

The driver employment contract signed by most students also contains a non-competition provision which prohibits drivers from working for any CRST competitor within the continental United States during the ten-month term of the contract, unless the driver pays off the full amount of his debt.[8] If the driver repays the debt, the covenant not to compete immediately lapses. When drivers who are still under contract to CRST attempt to find work with other trucking companies, CRST "notif[ies] carriers who are conducting DOT mandated employment verifications of the existence of the contract," and has commenced litigation against competing carriers who hire student drivers. Docket No. 151-13 at No. 56.

### 3.    Other Phase 2 Paperwork

During orientation, drivers also sign a contingent offer of employment and complete standard employment paperwork, including a Form I-9. The contingent offer reads: "CRST International offers to employ you as an Over-the-Road Driver provided the following conditions are met . . . ." Docket No. 151-26. Drivers

---

[8]    The only states where the driver employment contracts do not include the non-competition provision are California and Oklahoma. See Docket No. 159-8 ¶ 177; see also Docket No. 159-4 at 119:6-14; Docket No. 151-56 (driver employment contracts by state). Between January 2014 and December 2017, approximately 7,618 drivers signed contracts without the non-competition provision whereas approximately 16,369 individuals signed contracts with the restrictive covenants. See Docket No. 159-8 ¶ 178; see also Docket No. 151-57.

also sign additional forms authorizing payroll deductions for amounts advanced by CRST. Drivers also sign international driver acknowledgements/authorizations forms and direct deposit forms for future paychecks.

### C.   Phases 3 and 4: Team-Driving

Upon successful completion of orientation, CRST puts drivers on payroll, which initiates Phase 3. Phase 3 is approximately twenty-eight days of team driving, where a student driver is matched with a "lead driver" who has at least six months of driving experience. When the lead driver determines that the student driver is ready to advance to Phase 4, the student driver is matched with a co-driver for the remainder of the employment term.

#### 1.   Time Logs

During Phases 3 and 4, drivers log their time in four different categories according to DOT regulations: (1) driving time, (2) on-duty time, (3) sleeper berth time, and (4) off-duty time. All time spent at the controls of a commercial motor vehicle is considered driving time. On-duty time is time a driver is working, or is required to be ready for work, except driving time. This includes waiting for dispatch, conducting pre- and post-trip inspections, fueling the truck, and loading and unloading it. On-duty time also includes time drivers spend attending mandatory safety events and taking DOT-required drug

tests. Only time spent in the sleeper berth may be recorded as sleeper berth time. And a driver is off-duty when he is relieved of all duties and responsibilities, such as during meals, breaks, and showers. A driver may also log up to two hours in the passenger seat as off-duty time if it immediately precedes or follows eight consecutive hours in the sleeper berth (other time spent in the passenger seat is considered on-duty). Drivers sometimes log more than eight hours in the sleeper berth during a 24-hour period.

>    *2.   Wage Rates and Payroll*

CRST pays drivers during Phases 3 and 4 using a split-mileage formula. Under the formula, drivers are paid a certain rate-per-mile for half the total mileage covered by the team during a trip. For example, if a team drove 1,000 miles, each driver would be paid for 500 miles at his specific mileage rate, regardless of whether one driver worked more on-duty and driving hours than his co-driver. The split-mileage rates vary based on a driver's length of experience and whether he is a student driver or not. A new student driver without driving experience starts Phase 3 at $0.25 per split mile and works his way up to $0.26 after three months and $0.32 after six months of driving experience.

### 3.   *Deductions*

During Phases 3 and 4, CRST makes various deductions from drivers' paychecks. In Phase 3, CRST deducts $50 for each physical examination or drug screen test, a $50 processing fee, and approximately $27 if a driver chooses to purchase a "map pack" from CRST containing an atlas and a tire gauge.[9] During both Phases 3 and 4, drivers may request pay advances. CRST deducts a $4 wire charge from a driver's pay for each advance.

Beginning in Phase 4, CRST makes deductions from drivers' paychecks for the costs of housing and transportation provided during Phases 1 and 2. These deductions can total hundreds of dollars. For example, opt-in plaintiff Hollingsworth had a total of $255 deducted for transportation and $500 for housing. Similar amounts were deducted from opt-in plaintiff Fogarty's paychecks. If a driver does not complete Phase 4, CRST deducts the remaining amounts owed even if the deductions exceed $40, including the $6,500 training expenses, to the extent possible.

## IV.   **<u>Debt Collection</u>**

To the extent that amounts owed to CRST cannot be repaid via deductions from a driver's last paycheck, or if he drops out of the training program before Phase 3, CRST initiates a post-

---

[9]     The parties dispute exactly how much is deducted for the map pack. CRST contends that it deducts $30 per map pack, paid in four installments of $7.50 each. Johnson and Fogarty had $27 and $24 deducted for the map pack, respectively.

employment collections process.[10] The post-employment collection process for CRST and NADTA is handled by CRST International Inc.'s collections department in Cedar Rapids, Iowa. CRST sends two letters to drivers prior to sending their accounts to a third-party debt collector. The collection letters state that there are two ways to avoid further collection efforts: (1) return to work for CRST and fulfill the remainder of the contract or (2) pay the amount due.

The first letter states that CRST will not release the driver's diploma and school records until it receives payment in full. The letter gives the driver two weeks, after which it states that CRST "may TURN THIS ACCOUNT OVER TO OUR COLLECTION AGENCY. This may affect your current and future credit rating." Docket No. 151-42. Both letters state: "If you cannot pay off the full amount of the loan at this time, we would be willing to accept monthly payments at 18% interest if you comply with the Restrictive Term as stated in your Driver Employment Contract." Docket No. 151-42.

---

[10]    If a driver attends Phase 1 at NADTA but does not begin Phase 3 with CRST, then CRST/NADTA seeks reimbursement for the advances and a $4,700 tuition fee. If a driver attends Phase 1 at an independent driver training school but drops out before Phase 3, then the driver owes CRST for amounts advanced and any tuition CRST paid to the school on the driver's behalf. For any drivers who begin Phase 3 but do not complete the employment term, CRST seeks to collect any remaining balances for the advances and a $6,500 training fee, regardless of where the driver attended Phase 1 driver training.

The pre-employment agreement, driver employment contract, and collection letters all reference interest accruing on the debts owed; however, a CRST employee responsible for collecting debt from student drivers states that he has never collected interest on any account he had worked on.

## PROCEDURAL HISTORY

Montoya filed suit against CRST on January 21, 2016 on behalf of himself and all other similarly situated individuals. In March 2016, CRST moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) or to transfer to the Northern District of Iowa under 28 U.S.C. § 1404(a) (Docket No. 7). Defendants relied primarily upon a forum-selection clause in the driver employment contract which fixes venue in Cedar Rapids, Iowa. After some discovery and a hearing, the Court denied Defendants' motion to dismiss or transfer. See Montoya v. CRST Expedited, Inc., 285 F. Supp. 3d 493, 501 (D. Mass. 2018).

Montoya's first amended complaint raises four causes of action: violation of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (Count I); violation of the Iowa Wage Payment Collection Law, Iowa Code § 91A.1 et seq., the Iowa minimum wage law, Iowa Code § 91D.1, and Iowa Admin. Code § 875-35.2(91A) (Count II); violation of the Iowa Private Right of Action for Consumer Frauds Act, Iowa Code § 714H.1 et seq. (Count III); and violation of Iowa usury laws, Iowa Code § 535.2 (Count IV).

23

Montoya moved for conditional certification of a collective action pursuant to 29 U.S.C. § 216(b) with respect to the FLSA claims (Count I). He also moved for class certification under Federal Rule of Civil Procedure 23 for the Iowa law claims (Counts II-IV). On May 24, 2018, this Court certified the following four classes:

> Collective Action under the FLSA: all individuals who have participated as contract drivers in any phase of CRST's Driver Training Program, at any time since December 22, 2013.
>
> Iowa Wage Law Class: all individuals who have participated as contract drivers in Phase 1 or Phase 2 of CRST's Driver Training Program in Iowa at any time since January 21, 2014.
>
> Iowa Consumer Fraud Class: all individuals who have participated as contract drivers in any phase of CRST's Driver Training Program at any time since January 21, 2014 and faced training-related wage deductions and/or collections.
>
> Iowa Usury Law Class: all individuals who have signed pre-employment contracts and/or driver employment contracts with CRST that provided for an interest rate on amounts owed at a rate higher than the maximum lawful rate of interest determined by the Iowa Superintendent of Banking (ranging between 3.5 percent and 7.25 percent per annum) at any time since January 21, 2006, who received a collection letter, and who did not complete Phase 4 of the Driver Training Program.

See Montoya v. CRST Expedited, Inc., 311 F. Supp. 3d 411, 419-27 (D. Mass. 2018). The parties have completed fact discovery, other than discovery of FLSA opt-in plaintiffs, experts, and class damages, and now cross-move for partial summary judgment.

CRST moves for summary judgment on Counts II, III, and IV, and to narrow the scope of the FLSA claim in Count I (Docket No. 146). Montoya moves for summary judgment as to CRST's liability for certain practices related to Counts I, II, and III (Docket Nos. 150 and 153).

**LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute precludes summary judgment if it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quotation omitted). "[C]onclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment. See Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted).

When ruling on a motion for summary judgment, a court views the facts "in the light most favorable to the nonmovant," and draws all reasonable inferences "in that party's favor." Ameen

v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 68 (1st Cir. 2015) (quotation omitted). When parties cross-move for summary judgment, a court evaluates each motion "separately, drawing inferences against each movant in turn." Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 21 (1st Cir. 2018) (quotation omitted).

The moving party is responsible for "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet this burden "either by offering evidence to disprove an element of the plaintiff's case," if the defendant is the moving party, "or by demonstrating an 'absence of evidence to support the non-moving party's case.'" Rakes v. United States, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting Celotex, 477 U.S. at 325). If the moving party shows the absence of a disputed material fact, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256 (quoting Fed. R. Civ. P. 56(e)). A court denies summary judgment "if the nonmoving party adduces competent evidence demonstrating the existence of a genuine dispute about a material fact." Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

**DISCUSSION**

I.  **Counts I and II: FLSA and Iowa Wage Claims**

   A.   **Are Drivers Employees of CRST During Phases 1 and 2?**

The parties agree that student drivers are employees of CRST during Phases 3 and 4 of the training program. Both parties cross-move for summary judgment as to whether the drivers are "employees" under the FLSA and Iowa wage law during Phases 1 and 2 of the training.

   *1.  Legal Standard*

Under the FLSA employers must pay employees a minimum hourly wage for all hours worked. See 29 U.S.C. § 206(a). The FLSA defines "employee" as "any individual employed by an employer." Id. § 203(e)(1). To "employ" is "to suffer or permit to work." Id. § 203(g). These broad definitions are intended to be "comprehensive enough" to include "working relationships, which prior to [the FLSA], were not deemed to fall within an employer-employee category." Rutherford Food Corp. v. McComb, 331 U.S. 722, 729 (1947) (citing Walling v. Portland Terminal Co., 330 U.S. 148, 150 (1947)). "Without doubt [the FLSA] covers trainees," but not all trainees are "employees" under the FLSA. Portland Terminal, 330 U.S. at 151; see also Walling v. Nashville, C. & St. L. Ry., 330 U.S. 158, 159 (1947) (companion case).

In the seminal case of <u>Portland Terminal</u>, the Supreme Court considered whether the plaintiffs, who participated in a free, seven-to-eight-day, practical training course for prospective railroad yard brakemen, were "employees" under the FLSA. See 330 U.S. at 150. The Court emphasized that the trainees did not displace regular employees; their training impeded, rather than expedited, the railroad's business; there was no expectation or understanding of compensation; there was no guarantee of employment; and the training they received "most greatly benefit[ted] the trainees" rather than the railroad. <u>Id.</u> at 149-53. The Court suggested that, had the "trainees taken courses in railroading in a public or private vocational school, wholly disassociated from the railroad, it could not reasonably be suggested that they were employees of the school within the meaning of the [FLSA]." <u>Id.</u> at 152-53. Because the railroad received no "immediate advantage" from the trainee's work, the Court concluded that the trainees were not employees under the FLSA. <u>Id.</u> at 153. In so deciding, the Court was cognizant "that such a holding may open up a way for evasion of the law," but did not find in that case that the "arrangements were either conceived or carried out in such a way as to violate either the letter or the spirit of the minimum wage law." <u>Id.</u>

Since then, the Supreme Court has further elaborated that the "test of employment under the [FLSA] is one of 'economic

reality.'" <u>Tony & Susan Alamo Found. v. Sec'y of Labor</u>, 471 U.S. 290, 300-01 (1985) (affirming that "associates" who worked for a religious foundation and received in-kind benefits such as food, clothing, and shelter in exchange for their services for the foundation's commercial activities, were employees under the FLSA despite their vehement protests that they were not employees and did not expect compensation).

The First Circuit has not directly addressed what factors to consider in determining whether a trainee is an employee under the FLSA. <u>See</u> <u>Ballou v. Gen. Elec. Co.</u>, 433 F.2d 109, 111-12 (1st Cir. 1970) (holding that journeymen were not entitled to compensation for attending a required training program outside of work hours under the Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-62 because of their "status as students"); <u>see also</u> <u>Bienkowski v. Northeastern Univ.</u>, 285 F.3d 138, 141-42 (1st Cir. 2002) (concluding under the Portal-to-Portal Act that probationary employees were not entitled to compensation for taking a course to become certified emergency medical technicians). The First Circuit has simply stated that under <u>Portland Terminal</u>, "employers who furnished training to <u>potential</u> employees [are] not required under the FLSA to compensate trainees for time spent in the training program," but has not provided guidance for when potential employees are

employees under the FLSA. <u>Bienkowski</u>, 285 F.3d at 141. So the
Court looks to other sources for guidance.

Relying on <u>Portland Terminal</u>, the United States Department
of Labor ("DOL") has identified six criteria for determining
whether a trainee is an "employee" under the FLSA:

> 1. The training, even though it includes actual
> operation of the facilities of the employer, is
> similar to that which would be given in a vocational
> school.
>
> 2. The training is for the benefit of the trainees.
>
> 3. The trainees do not displace regular employees, but
> work under close observation.
>
> 4. The employer that provides the training derives no
> immediate advantage from the activities of the
> trainees; and on occasion his operations may actually
> be impeded.
>
> 5. The trainees are not necessarily entitled to a job
> at the conclusion of the training period.
>
> 6. The employer and the trainees understand that the
> trainees are not entitled to wages for the time spent
> in training.

<u>See</u> U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2001
WL 1558755, at *1-2 (Jan. 30, 2001) (citing <u>Portland Terminal</u>,
330 U.S. 148). The Department applies the criteria strictly, so
that only if <u>all</u> six criteria apply are trainees <u>not</u> employees
under the FLSA. <u>See</u> U.S. Dep't of Labor, Wage & Hour Div., Field
Operations Handbook, ch. 10b11 (2017).[11]

---

[11]     Although the Field Operations Handbook is non-binding, the Court may
consider it as persuasive authority. <u>See</u> <u>Newman v. Advanced Tech. Innovation
Corp.</u>, 749 F.3d 33, 37 (1st Cir. 2014).

Nevertheless, courts have rejected a rigid application of the six criteria, deeming them "relevant but not conclusive" as to whether trainees are employees under the FLSA. Reich v. Parker Fire Prot. Dist., 992 F.2d 1023, 1026-27 (10th Cir. 1993); see also Solis v. Laurelbrook Sanitarium & Sch., Inc., 642 F.3d 518, 526 n.2 (6th Cir. 2011) ("While the Court's recitation of the facts [in Portland Terminal] included those that resemble the [DOL's] six factors, the Court gave no indication that such facts must be present in future cases to foreclose an employment relationship." (internal citation omitted)). Instead, courts look to the totality of the circumstances of the training relationship. See, e.g., Boucher v. Shaw, 572 F.3d 1087, 1091 (9th Cir. 2009).

Many courts have held that the principal inquiry is whether the trainee or putative employer is the "primary beneficiary" of the training program. See Velarde v. GW GJ, Inc., 914 F.3d 779, 785 (2d Cir. 2019); Benjamin v. B & H Educ., Inc., 877 F.3d 1139, 1147 (9th Cir. 2017); Harbourt v. PPE Casino Resorts Md., LLC, 820 F.3d 655, 659 (4th Cir. 2016); Glatt v. Fox Searchlight Pictures, Inc., 811 F.3d 528, 536 (2d Cir. 2016); Schumann v. Collier Anesthesia, P.A., 803 F.3d 1199, 1203, 1209-10 (11th Cir. 2015); Solis, 642 F.3d at 529; McLaughlin v. Ensley, 877 F.2d 1207, 1209 & n.2 (4th Cir. 1989). But see Nesbitt v. FCNH, Inc., 908 F.3d 643, 647 (10th Cir. 2018) (declining to apply the

31

primary beneficiary test because assessing the six criteria already "relies on the totality of the circumstances and accounts for the economic reality of the situation").

By assessing "(1) the benefits of [the] relationship to the individual, (2) the benefits derived from that relationship by the putative employer, and (3) the expectations of the parties," the primary beneficiary test "seeks to assess the relative dominance in the relationship between host institution and the individual claiming employee status." Velarde, 914 F.3d at 785. The six criteria are still, of course, relevant to the analysis and guide the inquiry but the primary beneficiary test is best able to "capture[] . . . [the] economic realities in the student/employee context." Benjamin, 877 F.3d at 1147; see also Velarde, 914 F.3d at 785 ("[T]he goal of the primary beneficiary test is to balance flexibly the benefits received by the student and the economic realities of the student-entity relationship . . . ."). The Court flexibly considers both the six DOL factors and the primary beneficiary test to determine whether student drivers are employees in Phases 1 and 2.

> 2.  *Phase 1 Analysis*

Most of the DOL's factors militate in favor of finding that the student drivers are not employees under the FLSA. The content of the training provided in Phase 1 is similar to training given in a vocational school (factor one). It includes

32

both classroom and behind-the-wheel training, with an eye towards covering the knowledge and skills students need to pass a CDL exam. The topics covered have broad applicability in the industry and are addressed at any good driver training school. While NADTA creates its own curriculum, the fact that CRST sends drivers to both NADTA and independent driving training schools indicates that the content of Phase 1 is geared towards acquiring a CDL.

The training is for the benefit of the student drivers (factor two). The CDL that a student driver tests for at the conclusion of Phase 1 is not CRST-specific and is transferable to other commercial trucking jobs. See Harbourt, 820 F.3d at 660 (recognizing "the importance of the transferability of the training received when balancing who -- employer or trainee -- benefitted most from the training").

The student drivers do not perform work that would otherwise be performed by employees and do not displace regular employees (factor three). While Phase 1 produces a qualified and valuable labor pool for CRST to draw from, the training does not provide an "immediate advantage" to CRST (factor four). See Petroski v. H & R Block Enter., LLC, 750 F.3d 976, 980-81 (8th Cir. 2014); Reich, 992 F.2d at 1028; Donovan v. Am. Airlines, Inc., 686 F.2d 267, 271-72 (5th Cir. 1982); Otico v. Haw. Airlines, Inc., 229 F. Supp. 3d 1047, 1051 (N.D. Cal. 2017).

As for the expectations of the students, the pre-employment agreement contains clear language such that student drivers understand that they will not receive compensation for Phase 1 and CRST does not consider them employees at that time (factor six). Cf. Am. Airlines, 686 F.2d at 269 n.3 ("An employee cannot waive FLSA benefits so this agreement is material only insofar as it shows the expectations of trainees.").

Only one factor supports a finding that the student drivers are employees during Phase 1 – that they are entitled to employment at the conclusion of the training program (factor five). The welcome packet states that CRST "train[s] students to become professional drivers" and "[i]f you need to obtain your class A CDL, but lack the funds to do so, we offer an outstanding company-sponsored training program. . . . In return, we ask that you work for CRST Expedited for ten months." Docket No. 151-9 at 5. The pre-employment agreement, which students sign at the beginning of Phase 1, lists non-exclusive preconditions for students to become employees with CRST, including executing the driver employment contract and successfully completing Phases 1 and 2. See Docket No. 151-15 ¶¶ 4-5. The agreement reminds students that CRST requires students to work for ten months in order to pay off training expenses. Additionally, CRST requires students to bring employment documents to Phase 1 and sign an assignment of wages

and payroll deduction form during Phase 1. Students that attend
Phase 1 at NADTA must sign the driver employment contract as a
condition of graduation. Drivers who need commercial learner's
permits before testing for their CDLs sign not only the pre-
employment agreement, but also a change of domicile form and a
letter stating: "This letter is to confirm that _____ has
accepted employment as a truck driver for CRST Expedited, Inc.,
subject to specific requirements . . . ." Docket No. 151-20 at
1-2. The letter confirms that the company puts drivers through
Phase 1 in order for them to work for CRST.

The question of whether Phase 1 students are employees is
closer under the "primary beneficiary" test. The team-driving
approach CRST uses to transport goods produces a high employee
turnover rate and makes it difficult to recruit experienced
truck drivers. Through the driver training program, CRST ensures
it has a sufficient supply of drivers for the team-driving
model, which allows it to deliver goods across the country in
half the time it takes a solo driver. To put pressure on the
student drivers to accept employment, CRST withholds a student's
driving school diploma until he either fulfills a ten-month
driving contract with CRST or pays the debt owed to CRST for
advances during Phase 1. Without the driver training program,
CRST likely could not operate as currently configured because it

"would be completely changing the business model." Docket No. 151-2 at 67:6-21. It greatly benefits from the training program.

A "dilemma arises" where, as here, both the student and the employer obtain significant benefits from the training. Schumann, 803 F.3d at 1211. CRST relies heavily on American Airlines to support its argument that its Phase 1 students are not employees. There, prospective flight attendants participated in a free, 4-to-5 week training program that included both knowledge generally applicable to all airlines and American Airlines-specific procedures and policies. See Am. Airlines, 686 F.2d at 269. A "major part" of the training was "devoted to meeting the Federal Aviation Administration (FAA) requirements applicable to all flight attendants." Id. The Fifth Circuit, affirming judgment for the airline, found that, "[a]lthough training benefits American by providing it with suitable personnel, the trainees attend school for their own benefit, to qualify for employment they could not otherwise obtain," and that "American did not receive immediate benefit from the trainees' activities" because they could not be "productive" until after training. Id. at 272.

Montoya points to the recent decision by the Fourth Circuit in Harbourt to argue that CRST received the primary advantage. In that case, in response to the legalization of gambling in Maryland, the defendant-casino planned to begin offering table

games as soon as the state allowed. See Harbourt, 820 F.3d at 657. However, the casino needed to hire approximately 830 new dealers by opening day. See id. The casino developed a free, twelve-week "dealer school" in conjunction with a local community college and began advertising employment opportunities. Id. The casino authored all course materials, casino employees provided all course instruction, the course material was casino-specific, and attendees completed employment forms during the training. Id. at 657-68. In reversing the district court's dismissal of the FLSA claims, the Fourth Circuit rejected the argument that the casino could not be the primary beneficiary of the training because trainees did not perform work for the casino during the school. See id. at 659-61. The court "specifically recognized the importance of the transferability of the training received" and highlighted that the training was specific to the casino and arguably not transferable. Id. at 660.

Montoya argues here that because CRST withholds diplomas until student drivers either work for ten months or pay off their debt, the education received in Phase 1 is not transferable. However, the content in Phase 1 is the kind of general, educational information a driver would receive in any driver training school. While CRST develops its own curriculum, independent driver training schools are not required to use it,

and the goal of the training is to have students pass their licensing exams or refresh their safe driving knowledge. That training is easily transferable.

Montoya stresses that unlike the free training provided in American Airlines or Harbourt, Phase 1 is not a stand-alone vocational program nor a free pre-employment training program in which trainees may choose whether to work for the company or a competitor. Through its non-competition provision and debt collection practices, CRST creates economic pressure that forces student drivers into its employ. Because CRST has economic dominance in the relationship, Montoya argues, it is the primary beneficiary. While the degree of CRST's economic leverage over students is troubling, the caselaw, and the First Circuit's holdings in Ballou and Bienkowski interpreting a similar statute, support CRST's argument that despite its economic dominance, providing prospective employees with training that is valuable and transferable does not convert students in Phase 1 into employees under the FLSA.

### 3.   Phase 2 Analysis

The DOL's factors in Phase 2 weigh in favor of a determination that the drivers are employees. Most importantly, much of the training in Phase 2 is unique to CRST (factor one). While some is federally mandated, the content of Phase 2 differs

markedly from the education provided in Phase 1 to prepare
drivers to test for their CDLs.

CRST argues that Phase 2 benefits the drivers because most
of the content of orientation provides drivers with knowledge
and skills that are generally applicable to the trucking
industry (factor two). CRST's manager for orientation estimates
that approximately two-thirds to three-quarters of content
during Phase 2 is universally applicable compared to only about
one-quarter to one-third that is specific to CRST. CRST's own
color-coded orientation schedule belies this assertion. Of the
three-and-a-half-day orientation, more than half is dedicated to
administrative requirements, hiring-related information, CRST
guest speakers providing company-specific information, and other
CRST-specific trainings. See Docket No. 151-32 at 7. Most of the
remaining time is spent in federally required training, and
driver qualification tests. The content of the orientation bears
little resemblance to a general vocational or educational
program and is much more akin to standard employee on-boarding.
Although drivers derive some benefit from the further training
they receive, they do not gain an additional certification or
diploma that would be easily transferable.

Certain factors weigh against employee status. The drivers
still do not displace regular workers (factor three) and,
because they do not perform work for CRST, provide no immediate

advantage (factor four). But CRST treats drivers as employees
during Phase 2 orientation (factor 5). Both drivers and CRST
expect that anyone who attends the orientation will drive for
CRST. The driver handbook, which all drivers are given during
orientation, begins with a letter from Mike Gannon, President of
CRST International, which states:

> Welcome to CRST. It gives me great pleasure to welcome
> you, the professional driver, to the Gold Team!
>
> ...
>
> You begin your career at CRST with an orientation
> program emphasizing safety.
>
> ...
>
> In closing, it is with great pride I welcome you to a
> company I have called home for over 25 years. You have
> chosen a financially stable company that is an
> industry leader in providing expedited transportation.

Docket No. 151-32 at 2. A few pages later the handbook states,
"[w]e are pleased you have become a part of our corporation."
Id. at 5; see also Julian v. Swift Transp. Co., 360 F. Supp. 3d
932, 942 (D. Ariz. 2018) (noting that internal manuals referring
to "[n]ewly hired" individuals weighed in favor of finding
drivers were employees and not "merely job applicants"). During
orientation, drivers sign the driver employment contract (if
they have not done so already), a contingent offer of
employment, standard employment paperwork, and a deduction
authorization form. Drivers must also sign a form containing

40

employee acknowledgements that requires an "Employee Signature." While drivers are not promised compensation for orientation, CRST has presented "no credible evidence that a person who completed the training was not subsequently hired," which suggests that drivers should be considered employees from the beginning of Phase 2. See McLaughlin v. Ensley, 877 F.2d 1207, 1210 (4th Cir. 1989).

The primary beneficiary of Phase 2 is CRST. CRST derives a great benefit teaching drivers CRST specific-policies without compensation. The orientation does not impede CRST's business and provides an express lane for getting drivers on the road. Arguing that drivers are not employees in Phase 2, CRST again cites to the pre-employment training program in American Airlines. What distinguishes Phase 2 from the training program in that case is the economic reality of the relationship between student drivers and CRST. While training was free for flight attendants in American Airlines, and the airline provided free meals and housing, in this case drivers have already incurred significant debt for educational services by Phase 2. They must complete Phase 2 in order to begin paying their debt back for Phase 1 through an employment contract. Based on the undisputed facts in the record, drivers in the FLSA collective action are "employees" under the FLSA for Phase 2.

41

### 4.   *Iowa Wage Laws (Count II)*

Under the Iowa Wage Payment Collection Law ("IWPCL"), Iowa Code § 91A et seq., an employer is obligated to pay "all wages due its employee." Id. § 91A.3. Iowa's Minimum Wage Law, Iowa Code § 91D.1, provides that "[e]very employer, as defined in the [FLSA] . . . shall pay to each of the employer's employees, as defined in the [FLSA] . . . the state hourly wage," which currently is the same as the federal minimum wage ($7.25 per hour). Iowa wage law looks to caselaw interpreting the FLSA. Cf. Bouaphakeo v. Tyson Foods, Inc., 564 F. Supp. 2d 870, 883 (N.D. Iowa 2008) ("[T]he FLSA may be used to establish an employee's right to a certain amount of wages under the IWPCL and an employer's violation of the IWPCL for not paying all wages due its employees." (quotation omitted)). Therefore, the drivers who are part of the Iowa wage class are not employees during Phase 1 and are employees during Phase 2 under Iowa wage law.

### B.   **Does CRST's Compensation System in Phases 3 and 4 Violate the FLSA? (Count I)**

Both parties move for summary judgment with respect to certain deduction and payment practices during Phases 3 and 4 of the driver training program. Montoya claims, and CRST contests, that (1) the deductions from drivers' pay are unlawful, (2) CRST's post-employment collection from drivers violates the

42

FLSA, (3) sleeper-berth time and other off-duty time is compensable, and (4) CRST's split-mile formula results in minimum wage violations.

       1.   *Deductions from Drivers' Pay*

The FLSA requires employers to provide employees' wages, in cash or facilities, "free and clear" of improper deductions and kickbacks to the employer. 29 C.F.R. § 531.35. Employers are prohibited from charging employees expenses "if such expenses would drive the employee's pay below minimum wage." United States v. Gordon, 852 F.3d 126, 139 n.14 (1st Cir. 2017). "The only statutory exception to this requirement is set forth in 29 U.S.C. § 203(m), which allows an employer to count as wages the reasonable cost 'of furnishing [an] employee with board, lodging, or other facilities . . . .'" Arriaga v. Fla. Pac. Farms, L.L.C., 305 F.3d 1228, 1235 (11th Cir. 2002) (quoting 29 U.S.C. § 203(m)). DOL regulations define "reasonable cost" as used in § 203(m) to be "not more than the actual cost to the employer of the board, lodging, or other facilities," 29 C.F.R. § 531.3(a), and to "not include a profit to the employer or to any affiliated person," 29 C.F.R. § 531.3(b). Reasonable deductions for board, lodging, or other facilities may lower an employee's cash wages below the minimum wage. See Rivera v. Peri & Sons Farms, Inc., 735 F.3d 892, 897 (9th Cir. 2013).

"Facilities 'primarily for the benefit or convenience of the employer' do not count as 'other facilities' [under § 203(m)] and are not included in the wage calculation." Id. (quoting 29 C.F.R. § 531.3(d)(1)). Therefore, "[a]n employer may not deduct from employee wages the cost of facilities which primarily benefit the employer if such deductions drive wages below the minimum wage." Arriaga, 305 F.3d at 1236. "This rule cannot be avoided by simply requiring employees to make such purchases on their own, either in advance of or during the employment." Id.

DOL regulations provide "a list of facilities found . . . to be primarily for the benefit [or] convenience of the employer," which includes tools of the trade and uniforms. 29 C.F.R. § 531.3(d)(2). "[E]xpenses which are primarily for the benefit of the employee, and therefore constitute other facilities, include: meals; dormitory rooms; housing; merchandise from company stores such as 'food, clothing, and household effects'; and fuel, electricity, water and gas 'furnished for the noncommercial personal use of the employee.'" Arriaga, 305 F.3d at 1236 (quoting 29 C.F.R. § 531.32(a)). Certain costs "categorically are either for the benefit of the employee or the employer," while others are "more nuanced" and fact-specific. Id. at 1243. The dividing line is "whether the employment-related cost is a personal expense that would arise

44

as a normal living expense." Id. If a normal expense, then it may qualify as "other facilities" and the cost may be deducted from employee wages, even if it drives pay below the minimum wage.

    a.   Loans for Phase 1

As an initial matter, CRST argues that § 203(m) does not apply to deductions for loans or advances drivers incur while students in Phases 1 and 2. See U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2004 WL 3177896, at *1 (Oct. 8, 2004) ("[W]here an employer makes a loan or an advance of wages to an employee, the principal may be deducted from the employee's earnings even if such deduction cuts into the minimum wage . . . due the employee under the FLSA."); see also Field Operations Handbook, ch. 30c10(b). However, trainees are not employees in Phase 1, so any loan CRST provides to students in Phase 1 for lodging, transportation, tests, the $50 processing fee, etc., is not a loan from an employer to an employee. CRST may not deduct these loans from drivers' wages to the extent they bring wages below minimum wage. See Arriaga, 305 F.3d at 1236.

This includes the $6,500 training fee CRST seeks to deduct from employees' final paychecks if they do not complete the ten-month employment term. This training fee -- or "tuition" -- was not furnished by an employer to an employee. The training expense cannot be deducted from an employee's final paycheck to

45

Case 1:16-cv-10095-PBS   Document 194   Filed 09/06/19   Page 46 of 80

the extent it brings pay below minimum wage. See Gordon v. City of Oakland, 627 F.3d 1092, 1093 n.1 (9th Cir. 2010) ("The City conceded at oral argument that it would have violated the minimum wage provisions of the FLSA had it . . . withheld [the employee's] entire final paycheck in satisfaction of her debt [for training]."); Heder v. City of Two Rivers, 295 F.3d 777, 778-79, 782-83 (7th Cir. 2002) (holding an employee was entitled to at least minimum wage for his final two pay periods, which the city had previously withheld as payment for training costs and other liquidated damages when he did not complete his employment term).

           b.   Wire Charges

CRST deducts $4 anytime a driver requests a pay advance. These deductions do not qualify as "other facilities" under § 203(m) and are not properly counted towards wages. See Field Operations Handbook, ch. 30c10(b) ("Deductions for interest or administrative costs on the loan or advance are illegal to the extent that they cut into the minimum wage or overtime pay."). While CRST argues that the $4 wire charge benefits the employee who requests a pay advance, the charge is an administrative cost. Thus the $4 wire charges are unlawful deductions to the extent they reduce drivers' pay below minimum wage.

c.   Drug Test and Physical Exam Charges

Some drivers are subject to drug tests and physical screens during Phase 2. CRST argues that because the tests are required by federal law, they are primarily for the benefit of the driver's future employment.[12] A DOL opinion letter differentiates between drug tests required prior to an offer of employment and those required to continue employment:

> It is our position that an employer may not require an employee to pay for the cost of obtaining a physical that is required by the employer for the employee to <u>continue</u> employment if doing so cuts into any statutorily-required minimum wage . . . . We also consider the time spent in obtaining such a physical examination as compensable hours of work.

U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2001 WL 1558768, at *4 (Feb. 16, 2001). Because drivers are employees during Phase 2 orientation, such tests are for the benefit of the employer, not a pre-employment or normal living expense. Therefore, CRST may not deduct the costs of drug screens or physicals from driver pay to the extent they cut into minimum wage. See <u>Moodie v. Kiawah Island Inn Co.</u>, 124 F. Supp. 3d 711, 720 (D.S.C. 2015) (holding that medical testing was primarily for the benefit of the employer when prospective employees were requires to undergo testing in order to obtain their visas).

---

[12]   <u>See</u> 49 C.F.R. § 382.301 (requiring an employer to receive a negative pre-employment drug test result before letting a driver operate a commercial motor vehicle); <u>Id.</u> § 391.41 (requiring drivers to be "medically certified as physically qualified" to operate a commercial motor vehicle).

d.    Map Pack

Montoya objects to deductions taken for the map pack drivers may purchase from CRST during Phase 2. Tools of the trade are considered to be for the benefit or convenience of the employer, so the employer violates the FLSA "in any workweek when the cost of such tools purchased by the employee cuts into the minimum . . . wages required to be paid under the Act." Arriaga, 305 F.3d at 1237 n.10. CRST responds that a driver is not required to purchase a map pack or bring his own atlas and tire gauge to use while on the job because each truck is equipped with a GPS system.

Regardless, a tire gauge and atlas are "tools of the trade which will be used in or are specifically required for the performance of the employer's particular work." 29 C.F.R. § 531.35. They are used primarily for the benefit of CRST, are not normal living expenses, and their cost cannot be deducted from drivers' pay to the extent it reduces pay below the minimum wage.

e.    Transportation to Phase 2

CRST books and pays for transportation for drivers to attend Phase 2, which it then deducts from drivers' paychecks during Phases 3 and 4. Transportation expenses are primarily for the benefit of the employer and therefore not considered "other facilities" under § 203(m) "where such transportation is an

48

incident of and necessary to the employment." 29 C.F.R.
§ 531.32; see also Field Operations Handbook, ch. 30c03(a)(3)
("[T]ransportation which is an incident of or necessary to the
employment is not an 'other facility.'").

Transportation to centralized locations to begin CRST's
onboarding process in Phase 2 is "an incident of and necessary
to the employment." Even though the transportation expense
occurs prior to the employment relationship, CRST may not avoid
the expense if it is primarily for its benefit. See Arriaga, 305
F.3d at 1242 n.17 ("Such a position would permit employers to
avoid expenses primarily for their benefit simply by making them
a requirement of employment, which would allow an end-run around
the FLSA."). "Transportation costs -- aside from regular
commuting costs -- are nothing like board or lodging" and would
normally not be considered "other facilities." Id. at 1242; see
also Shultz v. Hinojosa, 432 F.2d 259, 267 (5th Cir. 1970) ("We
conclude that as used in the statute, the words 'other
facilities' are to be considered as being in pari materia with
the preceding words 'board and lodging.'"). But cf. Castellanos-
Contreras v. Decatur Hotels, LLC, 622 F.3d 393, 402-03 (5th Cir.
2010) (holding that company was not required to reimburse
inbound travel expenses for workers with H-2B visas). This is
not an ordinary commuting expense that a worker would incur in
daily life. Therefore, transportation costs to the Phase 2

orientation are not "other facilities" under § 203(m) and cannot be deducted to the extent they lower drivers' pay below minimum wage.

       f.   Lodging During Phase 2

Section 203(m) allows an employer to count as wages the reasonable cost of furnishing an employee with board, lodging, or other facilities. "Lodging, like meals, is ordinarily considered for the benefit and convenience of the employee." Field Operations Handbook, ch. 30c03(a)(2). DOL regulations provide that to claim a wage credit for lodging, an employer must ensure that:

> 1. The lodging is regularly provided by the employer or similar employers, 29 C.F.R. § 531.31;
>
> 2. The employee voluntarily accepts the lodging, 29 C.F.R. § 531.30;
>
> 3. The lodging is furnished in compliance with applicable federal, state, or local law, 29 C.F.R. § 531.31;
>
> 4. The lodging is provided primarily for the benefit of the employee rather than the employer, 29 C.F.R. § 531.3(d)(1); and
>
> 5. The employer maintains accurate records of the costs incurred in furnishing the lodging, 29 C.F.R. § 516.27(a).

Balbed v. Eden Park Guest House, LLC, 881 F.3d 285, 288–89 (4th Cir. 2018). Montoya argues that CRST should not be able to claim a wage credit for lodging because it was not provided primarily for the benefit of the drivers, and CRST did not maintain

accurate records of the costs involved. However, "while it may
be to the employer's advantage to provide such facilities at or
near the worksite, courts have consistently taken the view that
the employer may take a wage credit when the facilities are
primarily for the benefit or convenience of the employee." Field
Operations Handbook, ch. 30c03(a)(2). Providing lodging near
Phase 2 is a convenience afforded to the drivers and is covered
by § 203(m).

However, there is a factual dispute as to whether the costs
are "reasonable." The welcome packet alerts student drivers that
the average cost of housing during Phases 1 and 2 is $150 per
week. CRST asserts that it charges $160 per week for facilities
outside of California and $165 per week for lodging in
California, which are the averages for lodging and not the
actual costs. The $160 rate is an average, and not the actual
cost of lodging, across CRST's training locations. However, it
does not appear that CRST actually charges $160 per week. For
example, opt-in plaintiff Ronnie Fogarty was placed in an Iowa
hotel for three weeks during training, which charged CRST a
total of $1096.16 for those nights. CRST deducted $525 from
Fogarty's wages and, when he did not complete his employment
term, sent him a collection letter for the remaining $575.[13] The

---

[13]    Montoya authorized $320.00 be deducted from his wages for housing
costs. When he left employment with CRST during Phase 3, the company demanded
$320.00 for housing costs.

cost exceeds what drivers anticipated being charged, calling
into question both reasonableness and voluntariness. While
reasonable lodging costs may be counted as "wages" under
§ 203(m), this fact dispute precludes summary judgment on the
issue.[14]

### 2. Post-Employment Collections

Montoya argues that CRST's post-employment collection of
outstanding debt from a driver violates the FLSA as an unlawful
deduction or "kick-back." "The wage requirements of the [FLSA]
will not be met where the employee 'kicks-back' directly or
indirectly to the employer . . . the whole or part of the wage
delivered to the employee." 29 C.F.R. § 531.35. Montoya asserts
that collecting training, housing, and other expenses from
drivers after they leave employment with CRST violates the
FLSA's requirement to pay wages "free and clear." See Stein v.
HHGREGG, Inc., 873 F.3d 523, 535 (6th Cir. 2017) ("[I]t would be
unlawful for an employer to require an employee to return wages
already 'delivered to the employee.'").

The collection of pre-employment expenses incurred during
Phase 1 is not an unlawful kickback. See Gordon, 627 F.3d at
1093, 1096 (upholding a policy requiring police officers to
repay a portion of their training costs if they voluntarily left

---

[14]    Montoya also asserts that CRST did not meet the record keeping
requirement, but there is no evidence in the record to support this
assertion.

the city's employment before completing five years of service, as long as the city also paid them minimum wage). CRST may recoup advances made to students for Phase 1 pursuant to the contract.

### 3. Sleeper Berth

Both parties agree that eight hours of sleeping time in the sleeper berth is not compensable. They dispute whether time spent not sleeping in the sleeper berth is compensable under the FLSA.

As background, drivers in Phases 3 and 4 can be on the road for multiple weeks during one trip. Time logs of Montoya and the opt-in plaintiffs indicate that some student drivers were confined to sleeper berths for long hours at a time. For example, Raymond Hollingsworth was in the sleeper berth for an average of 14.35 hours a day during a thirty-six day stretch of driving. Because of the nature of the team-driving model, CRST requires a second driver to be physically present to begin driving when the first driver has exhausted his driving or on-duty time under DOT regulations. The second driver, by nature of the job, cannot leave the truck while it is in motion and must remain with or near the truck on long-haul trips across the country. For CRST's business model, the drivers are engaged to wait during non-sleeping time in the sleeper berth and other "off-duty" time and must be compensated to wait.

DOL regulations address compensation during wait time, sleep time, and travel time. See 29 C.F.R. §§ 785.14-.17, 785.20-.23, 785.33-.41. The DOT designation of "on-duty" and "off-duty" time do not govern whether time is compensable under the FLSA.

Montoya urges the Court to rely on § 785.22(a), a generally applicable regulation, to set an 8-hour cap on non-compensable sleep time in the berth:

> Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep.

In interpreting this regulation, courts have split on whether long-haul truck drivers are "on duty for 24 hours or more." Compare Petrone v. Werner Enters., Inc., No. 8:11CV401, 2017 WL 510884, at *10 (D. Neb. Feb. 2, 2017) (holding sleeper berth time is not compensable merely because the driver is away from home but rather the Court must determine factually whether drivers are "continuously on duty"), and Nance v. May Trucking Co., No. 3:12-cv-01655-HZ, 2014 WL 199136, at *8 (D. Or. Jan. 15, 2014) (finding that an employee in a sleeper berth is not on call and therefore is off-duty), aff'd in relevant part, 685 F. App'x 602 (9th Cir. 2017), with Julian, 360 F. Supp. 3d at 952

(holding that "truck drivers, just like all other employees, are subject to § 785.22 when they are on duty for 24 hours or more," so defendant carrier was "entitled to deduct no more than eight hours per day as time [drivers] were allowed to sleep"), and Browne v. P.A.M. Transp., Inc., No. 5:16-CV-5366, 2018 WL 5118449, at *2-4 (W.D. Ark. Oct. 19, 2018) (same).

CRST argues that the Court should rely on § 785.41 which provides:

> Any work which an employee is required to perform while traveling must, of course, be counted as hours worked. An employee who drives a truck . . . or an employee who is required to ride therein as an assistant or helper, is working while riding, except during bona fide meal periods or when he is permitted to sleep in adequate facilities furnished by the employer.

(emphasis added). Unlike § 785.22, this regulation expressly applies to truck drivers, but it specifies that an employee is "working while riding" except during meal periods or when "permitted to sleep." While § 785.41 does not cap the amount of time an employee is "permitted to sleep," when it is read in connection with § 785.22(a), a bona fide sleeping period would appear to be eight hours. Accordingly, under the regulations, other than the eight hours in the sleeper-berth when drivers are permitted to sleep, and meal times, the DOL regulations provide employees are "working."

55

This interpretation is buttressed by the regulations governing whether waiting time is "time worked." An employee is "engaged to wait" or on-duty when "waiting is an integral part of the job." Id. § 785.15. An employee is waiting to be engaged and off-duty when he "is completely relieved from duty" and the periods of time "are long enough to enable him to use the time effectively for his own purposes." Id. § 785.16. For example, a truck driver is not "off-duty" if he is "engaged to wait" during activities like loading and unloading. Id. Moreover, this interpretation is consistent with the "FLSA's usual rule . . . that an employer must pay an employee for all time the employee is required to spend at a worksite, even sleep time." Giguere v. Port Res. Inc., 927 F.3d 43, 47 (1st Cir. 2019) (citing 29 C.F.R. § 785.7).

In response, CRST argues that the Court should defer to the DOL's Wage and Hour Division ("WHD") interpretation of the regulatory scheme. WHD recently issued an opinion letter addressing "whether the time spent in a truck's sleeper berth is compensable." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2019 WL 3345452, at *1 (Jul. 22, 2019). In the scenario presented, a motor carrier regularly employed drivers to provide over-the-road long-haul trucking services. Id. In an example workweek, a particular driver spent 55.84 hours driving and 49.96 hours in the sleeper berth. Id. The WHD noted that three

prior opinion letters from the division "interpreted 29 C.F.R. § 785.41 in conjunction with §§ 785.15-.16 and §§ 785.21-.22 to mean that while sleeping time may be excluded from hours worked where 'adequate facilities' were furnished, only up to 8 hours of sleeping time may be excluded in a trip 24 hours or longer, and no sleeping time may be excluded for trips under 24 hours." Id. at *2.

The WHD "concluded that this interpretation is unnecessarily burdensome for employers." Id. at *3. Instead, it adopted an interpretation of § 785.41 in which all time "in a sleeper-berth is presumptively non-working time that is not compensable." Id. In doing so, the opinion letter reasoned that the regulations "draw a clear distinction between on-duty sleeping time [29 C.F.R. §§ 785.20-.22]," and "non-working time when the employer permits the employee to sleep in adequate facilities [29 C.F.R. § 785.41]." Id.

The WHD's opinion letter is unpersuasive because the agency was addressing a situation where the drivers were permitted to sleep, on average, seven hours during a twenty-four hour period. The WHD did not address the situation presented here where some student drivers spent time in the sleeper berth that is substantially more than a normal sleep period. Moreover, even if the opinion were to provide that drivers could be relegated to a sleeper berth for long periods of time without pay, the only

reason the agency provides for its flip-flop is that its prior interpretation was "unnecessarily burdensome for employers." Id. Because the FLSA was designed to protect workers, see 29 U.S.C. § 202(a), such reasoning does not support deference to the opinion, see Barrentine v. Ark.-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981). Additionally, the opinion letter does not address whether this new interpretation is consistent with its regulations requiring that wait time is compensated. See generally Kisor v. Wilkie, 139 S. Ct. 2400, 2416 (2019) ("We have recognized in applying Auer v. Robbins, 514 U.S. 452 (1997)] that a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight.").

Therefore, Montoya's motion is allowed and CRST's motion is denied with respect to compensation for sleeper berth time in excess of eight hours.

### 4.   *Split-Mileage Formula*

Montoya argues that CRST's split-mileage formula results in drivers' pay falling below the federal minimum wage based on all hours spent driving and "on-duty." Under the FLSA, employers may pay on a "piecework basis," so long as their employees "receive at least the equivalent of the minimum hourly rate." 29 C.F.R. § 776.5. Paying drivers based on a split-mileage formula is itself not an FLSA violation as long as CRST pays drivers

minimum wage for all hours worked. To the extent it does not do

so, as a matter of law, CRST has violated the FLSA.

### C.    Does the Court have Personal Jurisdiction Over CRST With Respect to the Opt-In Plaintiffs? (Count I)

Relying on the Supreme Court's decision in Bristol-Myers

Squibb Co. v. Superior Court, 137 S. Ct. 1773 (2017), CRST asks

the Court to dismiss the claims advanced by opt-in plaintiffs

Fogarty, Hollingsworth, and Johnson if the Court grants summary

judgment for CRST on the Iowa wage, usury, and consumer fraud

claims. Because the Court does not grant summary judgment for

CRST on these claims, the Court does not address the issue of

personal jurisdiction.

Moreover, CRST has waived this objection. Before filing an

answer to Montoya's complaint, CRST moved to dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(6), but not 12(b)(2).

"Rule 12 of the Federal Rules of Civil Procedure provides for

strict waiver with respect to certain specified defenses,

including the defense of lack of personal jurisdiction." Pilgrim

Badge & Label Corp. v. Barrios, 857 F.2d 1, 3 (1st Cir. 1988).

"[P]ersonal jurisdiction may be acquired in a number of ways,

including voluntary appearance," so defendants who file a motion

to dismiss without objecting to personal jurisdiction have "in

effect, consented to the court's jurisdiction." Id.  While an

intervening change in the law may excuse waiver, see United

States v. Bauzó-Santiago, 867 F.3d 13, 24 (1st Cir. 2017), the
Supreme Court's holding in Bristol-Myers was a "straightforward
application . . . of settled principles of personal
jurisdiction," and not an intervening change in law, 137 S. Ct.
at 1783–84.

## II.  **Count III: Iowa Consumer Frauds Act Claims**

Montoya's consumer fraud claims encompass a long list of
allegedly unfair or deceptive acts or practices. Montoya's "core
theory" is that "CRST misled drivers about the true costs of the
Driver Training Program." Montoya, 311 F. Supp. 3d at 425. The
parties cross-move for summary judgment with respect to
Montoya's consumer fraud claims. Montoya argues that he is
entitled to judgment that certain of CRST's practices violate
Iowa's Consumer Frauds Act as a matter of law. CRST argues that
Montoya cannot prove, as a matter of law, certain elements of
his claims or, in the alternative, that his claims are preempted
by the Federal Aviation Administration Authorization Act
("FAAAA") and barred by the statute of limitations.

### A.  **Legal Standard**

The Private Right of Action for Consumer Frauds Act, Iowa
Code § 714H.1 et seq., provides:

> A person shall not engage in a practice or act the
> person knows or reasonably should know is an unfair
> practice, deception, fraud, false pretense, or false
> promise, or the misrepresentation, concealment,
> suppression, or omission of a material fact, with the

> intent that others rely upon the unfair practice,
> deception, fraud, false pretense, false promise,
> misrepresentation, concealment, suppression, or
> omission in connection with the advertisement, sale,
> or lease of consumer merchandise . . . .

Id. § 714H.3(1). Any "consumer who suffers an ascertainable loss of money or property as the result of a prohibited practice or act . . . may bring an action at law to recover actual damages." Id. § 714H.5(1). To succeed on his consumer fraud claim, a plaintiff must show that he (1) suffered an ascertainable loss of money or property, (2) as a result of, (3) a prohibited practice or act. See McKee v. Isle of Capri Casinos, Inc., 864 N.W.2d 518, 532-33 (Iowa 2015) (finding proof of "an ascertainable loss of money or property" necessary to sustain a claim under the Act).

To succeed on his claim, Montoya must also show "an ascertainable loss of money or property as a result of a prohibited practice or act." Iowa Code § 714H.5(1) (emphasis added). "[T]he phrase 'as a result of' can be naturally read simply to impose the requirement of a causal connection." Brown v. La.-Pac. Corp., 820 F.3d 339, 348-49 (8th Cir. 2016) (cleaned up). It "requires merely factual causation" not proximate or legal cause. Id. at 349. "To determine whether the defendant in fact caused the plaintiff's harm," Iowa courts apply a "but-for" test. Garr v. City of Ottumwa, 846 N.W.2d 865, 869 (Iowa 2014).

Plaintiff must also show that CRST engaged in a prohibited act or practice. The Iowa Supreme Court has recognized that the Consumer Frauds Act is "designed to infuse flexible equitable principles into consumer protection law so that it may respond to the myriad of unscrupulous business practices modern consumers face." State ex rel. Miller v. Vertrue, Inc., 834 N.W.2d 12, 34 (Iowa 2013) (quotations and citations omitted). "Deceptive and unfair practices are distinct lines of inquiry." Id. at 33 (quotation omitted). "Deception" is "an act or practice that is likely to mislead a substantial number of consumers as to a material fact or facts." Iowa Code § 714H.2. "To ascertain whether a practice is likely to mislead in the consumer protection context, courts typically evaluate the overall or 'net impression' created by the representation." Vertrue, 834 N.W.2d at 34. "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures. . . . A misleading impression created by a solicitation is material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." Id. (quoting FTC v. Cyberspace.Com LLC, 453 F.3d 1196, 1200-01 (9th Cir. 2006)). Deception occurs primarily at the formation stage of the contract. Vertrue, 834 N.W.2d at 34.

An "unfair practice" is "an act or practice which causes substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefits which the practice produces." Iowa Code §§ 714H.2, 714.16. Unfairness occurs primarily with respect to the substance or performance of a contract. Vertrue, 834 N.W.2d at 34.

**B.    Prohibited Practices**

Montoya argues that (1) CRST's advertising and recruitment communications contain misrepresentations and omissions of material facts which constitute deceptive practices, and (2) CRST's requirement that students sign a restrictive covenant barring employment with a competitor in an unlimited geographic area for the lesser of ten months or until the student's debt of $6,500 or more is paid off constitutes an unfair practice. CRST responds that even if Montoya has shown unfair or deceptive practices, his claims must still fail as a matter of law because he cannot prove causation or ascertainable loss.

1.    *Misrepresentations About Driver Training Program*

a.    Dropout Rate

Montoya argues that CRST's failure to disclose its high dropout rates at any point during the advertising or recruitment process constitutes a deceptive practice. Cf. Parks v. Persels & Assocs. LLC, 509 B.R. 345, 357 (D. Kan. 2014) (holding failure to discuss low success rate for debt settlement clients was a

63

breach of fiduciary duty). Between November 22, 2013 and March
31, 2017, approximately 25,796 drivers started the driver
training program, but only 5,360 completed Phase 4. The welcome
packet makes no representations about success rates or
graduation rates, so the omission of this information is not
materially misleading. The Court denies Montoya's motion for
summary judgment as to this practice.

        b.   Sponsored Tuition

    Montoya also argues that CRST's characterization of the
driver training program as "sponsored" in the welcome packet and
other advertising is deceptive and misleading because it
suggests that CRST is prepaying tuition to the driver training
schools, and that a driver only needs to repay tuition if he
does not work for ten months.[15] The welcome packet, which is sent
to every prospective driver, states: "CRST will pre-pay all your
school expenses – CRST will pre-pay your tuition and as long as
you work for CRST for 10 months, you will not have to repay
tuition!" Docket No. 151-9 at 4. The packet also states: "If you
need to obtain your class A CDL, but lack the funds to do so, we
offer an outstanding company-sponsored training program. With no

---

[15]    Montoya no longer appears to be pressing his theory about CRST
advertising "free" training, as he admitted he did not believe the postcard
that advertised "free" training to be true when he joined CRST's training
program.

credit checks! In return, we ask that you work for CRST Expedited for ten months." Id.

By saying that "tuition" is prepaid by CRST, the company leaves the misleading impression that a driver will have to repay only the cost of tuition to a driver training school, plus expenses for lodging, etc. if he does not work for ten months. In reality, the tuition to the driver training schools is somewhere in the range of $1,400 to $2,500.[16] The $6,500 fee that CRST charges to drivers who do not complete the ten-month employment term is based on a calculation of total costs to CRST for Phases 1 through 4.

CRST argues that student drivers were essentially told that they would owe $6,500 if they failed to complete the ten-month contract because the prepay option requires prospective students to pay $6,500 upfront for the training. However, the welcome packet's statement about CRST prepaying "tuition" is deceptive because it is likely to mislead consumer-students that the actual tuition for driver training school is $6,500. The misleading information is material because it involves information, namely the cost of attending a commercial driving

---

[16]    The amount CRST has paid independent driver training schools ranges from $1,400 to $2,500 per student who completes Phase 1 training; the amount CRST has paid NADTA ranges from $1,450 to $2,150. See Docket No. 159 ¶ 33. If a student attends Phase 1 with NADTA but does not sign the driver employment contract, CRST seeks to collect $4,700 in training expenses. For drivers who sign the contract but do not complete the ten-month employment term, CRST seeks to collect $6,500 which "includes, but is not limited to, tuition costs charged by the Phase 1 educational facilities." Docket No. 159 ¶ 33.

school, that is important to consumers in choosing whether to
accept the advance from CRST. Leaving drivers with the
impression that it loaned them $6,500 for the cost of driver
training school, when in fact the cost was thousands of dollars
lower, is a deceptive practice in violation of Iowa's consumer
frauds act. Cf. 16 C.F.R. § 254.7 (requiring private vocational
schools to disclose to prospective students the cost of the
program's tuition); Manley v. Wichita Bus. Coll., 701 P.2d 893,
899-901 (Kan. 1985) (affirming jury finding that college
violated Kansas Consumer Protection Act because it intentionally
concealed, suppressed, or omitted a material fact with regard to
the college's tuition refund policy).

In response, CRST argues that Montoya cannot prove some
ascertainable loss based on the misrepresentations on a class-
wide basis. See Goins v. JBC & Assocs., P.C., 352 F. Supp. 2d
262, 275 (D. Conn. 2005) (holding that the threat of debt
collection does not give rise to an ascertainable loss). The
Consumer Frauds Act defines "actual damages" as "all
compensatory damages proximately caused by the prohibited
practice or act that are reasonably ascertainable in amount" and
expressly excludes "damages for . . . mental distress." Iowa
Code § 714H.2. The consumer class includes "[a]ny driver who
repaid training-related expenses through wage deductions and/or
was subject to collections efforts for such costs." Montoya, 311

66

F. Supp. 3d at 425. Any driver who had a portion of his paycheck deducted for the $6,500 training cost or repaid some portion of the cost during collections has suffered an "ascertainable loss" which can be measured on a class-wide basis.

Montoya argues that class members who did not repay the debt were nevertheless harmed by incurring baseless debt and receiving threatening collections letters. One Court has held that

> [i]ncurring a debt, or even _believing_ that one has incurred a debt, has far-reaching practical implications for individuals. It could affect the way an individual saves money or applies for loans. An individual might feel obligated to report that debt when filling out job applications, credit applications, court documents, or other financial records that require self-reporting of existing liabilities.

Stein, 873 F.3d at 535. While the real-life effects of debt can produce ascertainable losses in some circumstances, Montoya has not sufficiently demonstrated how he plans to show ascertainable losses on a class-wide basis without relying on actual deductions and collections of money. In sum, the Court allows Montoya's motion for summary judgment with respect to liability for the misrepresentation of the amount of tuition for those drivers who repaid tuition expenses through either wage deductions or as a result of collection efforts.[17]

---

[17]    In the briefing, Montoya suggests that one class-wide remedy may be cancellation of the debt. That issue has not been adequately briefed.

c.   The Non-Competition Provision

Finally, Montoya argues that the welcome packet is misleading because it fails to describe the material terms of the driver employment contract that students will need to sign in order to have their training expenses covered by CRST. While the company tells prospective drivers that it will advance the cost of tuition for driver training school as long as drivers complete a ten-month employment term with CRST, it does not disclose that the employment contract contains a non-competition provision. The pre-employment agreement states that students will be required to sign the driver employment contract in order to fulfill the terms of their tuition advance, but CRST never provides the students with a copy of the contract. The pre-employment agreement lays out other requirements in the driver employment contract, such as the repayment provision if a driver does not complete his ten-month employment term, but students are not aware of the scope or terms of the non-competition provision in the driver employment contract until the end of Phase 1 or the beginning of Phase 2.

Montoya argues that the prospective drivers, as consumers of educational services, are misled as to a material term of the tuition advanced by CRST, and then are forced to accept a term of employment or incur substantial debt. Montoya contends that

68

this omission would likely cause a substantial number of consumers to decline to pursue training in Iowa.

CRST responds that Montoya could not have been deceived by the company's failure to disclose the non-competition provision because disclosing that the employment contact requires a ten-month term of employment effectively discloses the non-competition provision. However, a ten-month commitment is not equivalent to a non-competition provision. The Court concludes that this omission is material because it is "likely to affect a consumer's conduct or decision with regard to a product or service." Rahmani, 472 N.W.2d at 258. Only after a student has been transported to a training facility (with a one-way bus ticket), completed training for his CDL, and already incurred debt for tuition, lodging, etc., does CRST discloses the non-competition provision which applies until the employee pays back the loan. The failure to disclose an essential term of the employment contract to students before they become consumers of CRST's educational services, and incur significant debt, is deceptive in violation of the Consumer Frauds Act.

Montoya contends that the non-competition provision is itself an unfair practice as a matter of law and not enforceable.[18] While this may be true, the certified class only

---

[18]    Generally, an employer does not offer or sell consumer merchandise to an employee. See Manning v. Zuckerman, 444 N.E.2d 1262, 1264 (Mass. 1983) (declining to extend the private right of action in the Massachusetts

includes drivers who have had wages deducted or are subject to collection actions. Montoya has not demonstrated how he will prove an ascertainable loss on a class-wide basis resulting from the non-competition provision. Because ascertainable loss is an element of Montoya's consumer frauds claim, the Court denies Montoya's motion for summary judgment as to the non-disclosure of the non-competition provision of the pre-employment stage. CRST's motion for summary judgment on this particular practice is allowed with respect to the class claim.[19]

### C.   FAAAA Preemption

CRST argues that it is entitled to summary judgment because Montoya's consumer fraud claims are expressly preempted by the FAAAA. The FAAAA's express preemption clause provides that all state laws "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property" are preempted. 49 U.S.C. § 14501(c)(1). Decisions interpreting parallel language in the Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 41713(b)(1), inform interpretations of the FAAAA's preemption clause. See Rowe v. N.H. Motor Transp. Ass'n,

---

Consumer Protect Act to cover unfair or deceptive acts committed by an employer with respect to an employee). Therefore, the Court declines to apply the Iowa Consumer Frauds Act to the employer-employee relationship between CRST and drivers. To the extent Montoya argues that the non-competition provision is still unfair, the Court declines to rule under the Consumer Frauds Act.

[19]   In his Amended Complaint, Montoya did not request an injunction against enforcing the non-competition provisions on behalf of the class. See Docket No. 90 at 25-27.

552 U.S. 364, 370 (2008). The phrase "related to" "embraces state laws having a connection with or reference to carrier rates, routes, or services, whether directly or indirectly." Dan's City Used Cars, Inc. v. Pelkey, 569 U.S. 251, 260 (2013) (quotations and citations omitted). However, "§ 14501(c)(1) does not preempt state laws affecting carrier prices, routes, and services 'in only a tenuous, remote, or peripheral . . . manner.'" Id. at 261 (quoting Rowe, 552 U.S. at 371). "[T]he breadth of the words 'related to' does not mean the sky is the limit." Id. at 260. Furthermore, the "FAAAA formulation contains one conspicuous alteration [from the ADA] -- the addition of the words 'with respect to the transportation of property,'" and this phrase "massively limits the scope of preemption ordered by the FAAAA." Id. at 261 (quotation omitted); see also 49 U.S.C. § 13102(23)(B).

Montoya's claims are not preempted because they relate to training potential drivers, not CRST's transportation of property. See Dan's City, 569 U.S. at 261-62, 266 (holding that claims brought under the New Hampshire Consumer Protection Act were not preempted by the FAAAA because the unfair conduct alleged – the storage and disposal of a car - was not "sufficiently connected to a motor carrier's service with respect to the transportation of property to warrant preemption"). "The FAAAA's focus on prices, routes, and services

71

shows that the statute is concerned with the industry's
production outputs, and seeks to protect them from state
regulation." Bedoya v. Am. Eagle Express Inc., 914 F.3d 812, 821
(3d Cir. 2019), cert. docketed, No. 18-1382 (May 2, 2019). The
motor carrier industry's output -- the service it provides -- is
the "transportation of property from origin to destination." Id.
Although state laws that regulate industry inputs -- labor,
capital, and technology -- "may impact costs and may in turn
affect prices charged and services provided to customers," the
FAAAA does not preempt these kinds of regulations and laws. Id.
at 822; see also Tobin v. Fed. Express Corp., 775 F.3d 448, 456
(1st Cir. 2014) (describing the ADA preemption "dividing line"
as "between state laws that regulate 'how [a] service is
performed' (preempted) and those that regulate how an airline
behaves as an employer or proprietor (not preempted)" (quoting
DiFiore v. Am. Airlines, Inc., 646 F.3d 81, 87-88 (1st Cir.
2011))).

     CRST argues that the Supreme Court's holding in American
Airlines, Inc. v. Wolens, 513 U.S. 219 (1995), controls here. In
Wolens, the Supreme Court held that a claim by a consumer
against an airline under the Illinois Consumer Fraud Act was
preempted by the ADA due to the "potential for intrusive
regulation of airline business practices inherent in state
consumer protection legislation typified by the [Illinois]

Consumer Fraud Act." Id. at 227–28. CRST argues that because the Iowa Consumer Frauds Act is the same in material respects to the Illinois Consumer Fraud Act, Montoya's consumer fraud claims are preempted by the FAAAA. Wolens is inapplicable here. In Wolens the alleged misrepresentation dealt directly with the price of airline tickets and frequent flyer services the airline provided to consumers; here it deals with the way in which a company trains prospective employees.

State law prohibiting alleged unfair and deceptive practices as to driver training programs for students who are seeking a CDL may have "indirect effects" on CRST's trucking service, but the impact is "tenuous, remote, or peripheral." DaSilva v. Border Transfer of MA, Inc., 227 F. Supp. 3d 154, 157 (D. Mass. 2017) (Saris, J.) (quoting Rowe, 552 U.S. at 370-71). Montoya's consumer fraud claims related to Phase 1 students are not preempted by the FAAAA.

**D.    Statute of Limitations**

CRST argues that Montoya's claims are barred by the Iowa Consumer Frauds Act's statute of limitations. The Act provides that a claim must be brought within two years of the last event giving rise to the cause of action, or within two years of the discovery of the violation, whichever is later. Iowa Code § 714H.5(5). "The discovery rule tolls the statute of limitations until the plaintiff has discovered the fact of the injury and

its cause or by the exercise of reasonable diligence should have discovered these facts." Hallett Constr. Co. v. Meister, 713 N.W.2d 225, 231 (Iowa 2006) (quotation omitted). Therefore, an action accrues when a plaintiff has knowledge of all of the facts he "needed to know to be charged with a duty to investigate to determine the existence of a cause of action against defendant." Franzen v. Deere & Co., 377 N.W.2d 660, 664 (Iowa 1985).

Montoya's claim concerning the misleading information about sponsored tuition in the welcome packet is not barred by the statute of limitations.[20] While Montoya filed his complaint on January 21, 2016, more than two years since he received his welcome packet in June 2013, his claim did not accrue then. Montoya would not have known, or had reason to suspect, that the real cost of tuition was not $6,500 at that time. Montoya's claim is therefore timely.

In sum, the Court allows Montoya's motion for summary judgment on the claim that CRST violated the Act by materially misleading drivers as to the true cost of tuition advanced by the company. The amount of "ascertainable loss" caused by the

---

[20]   The statute of limitations also does not bar Montoya's claims based on the non-competition provision. Montoya did not become aware of the non-competition provision until he was presented with the driver employment contract in October 2014, within the two-year statute of limitations period. See Docket No. 151-25 at 1.

misrepresentation of the amounts deducted or collected for training expenses will proceed to trial.

### III. **Count IV: Usury**

CRST moves for summary judgment on Montoya's usury claim, arguing that because it neither contracted for nor collected interest at a usurious rate, it did not violate Iowa's usury law. Montoya asserts that a defendant violates Iowa's usury law when it seeks a usurious interest rate, even if the contracts do not provide for a usurious rate and the driver does not actually pay interest at the usurious rate. During the relevant time period, the maximum lawful rate of interest which could be provided for in a written agreement under Iowa law ranged from 3.5% to 7.25% per annum. The pre-employment agreement and driver employment contract provided for interest at 18% or the maximum applicable by law. CRST then sought 18% interest in its debt collection letters.

Iowa Code § 535.4 states that "[n]o person shall, directly or indirectly, receive in money or in any other thing, or in any manner, any greater sum or value for the loan of money, or upon contract founded upon any sale or loan of real or personal property, than is in this chapter prescribed." To succeed on his usury claim, Montoya must prove four elements: (1) a loan of money, (2) an understanding between the parties that the principal shall be repaid, (3) the exaction of greater profit on

the loan than is allowed by law, and (4) an intention to violate the law. See Kaiser Agric. Chems., Inc. v. Peters, 417 N.W.2d 437, 441 (Iowa 1987).

There is no dispute that the first and second elements of a usury claim are present in the transactions. There was an advance of money for housing, transportation, and other expenses, and an understanding that the principal would be repaid. As to the third element, CRST points out that there is no evidence in the record that it collected and received interest at a usurious rate, i.e., extracted a profit in violation of law. However, "a creditor need not actually receive the amount charged in excess of the statutory ceiling to violate the statute." Id. Montoya's claim is not foiled if CRST did not actually collect interest.

As to the final element, the "required intent under the fourth element of usury is 'simply to charge a rate of interest which exceeds the maximum permitted.'" Id. at 442 (quoting CBS Real Estate of Cedar Rapids, Inc. v. Harper, 316 N.W.2d 170, 172 (Iowa 1982)). "A charge must be communicated to the debtor." George A. Fuller Co. of Tex. v. Carpet Servs., Inc., 823 S.W.2d 603, 605 (Tex. 1992); see also Kaiser, 417 N.W.2d at 442 (interpreting whether a usurious interest rate had been "charged" to the debtor). CRST charged Montoya a usurious interest rate of 18% when it sent him the collection letter

stating: "If you cannot pay off the full amount of the loan at this time, we would be willing to accept monthly payments at 18% interest if you comply with the Restrictive Term as stated in your Driver Employment Contract." Docket No. 151-42. Montoya appears to have met each element of his usury claim.

In response, CRST argues that Montoya cannot succeed on his usury claim because the pre-employment agreement and driver employment contract were not contracts for a usurious rate, as stated in the Iowa Code. Both contracts authorized interest on amounts owed at "the lesser of 1.5 per month [18% per year] or the maximum rate permitted by applicable federal and state usury laws." Docket No. 151-33 at 2 (emphasis added). The Iowa Supreme Court has found a violation of the usury law where the interest charged exceeded the legal maximum even in the absence of an applicable contract containing a usurious rate. See Kaiser, 417 N.E. 2d at 441. Additionally, Iowa Code prohibits contracting for a usurious rate, either "directly or indirectly." Iowa Code § 535.5; see also Doggett v. Heritage Concepts, Inc., 298 N.W.2d 310, 312 (Iowa 1980) ("Section 535.4 prohibits the imposition of usurious rates directly 'or indirectly.'"). Accordingly, under the Iowa Code, CRST may not contract for a legal rate and then charge a usurious one in a collection effort. However, the fact that the contract did not contain a usurious rate at its inception may mean that the loan contract

itself cannot be invalidated, even if the Court cancels the usurious interest rate. See Kaiser, 417 N.W. 2d at 442. The usury class is limited to those individuals who received collections letters demanding 18% interest. Therefore, CRST's motion for summary judgment with respect to Count IV is denied.

## IV.   **Conclusion**

After this long-haul opinion, the case stands here:

Counts I and II: As to the FLSA claims and the Iowa wage law claims, both Montoya's and CRST's motions for summary judgment are allowed in part and denied in part. As a matter of law, student drivers are employees under the FLSA and Iowa wage law during Phase 2, but not Phase 1.

The following deductions from drivers' pay during Phases 3 and 4 are unlawful under the FLSA to the extent they bring pay below minimum wage: $4 wire charges, drug tests and physicals conducted in Phase 2, the map pack, and transportation to Phase 2. Post-employment collection of advances or loans for tuition and other expenses made to students before and during Phase 1 is permissible (subject to limitations under Iowa usury law). There remain issues for trial as to whether the lodging costs during Phase 2 were reasonable and whether the split-mileage formula results in FLSA violations.

Sleeper berth time in excess of eight hours must be counted towards hours worked.

Count III: CRST's motion for summary judgment on Montoya's consumer fraud claims is allowed in part and denied in part, as is Montoya's motion for summary judgment as to liability for certain of CRST's practices. Montoya's claims are neither preempted by the FAAAA nor barred by the Iowa Consumer Frauds Act's statute of limitations. The omission of the drop-out rate from recruiting and advertising materials is not a prohibited practice. Failing to disclose the non-competition provision in the driver employment contract is a prohibited practice under the Consumer Frauds Act. However, Montoya's claim that the non-competition provision is itself a violation fails as matter of law because he is unable to demonstrate how he will prove ascertainable loss on a class-wide basis. Misleading a driver that he needs to prepay only the "tuition" advanced by the CRST if he does not work ten months is a prohibited practice under the Consumer Frauds Act, and the amount of "ascertainable loss" caused by the misrepresentation -- based on deductions and collections -- will require a trial.

Count IV: CRST's motion for summary judgment on Montoya's usury claim is denied.

**ORDER**

For the reasons stated above, CRST's motion for summary judgment (Docket No. 146) is **ALLOWED IN PART** and **DENIED IN PART**

and Montoya's motions for summary judgment (Docket Nos. 150 and
153) are **ALLOWED IN PART** and **DENIED IN PART**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
Chief United States District Judge