**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                          )
JUAN CARLOS MONTOYA,                      )
on his own behalf and on behalf of        )
all others similarly situated,            )
                                          )
                     Plaintiffs,          )      Civil Action No. 1:16-cv-10095-PBS
v.                                        )
                                          )
CRST EXPEDITED, INC. and                  )
CRST INTERNATIONAL, INC.,                 )
                                          )
                     Defendants.          )
_____)

**PLAINTIFFS' ASSENTED-TO MOTION FOR PRELIMINARY SETTLEMENT**
**APPROVAL AND MEMORANDUM IN SUPPORT THEREOF**

This case has been brought on behalf of truck drivers for Defendants (hereinafter

collectively referred to as "CRST").  Plaintiff Juan Carlos Montoya has alleged that

CRST's practices with respect to contract drivers in its Driver Training Program violate

the law in several ways, including failure to pay minimum wages and violations of

Iowa consumer protection and usury laws.  This Court has already granted class

certification and has granted, in part, summary judgment to Plaintiffs as to CRST's

liability for several of the alleged violations.  _See Montoya v. CRST Expedited, Inc._, 404 F.

Supp. 3d 364 (D. Mass. 2019); _Montoya v. CRST Expedited, Inc._, 311 F. Supp. 3d 411 (D.

Mass. 2018).

The parties have reached a proposed class/collective action settlement, to resolve

this case and to resolve claims pending in two other cases, specifically _Larry Wimbish_

_and Rinel Tertilus, et al. v. CRST International, Inc. et al._, Civil Action No. 16-2020-CA-

003424 (Fla. 4th Cir., Duval Cty.), and *Maurice Smith et al. v. CRST International, Inc. et al.*, D. Mass. Civil Action No. 1:20-cv-11353-PBS.  *Wimbish* raises claims for unpaid minimum wages under Florida law for orientation attended in Florida.  *Smith* raises claims for unpaid wages on behalf of individuals who worked as contract drivers in CRST's Driver Training Program after July 2019, as well as consumer claims and other claims relating to CRST's allegedly unlawful enforcement of its non-competition provision.  The parties have agreed to seek stays of the *Wimbish* and *Smith* matters pending approval of this settlement.  Upon final approval of the settlement in this matter, if granted, the parties shall seek dismissal with prejudice of those cases.

The parties' Settlement Agreement with attached exhibits is attached hereto as Exhibit 1.

This proposed settlement is a fair, reasonable, and adequate result for the members of the classes and collectives, as discussed in detail below.  In addition to affording each settlement class/collective member significant monetary and non-monetary recovery for the claims in this case, it will avoid the risks, uncertainties, costs, and delays inherent in further litigation.  Accordingly, Plaintiffs respectfully ask that the Court:

1.     Preliminarily certify the proposed classes/collectives for settlement purposes (to the extent not already certified);

2.     Approve the notice procedure and authorize Plaintiffs to issue notice and claim forms to the settlement class members in the forms attached to the parties'

Settlement Agreement as Exhibits A through E, and approve the advertisement attached to the parties' Settlement Agreement as Exhibit F;

3.      Approve the distribution formula and claim procedure set forth in the parties' Settlement Agreement and this motion; and

4.      Schedule a final fairness and approval hearing to take place at 2:30 p.m. on March 30, 2021, at which time Plaintiffs will report to the Court the results of the notice process and explain why this settlement should be given final approval and the settlement fund distributed.

A proposed preliminary settlement approval order is attached as Exhibit 2.

## TERMS OF PROPOSED SETTLEMENT

### I.      CLASSES/COLLECTIVES

The proposed settlement is on behalf of the following classes/collectives:

1)      **Federal Wage Claims Class**:  all eligible individuals who have opted in or who will opt in to the FLSA claims as part of the settlement notice process and participated as contract drivers in CRST's Driver Training Program at any time between December 22, 2013, and December 31, 2020.  This includes eligible individuals who have already opted in to the FLSA claims and individuals who have not yet received an opportunity to opt in but will file Claim Forms to participate in the settlement.  It does not include individuals who already received an opportunity to opt in to the FLSA claims but did not do so.  Those individuals will not be given an opportunity to participate in the settlement for the FLSA claims.

2)       **Iowa Orientation Claim Class**:  all eligible individuals who do not request exclusion from the settlement and who attended Phase 2 orientation as contract drivers in Iowa at any time between January 21, 2014, and December 31, 2020.

3)      **Iowa Consumer Claim Monetary Relief Class**:  all eligible individuals who participated in any phase of CRST's Driver Training Program at any time between January 21, 2014, and December 31, 2020, and have paid back training costs to CRST in excess of the amount that CRST paid in tuition to the Phase 1 CDL schools, through final paycheck deductions or through post-employment debt collection, at any time since January 21, 2014, and who do not file a request for exclusion from the settlement.

4)      **Iowa Consumer Claim Non-Monetary Relief Class**:  all eligible individuals who participated in any phase of CRST's Driver Training Program at any time after January 21, 2014, and have been subject to debt collection by CRST at any time since January 21, 2014.

5)      **Florida Orientation Claim Class**:  all eligible individuals who do not request exclusion from the settlement and who attended Phase 2 orientation as contract drivers in Florida at any time between May 28, 2015, and December 31, 2020.

6)      **Iowa Usury Class**:  all eligible individuals who received collection letters from CRST indicating 18% per annum interest since January 21, 2006.

## II.     SETTLEMENT AMOUNT, DISTRIBUTION, AND CALCULATION FORMULAS

The total amount of the Settlement Fund is $12,500,000 (except as set forth below with respect to the sleeper berth claim).  The Settlement Fund is inclusive of any and all alleged unpaid wages, liquidated damages, penalties, attorneys' fees, costs, expenses, including reasonable settlement administration costs, and any reasonable service awards.  Defendants shall pay the employer's share of payroll taxes separately, and those monies shall not come out of the Settlement Fund.  The settlement is non-reversionary, meaning that no part of the Settlement Fund shall revert back to the Defendants.

The parties propose that the Settlement Fund be divided as follows:

| Category | Amount |
| --- | --- |
| Attorneys' fees for Plaintiffs' counsel | Up to $4,166,667 |
| Incentive payments (for eight named plaintiffs, three early opt-in plaintiffs, and twenty deponents) | Up to $92,500 total[1] |

---

[1]      The proposed incentive payments include the following:  of up to $25,000 for named plaintiff Juan Carlos Montoya and up to $10,000 each for Raymond Hollingsworth, Ronnie Fogarty, and Clarence Johnson; up to $2,500 each for Larry Wimbish, Rinel Tertilus, Maurice Smith, Jean Paul Bricault Jr., Jose Torres Rosado, Austin Coddington, and Kevin Hamilton (named plaintiffs in the *Wimbish* and *Smith* matters); and up to $1,000 each for the twenty opt-in plaintiffs who appeared for depositions.

| Costs of claims administration | $250,000 |
|---|---|
| Reasonable litigation costs incurred by Plaintiffs' counsel | $500,000 |
| Dispute fund | $200,000 |
| Class distribution | $7,290,833 |
| Total | $12,500,000 |

Additionally, the parties propose the following division of the amount being distributed to members of the classes/collectives:

1) **Orientation Claim (for the Federal Wage Claims Class, the Iowa Orientation Claim Class, and the Florida Orientation Claim Class):** The total amount allocated to the Orientation Claim (including the Iowa Orientation Claim, the Florida Orientation Claim, and the Federal Orientation Wage Claim), is $2,750,000. The amounts shall be distributed to eligible individuals who submit timely claim forms as follows: the total amount will be divided equally among all eligible individuals who submit timely and valid claims forms. Plaintiffs estimate that, if 100% of eligible individuals submitted claim forms, each class member would receive approximately $110.00 for this claim. Amounts paid to eligible claimants for the Orientation Claim shall be paid 1/2 as W-2 wages and 1/2 as liquidated damages/1099 other income (reported in Box 3).

2) **Minimum Wage Driving Claim (for the Federal Wage Claims Class):** The total amount allocated to the Minimum Wage Driving Claim is $2,040,833. The amounts shall be distributed to eligible individuals who submit timely claim forms as follows: the total amount will be divided among all eligible individuals who submit timely and valid claims forms based on number of weeks worked during Phase 3 and/or Phase 4 (i.e., while driving). Plaintiffs estimate that, if 100% of eligible individuals submitted claim forms, each class member would receive approximately $16.00 per week worked during Phase 3 and/or Phase 4 for this claim. Amounts paid to eligible claimants for the Minimum Wage Driving Claim shall be paid 1/2 as W-2 wages and 1/2 as liquidated damages/1099 other income (reported in Box 3).

3) **Iowa Consumer Claim (for the Iowa Consumer Claim Monetary Relief Class):** The total amount allocated to the Iowa Consumer Claim is $2,500,000. The amounts shall be distributed to eligible individuals who submit timely claim forms as follows: each eligible claimant shall receive an amount from the settlement in proportion to the difference between the amount that they paid to CRST in debt collection and $2,500. Plaintiffs estimate that, if 100% of eligible individuals submitted claim forms, each class member would receive an amount equal to approximately 100% of the amount that they paid in excess of $2,500 for this claim. Amounts paid to eligible

claimants for the Iowa Consumer Claim shall be paid as non-taxable return of training costs paid by the driver in excess of training costs paid by Defendants, subject to consultation with tax advisors.

## III.   NON-MONETARY RELIEF

In addition to the monetary payments described above, the parties have agreed to the following non-monetary relief, which shall apply to all affected individuals regardless of whether they are eligible class members and regardless of whether they submit claim forms to participate in the settlement:

1)   **CRST's release of obligations of class/collective members**:  For all class/collective members (whether they submit a claim form to participate in the settlement or not) and for all individuals who have signed or will sign any version of the Driver Employment Contract in effect during the pendency of this lawsuit up through the date of the signing of the Settlement Agreement, CRST agrees to release entitlement to and not to pursue any collection efforts for training school costs in excess of the amount CRST actually paid to the CDL school for tuition.[2]  CRST also agrees to release entitlement to and not to pursue any collection efforts for any other costs from class/collective members (including relating to drug tests, physical examinations, processing fees, wire charges, meals, etc.), except that CRST may continue efforts to recover housing and transportation costs, as long as those amounts are reasonably related to amounts actually paid by CRST for housing and/or transportation. Defendants shall not issue 1099 forms or other tax forms for this release because no compensatory payment will issue.

2)   **Credit reporting**:  CRST agrees not to restart credit reporting on drivers' obligation to CRST until six months after notice goes out to class members about the settlement or two months after payments are issued, whichever is later.  Additionally, CRST agrees to provide accurate information to the national credit reporting agencies (Experian, Equifax and TransUnion) about drivers' reduced obligations to CRST.

3)   **HireRight**:  If applicable, if driver requests by letter to HireRight that records of a default to CRST be corrected in accordance with CRST's release of monies, CRST agrees to provide a letter to HireRight within a reasonable time with a copy to the

---

[2]   Through June 2, 2020, the amount that CRST paid to the CDL schools is capped at no more than $2,500.  Additionally, the amount CRST pays for tuition for drivers to attend the North American Driver Training Academy (CRST's own CDL school) is capped at no more than $2,500 for the eighteen months following execution of the Settlement Agreement.

requesting driver stating that any defaults owing to CRST have been rescinded by mutual agreement.

4)      **Employment references**:  CRST agrees to give no new or additional negative references to any driver for having allegedly defaulted on any monies released.  CRST will not affirmatively or in response to inquiries from other companies give negative references for any drivers for having allegedly defaulted on any monies released or state that the driver is under contract with CRST or owes monies to CRST.

5)      **Non-competition provision**:  For everyone who has signed the current version of Driver Employment Contract with a non-competition provision, CRST agrees not to seek to enforce the non-competition provision or to represent to entities that drivers are still under contract with or still employed with CRST or to decline to provide employment and training history upon request (or otherwise refuse to verify employment) after the earlier of:  (1) eight to ten months after the driver has signed the Driver Employment Contract (depending on whether the driver has signed an eight-month or ten-month contract), regardless of whether the driver has worked for CRST for any or all of that time; or (2) the driver paying off the unpaid balance of the total of housing, transportation and the actual amount CRST paid to the Phase 1 CDL school. CRST shall cooperate to take reasonable steps necessary so that DAC reports accurately reflect drivers' training and employment history with CRST, including dates of employment, whether employment has terminated, and whether or not drivers are under contract.

6)      **Orientation wages**:  Starting in January 2021, CRST agrees to treat drivers in the Driver Training Program as employees when participating in orientation and to pay them at least the applicable minimum wage for hours of orientation attended.

7)      **Interest on monies owed**:  As to drivers who have already signed Driver Employment Contracts, CRST agrees not to send any communications to drivers stating that an 18% interest rate will be added to monies owed.  Drivers will only owe the principal amount to CRST (after the release of monies described above) and will not owe any interest.  Starting no later than the anticipated date of final approval, CRST will not include any reference to an 18% interest rate on its pre-employment or employment contracts or any other documents presented to drivers.  In the future, any interest that CRST may seek to collect on monies owed by drivers will not exceed the maximum rate permitted by applicable federal and state usury laws.

8)      **Final paychecks**:  Starting on January 1, 2021, Defendants will not deduct a lump sum of tuition from final paychecks, but may deduct installment payments, including without limitation payments for tuition, transportation and housing, but only to the extent that those deductions do not reduce drivers' pay below minimum wage.

9)      **Notice about monies to be owed**:  Going forward, if CRST intends to seek to collect from drivers more in tuition than the amount actually paid to the Phase 1 CDL

schools, Defendants must disclose the following in writing to prospective drivers, before scheduling them for driver training school:  (1) the price that CRST will charge them for the program, including the full amount attributed to the training program; (2) that the training program amount includes but is not limited to the amount that CRST actually pays to the CDL schools for tuition; and (3) that the amount CRST pays to each CDL school varies but, in the past year, has ranged from $[the lowest amount CRST has paid in the most recent year] to $[the highest amount CRST has paid in the most recent year].

## IV.   SLEEPER BERTH CLAIM

The parties have agreed to seek entry of a separate stipulated judgment on the sleeper berth claim, in the amount of $2,500,000, in which CRST unequivocally reserves the right to appeal the Court's finding of liability in its summary judgment order.  This amount is to be divided as follows:  (1) up to $833,333 in attorneys' fees; (2) reasonable costs of settlement administration, not to exceed $75,000; (3) a reasonable amount for a dispute fund (not to exceed $50,000); and (4) at least $1,541,667 to be divided among the Federal Wage Claims Class.  If any amounts are not distributed for attorneys' fees, settlement administration, or the dispute fund, then those amounts shall be redistributed to the Federal Wage Claims Class.  No amount shall revert to Defendants.  Any amounts not distributed from the dispute fund or from uncashed checks shall be distributed on a *cy pres* basis to Iowa Legal Aid.

The class to whom this stipulated judgment applies is the Federal Wage Claims Class.  The formula for distribution of these amounts (if applicable, i.e., if the judgment is affirmed after exhaustion of all appeals) shall be:  the total amount will be divided among all eligible individuals who submit timely and valid claims forms based on number of weeks worked during Phase 3 and/or Phase 4 (i.e., while driving).  Plaintiffs estimate that, if 100% of eligible individuals submitted claim forms, each class member

would receive approximately $12.00 per week worked during Phase 3 and/or Phase 4 for this claim (in addition to amounts received from the original settlement for FLSA minimum wage driving claims).  These amounts shall be paid ½ as W-2 wages and ½ as liquidated damages/1099 other income (reported in Box 3).  Defendants shall separately pay the employer's share of any payroll taxes.

The parties agree unequivocally that this judgment shall be appealable by CRST. CRST intends to appeal this judgment.   If the judgment is affirmed in its entirety after exhaustion of all appeals, the parties shall seek the following:

1)      Amendment of the amount of the judgment to be increased pro rata based on the additional time that has passed from January 1, 2021, to the date on which that final judgment becomes final and unappealable ("the Appeal Period"), as a percentage increase of the time period of December 13, 2013, to December 31, 2020, multiplied by the ratio of the average monthly number of CRST Expedited trucks on the road during the Appeal Period divided by the average number of CRST Expedited trucks on the road between December 2013 and December 2020;[3]

2)      Notice to individuals who have not yet received notice and an opportunity to opt in;

3)      Final approval of the settlement in the amount of the amended judgment; and

---

[3]      For example, if the appellate period is one-fourth of the duration of the time period of December 13, 2013, to December 31, 2020, and the average number of trucks on the road during the appeal period is nine-tenths of the number of trucks on the road from December 2013 to December 2020, the settlement amount shall be increased by 22.5%.

4)      Distribution of the settlement fund for the sleeper berth claim (in the amount of the amended judgment).

## V.     NOTICE PROCESS

If this Court preliminarily approves this settlement, Plaintiffs will send the notice and claim form attached to the parties' Settlement Agreement as Exhibits A through E to members of the proposed classes/collectives.  There are two forms of notice.  One notice shall go out to individuals who are eligible to receive monetary recovery as part of the settlement (Exhibits A through C to the Settlement Agreement); and another notice shall go out to individuals who will be impacted by some or all of the non-monetary aspects of the settlement but are not eligible to receive monetary recovery as part of the settlement (Exhibits D and E to the Settlement Agreement).

The parties have agreed to notice being sent by text and email to all individuals for whom CRST has telephone numbers and/or email addresses and by first-class mail (with return envelope provided) for all individuals for whom CRST does not have email addresses and/or as to whom the texts and/or emails are returned as undeliverable. The Settlement Administrator shall make all reasonable efforts to follow up on undeliverable addresses and to resend the notice and claim form to updated addresses (including all addresses provided by Plaintiffs' counsel and/or class members).  The Settlement Administrator shall establish a website with the notice, contact information for the Settlement Administrator and Plaintiffs' counsel, and the claim form which may be submitted electronically (*inter alia*).  A reminder shall go out approximately halfway through the claim period to those who have not claimed.  The reminder shall go out by

email to those with valid email addresses and by a postcard by first-class mail for others.  The reminder shall include the address of the website, as well as contact information for the Settlement Administrator and Plaintiffs' counsel.

Additionally, Plaintiffs' counsel shall take out advertisements in three online trucking publications advertising the notice and deadline to submit claims and directing class members to consult the website for more information.  The publications will be:  Landline Magazine (website); CDLLife (phone app and website); and Trucker News (website and newsletter).  These advertisements will run during the claim period. A copy of the advertisement is attached to the parties' Settlement Agreement as Exhibit F.

Class/collective members who are eligible to receive monetary recovery as part of the settlement shall have sixty days from initial mailing to submit claim forms, object, or request exclusion from the settlement, except that those deadlines shall be extended for those whose original notice packet is resent because of undeliverable addresses so that the individuals have no less than thirty days to submit a claim form, object, or request exclusion.  Class/collective members may submit claim forms electronically (using electronic signature) via the class settlement website and may also submit claim forms by mail (including FedEx, UPS, etc.), email, or facsimile, sent or postmarked by the claim deadline.  Class/collective members who are only eligible for non-monetary relief as part of the settlement shall have sixty days from initial mailing to object to the settlement, except that those deadlines shall be extended for those whose original notice

packet is resent because of undeliverable addresses so that the individuals have no less than thirty days to object.

## VI.    RELEASE OF CLAIMS

Pursuant to the parties' agreement, Juan Carlos Montoya, Raymond Hollingsworth, Clarence Johnson, Ronnie Fogarty, Larry Wimbish, Rinel Tertilus, Maurice Smith, Jean Paul Bricault Jr., Jose Torres Rosado, Austin Coddington, and Kevin Hamilton and CRST would agree to a mutual general release of claims, including any tuition CRST contends that any of those individuals owe and a full release from the non-competition provision for all such individuals.  Additionally, these individuals would agree not to seek or accept re-employment with CRST.

Class members would release claims against CRST to the extent that the claims were brought or could have been brought on behalf of the classes and/or collectives of which those individuals are a part.  Specifically, the release applies as to the FLSA claims for all eligible individuals who have opted in or will opt in to the FLSA claims, and it applies as to the Rule 23 claims for all eligible individuals who do not seek to exclude themselves from the settlement.  If an individual is not part of any class or collective (including those individuals who do not opt in to the FLSA claims), then the release for that individual would not cover those claims.  As applicable, the release includes claims relating to individuals' participation as contract drivers, driver training, education, orientation, employment, or driving with or for Defendants as part of Defendants' Driver Training Program.  Under no circumstances shall this release be deemed to release any claim that any individual may have against CRST or related

entities that:  (1) falls outside of the class period in this case; or (2) relates to the portion of any workweek during which the individual was classified as a non-employee and/or independent contractor driver.  CRST does not release any class members for any unpaid portion of housing, transportation or actual tuition as provided in the Settlement Agreement.

## VII.  ISSUANCE OF SETTLEMENT PAYMENTS AND COMMUNICATIONS ABOUT COLLECTION OF MONIES

The settlement administrator shall issue payments to eligible claiming class/collective members from the Qualified Settlement Fund within 30 days after the Court's final approval of the settlement (including final exhaustion of all appeals, if any, except relating to the sleeper berth claims).  Individuals receiving checks shall have 180 days to deposit/cash checks from the settlement.  Also within 30 days after the Court's final approval of the settlement (including final exhaustion of all appeals, if any, except relating to the sleeper berth claims), the settlement administrator shall issue payments to Class Counsel for the Court-approved attorneys' fees and costs and to the named plaintiffs and other eligible individuals for the Court-approved incentive awards.  If any settlement checks are returned as undeliverable, the settlement administrator shall promptly attempt to locate the person (including using the Social Security Number of that individual and any other identifying information and/or by contacting the person via email or telephone). Upon request, the settlement administrator will promptly reissue checks that were mailed but not cashed by the Participating Class Member, during the 180-day time period to deposit/cash checks from the settlement. Any settlement check that remains undeliverable or is not cashed after the 180 days

following its issuance shall be cancelled and voided, and remaining monies (after any applicable cancellation or void fees) shall be distributed on a *cy pres* basis to Iowa Legal Aid.

Credit reporting on amounts owed to CRST by class/collective members shall not resume until six months after notice goes out to class members about the settlement or two months after payments are issued, whichever is later.  Defendants and third-party collection agencies shall not send any communications to class members relating to collection efforts that reference the settlement in this case or amounts drivers have received or may receive in connection therewith. Defendants and third-party collections agencies may continue to send collections notices and communicate with class members relating to collection efforts as they have been doing in the normal course, but such communications shall not reference the settlement of this case or any payments the class members may receive as part of this settlement.  Defendants shall not keep any record of the amounts class members have received or will receive as part of the settlement for collection purposes and shall not provide information to third-party collection agencies about amounts to be received by class members as part of this settlement.

Approximately one month before credit reporting is scheduled to resume, Plaintiffs' counsel and/or the settlement administrator will send an electronic communication to class members informing them that credit reporting will resume soon and stating that they may contact Plaintiffs' counsel or the settlement administrator for information about their balance and how to pay it off, substantially in the form attached to the Settlement Agreement as Exhibit K.  To the extent not already done, Defendants

will provide updated information to Plaintiffs' counsel about class members'

obligations at least 45 days before credit reporting is scheduled to resume.

## ARGUMENT

I.   **THE COURT SHOULD GRANT PRELIMINARY APPROVAL OF THIS SETTLEMENT.**

A.   **The Court should certify the proposed settlement class/collective pursuant to Federal Rule of Civil Procedure 23(b)(3) and 29 U.S.C. § 216(b).**

For settlement purposes, and as required by Rule 23(e), the proposed settlement

classes/collectives meet the requirements of Rule 23(a), Rule 23(b)(2), and Rule 23(b)(3)

for certification.  The Court has already granted class and collective certification as to

the claims in this case.  *Montoya v. CRST Expedited, Inc.*, 311 F. Supp. 3d 411 (D. Mass.

2018).  For the same reasons set forth in the Court's decision granting certification, it is

also appropriate to certify the class of individuals who have attended Phase 2

orientation as contract drivers in Florida under Rule 23(a) and Rule 23(b)(3).  Indeed,

the claim on behalf of the class of individuals who attended orientation in Florida is

nearly identical to the claim on behalf of individuals who attended orientation in

Iowa—it seeks minimum wages under state law for unpaid work performed in that

state.  *See Montoya*, 311 F. Supp. 3d at 423-24 ("common legal and factual issues exist,

and they predominate over individual issues" for claim under Iowa minimum wage

law relating to orientation attended in Iowa).

Additionally, there are two proposed classes for which the parties have agreed

on substantial non-monetary relief, namely:  (1) all individuals who participated as

contract drivers in any phase of CRST's Driver Training Program at any time after

January 21, 2014, and have been subject to debt collection by CRST at any time since January 21, 2014; and (2) all individuals who have received collection letters from CRST indicating 18% per annum interest since January 21, 2006.  Those classes are appropriately certified under Rule 23(a) and Rule 23(b)(2) because "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Specifically, the relief for the proposed Rule 23(b)(2) class relates to CRST's policies and practices regarding communications with drivers, standard form documents presented to drivers, collection of monies from drivers, and charging of interest on monies owed by drivers, all of which are uniform for the class.  The fact that this Court has already certified classes under Rule 23(b)(3) further supports this certification, because "[a]ctions under Rule 23(b)(2) may be more rough-hewn than those in which the court is asked to award damages."  *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 12 (D. Mass. 2010) (internal quotation marks omitted).

All of the classes and collectives to which this settlement applies are appropriately certified under Rule 23 and/or 29 U.S.C. § 216(b).

**B.     The proposed settlement is fair, reasonable, and adequate.**

It is well-established that courts prefer settlements of lawsuits over continued litigation.  *See, e.g., In re: Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 326 (3d Cir. 2019) ("[W]e favor the parties reaching an amicable agreement and avoiding protracted litigation.").  "[S]ettlements spare the judicial system and the

litigants the expense and time associated with the full panoply of pretrial, trial and post

trial proceedings.'" *Vermont Pure Holdings, Ltd. v. Berry*, 23 Mass. L. Rptr. 33, 2010 WL

1665258, *11 (Mass. Super. 2010), *quoting* 2 McLaughlin on Class Actions § 6:3.

Moreover, "[c]ourts have consistently noted that the public interest favoring the

settlement of litigation is even stronger in the context of class action litigation, where

one proceeding can resolve many thousands or even millions of claims that might

otherwise threaten to swamp the judiciary.'" *Id.*

A class action may not be compromised without court approval, and the court

must decide whether the settlement is "fair, reasonable, and adequate." *See* Fed. R. Civ.

P. 23(e); *see also In re Relafen Antitrust Litig.*, 360 F. Supp. 2d 166, 195 (D. Mass. 2005).  At

the preliminary approval stage, the court applies a "less rigorous standard" and "need

only determine whether the settlement 'appears to fall within the range of possible final

approval.'" *Sesto v. Prospect CharterCARE, LLC*, No. CV 18-328 WES, 2019 WL 2394251,

at *1 (D.R.I. June 6, 2019);  *In re JPMorgan Chase Mortg. Modification Litig.*, No. 1:11-MD-

02290-RGS, 2014 WL 2205493, at *1 (D. Mass. May 28, 2014) (preliminarily approving

settlement "as being fair, reasonable, and adequate, and within

the range of possible approval").

"A settlement is presumed to be reasonable when it is achieved by arm's length

negotiations conducted by experienced counsel." *Nat'l Ass'n of the Deaf v. Massachusetts

Inst. of Tech.*, No. 3:15-CV-30024-KAR, 2020 WL 1495903, at *4 (D. Mass. Mar. 27, 2020).

Moreover, when the following "procedural guidelines have been followed," there is a

"presumption that the settlement is within the range of reasonableness": "'(1) the

negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *In re M3 Power Razor System Marketing & Sales Practice Litig.*, 270 F.R.D. 45, 62-63 (D. Mass. 2010) (quoting *In re Lupron Mktg. and Sales Prac. Litig.*, 345 F. Supp. 2d 135, 137 (D. Mass. 2004)).

Each of these elements is satisfied here.[4]  First, the proposed settlement resulted from extensive arms' length negotiations that occurred over the course of several years. The parties attended four separate full-day mediations in December 2018, June 2019, May 2020, and October 2020, before three different highly experienced mediators.  The parties exchanged extensive data and engaged expert witnesses to analyze that data, both for settlement purposes and in the litigation.  Ultimately, the expert witness for each side produced both initial and rebuttal expert reports relating to damages and were both deposed twice.

Second, substantial litigation and discovery has taken place.  The case was filed in December 2015.  The parties have briefed and argued numerous substantive motions, including Defendants' motion to transfer venue, multiple motions for collective and/or class certification, cross-motions for summary judgment, Plaintiffs' motion for an injunction, and Plaintiffs' *Daubert* motions to exclude Defendants' initial and rebuttal expert reports.  Discovery has been extensive, including:  the production by CRST of almost 200,000 pages of written discovery and millions of lines of data; written

---

[4]    Because notice has not yet gone out, the fourth factor – number of objectors – is irrelevant.  To the extent that any class member objects to this settlement after receiving notice, Plaintiffs will address that objection in their final settlement approval briefing.

discovery responses from approximately 200 opt-in plaintiffs; two days of deposition of named plaintiff Montoya, full-day depositions of three other early opt-in plaintiffs, and depositions of approximately twenty opt-in depositions; and Rule 30(b)(6) depositions of ten witnesses designated by CRST.  Expert discovery was significant as well.  Each party's expert witness produced an initial expert report and a rebuttal report, and each was deposed twice, for a total of four expert depositions.  In light of the extensive litigation in this case, there can be no question that all parties were familiar with the factual record underlying the claims in this case.

Third, the parties' attorneys are experienced in this type of litigation.  Plaintiffs' lead counsel Hillary Schwab and Rachel Smit of Fair Work, P.C. have extensive experience litigating and settling wage class actions.  Indeed, they focus their practice exclusively on wage and employment matters, and they have been appointed class counsel in several wage cases.  *See, e.g., Montoya*, 311 F. Supp. 3d at 424 (holding that undersigned counsel satisfied adequacy element for class certification); *Dvornikov v. Landry's Inc.*, No. 15-CV-13286-ADB, 2017 WL 1217110, at *10 (D. Mass. Mar. 31, 2017) ("Plaintiffs' counsel [including Hillary Schwab as lead counsel] is clearly qualified, experienced, and able to undertake this litigation."); *Chebotnikov v. LimoLink, Inc.*, No. CV 14-13475-FDS, 2017 WL 2909808, at *2 (D. Mass. July 6, 2017) ("[P]laintiffs' chosen lead counsel, Hillary Schwab, appears to be a qualified and experienced attorney in the areas of employment law and class action litigation.").  They are experienced in this area of the law and have used the knowledge derived from that experience to achieve a fair and reasonable result for the settlement class.  Andrew Schmidt, Esq. is the

principal of Andrew Schmidt Law PLLC and is of counsel for Towards Justice, an innovative impact litigation nonprofit in Denver, Colorado, and has represented hundreds of low-wage workers in both individual and class/collective actions.

Plaintiffs' counsel take very seriously their obligation and duty to unnamed settlement class members and will agree to a settlement only when they are convinced that it is in the best interest of the settlement class.  In this case as well, the named plaintiffs have been committed to obtaining a fair resolution of the case for their fellow settlement class members as well as themselves and have supported Plaintiffs' counsel's commitment to negotiating on behalf of the interest of the entire class.

### C. The proposed allocation formula is fair, reasonable, and adequate.

Moreover, Plaintiffs' proposed allocation formula is fair, reasonable, and adequate in that it takes into account each individual's potential damages from the case and allocates the settlement monies accordingly.  Courts routinely hold that such formulas are fair, reasonable, and adequate.  Indeed, a distribution formula that reimburses class members based on the type and extent of their injuries is presumptively reasonable.  *See, e.g., Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 328 (3d Cir. 2011) ("Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable") (citations omitted); *Walsh v. Popular, Inc.*, 839 F. Supp. 2d 476, 482 (D.P.R. 2012) (approving methodology for calculating shares from class settlement based on "each class member's losses relative to those of the class as a whole"); *Hochstadt v. Bos. Sci. Corp.*, 708 F. Supp. 2d 95, 110 (D. Mass. 2010) (holding that plan of allocation was reasonable because it was based on

class members' losses); *In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008) ("It is reasonable to allocate the settlement funds to class members based on the extent of their injuries"); *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001) (allocation plan that "reimburses class members based on the type and extent of their injuries is generally reasonable").

Here, individuals who participate in the settlement will receive substantial monetary relief for their claims.  At a minimum, the settlement would afford those who attended unpaid orientation approximately $110, which would compensate them for more than 15 unpaid hours at $7.25 per hour.[5]  For the minimum wage claims relating to driving (other than the sleeper berth claim), the settlement would afford drivers a minimum of $16 per week, or minimum wage for 2.2 hours per week.  The stipulated amount for the sleeper berth claim, $1,541,667 after attorneys' fees and costs, etc., would afford drivers a minimum of $12 per week, or minimum wage for 1.7 hours per week (in addition to the amounts already received for non-sleeper berth FLSA claims).[6]  And for the consumer claim, drivers who paid back to CRST more than CRST paid to the Phase 1 CDL schools for their training will receive, at a minimum, the entire amount that they paid to CRST in excess of what CRST paid to the schools.  Drivers are likely to

---

[5]    The total amount to be distributed to claimants for the orientation claims, $2,750,000, is higher than the amount calculated by Plaintiffs' expert witness, Dr. Robert Speakman, for that claim.  Dr. Speakman calculated damages for the orientation claim at $2,422,736 (though this amount did not include damages for the Florida orientation claim, which Plaintiffs estimate to be approximately $350,000).

[6]    The total amount to be distributed to claimants for the FLSA minimum wage driving claims (other than the sleeper berth claim) is $2,040,833.  Dr. Speakman calculated damages for this claim as $1,763,592.  The amount that Dr. Speakman calculated for the sleeper berth claim was $2,457,418.  This calculation assumed that drivers always correctly coded time as sleeper berth time.

receive substantially more than these amounts, moreover, because all unclaimed funds will be redistributed to claiming class/collective members.

The proposed settlement allocation formula affords drivers monetary recovery that is directly tied to their potential damages and is likely to afford them a significant amount of the recovery to which they are entitled.  The proposed formula is fair, reasonable, and adequate.

> **D.    The proposed notice process is fair, reasonable, and adequate.**

The proposed notice constitutes sufficient class notice.  "Notice is satisfactory 'if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'"  *Nat'l Ass'n of the Deaf*, 2020 WL 1495903, at *4 (approving notice which "includes a clear and comprehensive summary of the provisions of the proposed settlement," "defines the relevant terms, explains what content will be captioned, when the captioning will occur, and 'explains to class members their right to object and be heard in open court'"); *Wallace v. Powell*, 288 F.R.D. 347, 367 (M.D. Pa. 2012) (adequate class settlement notice "detailed the nature of the action, the definition of [the classes], the claims of the Settlement Classes, the terms of the Settlement Agreement, and the right to object or request exclusion from the terms of the Settlement").  Substantively, the notice clearly informs settlement class/collective members about the terms of the settlement, their options with respect to the settlement, the monetary and non-monetary relief to which they are entitled if they participate, the release of claims, relevant deadlines and dates, and contact information

for the Settlement Administrator and Plaintiffs' counsel.  The settlement agreement will also be available on the settlement website.

The plan for dissemination of the notice is reasonable as well.  Notice will be sent to class/collective members by text and email or by mail for those for whom CRST does not have email addresses or for whom emails are returned as undeliverable and will also be available on the settlement website.  A reminder will be sent by mail and/or text and/or email as well to those who have not yet claimed approximately halfway through the claim period.  Class/collective members are able to submit claim forms electronically through the website or by mail, fax, or email.  Moreover, in addition to the direct notice, the parties have agreed that Plaintiffs' counsel shall take out ads in three online trucking publications advertising the notice and deadline to submit claims and directing class members to consult the website for more information.  This notice and method for submission of claim forms is unquestionably reasonable and the best practicable, particularly for a population of truck drivers who are often away from home but usually have frequent access to email.

Significantly, the notice plan proposed herein is substantially similar to the notice plan that this Court previously approved when class and collective notice originally went out in this case.  *See* ECF Dkt. No. 205.  Indeed, courts routinely approve notice dissemination plans similar to this one.  *See Romero v. Clean Harbors Surface Rentals USA, Inc.*, 368 F. Supp. 3d 152, 163 (D. Mass. 2019) ("[T]he Court agrees with Romero that email notice is appropriate in this case because it is likely to be more effective than alternative methods."); *Graham v. Hall's S. Kitchens, LLC*, No. 2:18-CV-02621-RMG, 2018

WL 6177971, at *2 (D.S.C. Nov. 27, 2018) ("[T]he Court finds that notice via email is appropriate in today's mobile society."); see also In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., 2017 WL 5710424, at *1 (D. Mass. Nov. 27, 2017) (approving notice to individual class members by first-class mail plus posting notice on settlement website); In re Asacol Antitrust Litig., 2017 WL 4118967, at *3-4 (D. Mass. Sept. 14, 2017) (same).

For the reasons set forth above, Plaintiffs' proposed notice and plan for dissemination of notice and submission of claim forms are fair, reasonable, and adequate and should be preliminarily approved.

### E. The proposed incentive awards are fair and reasonable.

In their motion for final settlement approval, Plaintiffs will also request that the Court approve incentive awards as follows:  up to $25,000 for Juan Carlos Montoya and up to $10,000 each for Raymond Hollingsworth, Ronnie Fogarty, and Clarence Johnson; up to $2,500 each for Larry Wimbish, Rinel Tertilus, Maurice Smith, Jean Paul Bricault Jr., Jose Torres Rosado, Austin Coddington, and Kevin Hamilton; and up to $1,000 each for the twenty opt-in plaintiffs who appeared for depositions..  These proposed incentive awards are fair and reasonable, given that it was the named plaintiffs who not only initiated this lawsuit on behalf of their co-workers, but who obtained this recovery. The named plaintiffs were vital to the prosecution of this matter.  Juan Carlos Montoya participated in significant discovery, including responding to written discovery and sitting for deposition over two full days.  His testimony was crucial to Plaintiffs' opposition to Defendants' motion to transfer venue and to Plaintiffs' motions for class certification and summary judgment.  Early opt-in plaintiffs Raymond Hollingsworth,

Ronnie Fogarty, and Clarence Johnson also responded to written discovery and sat for full-day depositions, and Plaintiffs' counsel relied on their testimony and written discovery responses in moving for class certification and summary judgment as well. Larry Wimbish and Rinel Tertilus are the named plaintiffs in the *Wimbish* case, and Maurice Smith, Jean Paul Bricault Jr., Jose Torres Rosado, Austin Coddington, and Kevin Hamilton are the named plaintiffs in the *Smith* case.  Twenty opt-in plaintiffs were required to sit for deposition by videoconference during COVID-19 this past summer.

Courts have widely recognized that efforts such as those undertaken by the named plaintiffs and opt-in plaintiffs here are deserving of incentive awards, which serve an important function in promoting enforcement of state and federal law by private individuals while encouraging class settlements.  *See In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 82 (D. Mass. 2005) ("Incentive awards are recognized as serving an important function in promoting class action settlements, particularly where as here, the named plaintiffs participated actively in the litigation"), *quoting In re Lupron*, 228 F.R.D. 75, 98 (D. Mass. 2005).[7]  "Service awards [aka incentive payments] are common in class action cases and serve to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and

---

[7]     *See also, e.g., In re Compact Disc Min. Adver. Price Antitrust Litig.*, 292 F. Supp. 2d 184, 189 (D. Me. 2003) ("Because a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage or induce an individual to participate in the suit"); Savett, *et al.*, "Consumer Class Actions: Class Certification Issues, Including Ethical Considerations and Counsel Fees and Incentive Payments to Named Plaintiffs," 936 PLI / Corp. 321, 340 ("It has become commonplace for the named representatives to request a special payment for having borne the flag and headed a class action. Most courts are receptive to this because they feel that private attorneys general should be encouraged, and such incentives further the goals of federal and state laws"); *Sheppard v. Consol. Edison Co. of New York, Inc.*, 2002 WL 2003206, at *5-6 (E.D.N.Y. 2002) (collecting cases approving incentive payments).

continuing as a litigant, and any other burdens sustained by the plaintiffs. . .  It is important to compensate plaintiffs for the time they spend and the risks they take." *Beckman v. KeyBank, N.A.*, 85 Fed. R. Serv. 3d 593 (S.D.N.Y. Apr. 29, 2013).

The incentive payments requested here are well within the range of those approved in other class actions and, in the aggregate, constitute approximately 1% of the total monetary recovery available to the Class.  *See, e.g., In re Asacol Antitrust Litig.*, 2017 WL 11475275, at *4 (D. Mass. Dec. 7, 2017) (approving service awards of $100,000 each for five named plaintiffs); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d at 751 (awarding incentive awards of $50,000 and $40,000); *Brotherton v. Cleveland*, 141 F. Supp. 2d 907, 914 (S.D. Ohio 2001) (awarding $50,000 incentive payment to named plaintiff who "has been instrumental in bringing this lawsuit forward" and "has performed numerous tasks in association with this litigation"); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 479–80 (D.N.J. 2008) (awarding $60,000 incentive awards to each named plaintiff where "the Class Representatives spent a significant amount of their own time . . . litigating these cases for the benefit of the absent members of the settlement class. . .").

Indeed, in other wage and hour class actions in the trucking industry, courts have awarded incentive payments in the range requested here.  In *Van Dusen v. Swift Transportation Co.*, the court awarded "Service Awards to Named Plaintiffs in the amount of $50,000 per Named Plaintiff as the reasonable value of the services provided by each of the Named Plaintiffs to the Class Members in litigating and resolving this Action."  D. Ariz. Civil Action No. 2:10-cv-00899, Dkt. No. 1158.  In *Browne v. P.A.M.*

*Transport, Inc.*, the court has granted preliminary approval of the parties' proposed settlement, including $50,000 incentive payments for each of three named plaintiffs (for a total of $150,000).  W.D. Ark. Civil Action No. 5:16-cv-5366, Dkt. Nos. 279, 282.

Plaintiffs' requested incentive payments are appropriate, and Plaintiffs respectfully request that they be preliminarily approved.

## II.    THE REQUESTED ATTORNEYS' FEES AWARD IS FAIR AND REASONABLE, AND SUPPORTED BY APPLICABLE PRECEDENT.

Two weeks before the deadline for class/collective members to submit claims, Plaintiffs will file a separate detailed preliminary petition for attorneys' fees and costs. This petition will include information about Plaintiffs' counsel's lodestar rates, so that the Court may perform a lodestar crosscheck.  In the motion for final settlement approval, Plaintiffs will also request that the Court approve distribution of a 1/3 share of the settlement proceeds (up to $4,166,667) to Plaintiffs' counsel for attorneys' fees, as well as up to $500,000 in litigation costs, and up to $250,000 for the costs of settlement administration.  The proposed settlement notice informs the settlement class members that Plaintiffs' counsel will request up to one-third of the settlement proceeds as attorneys' fees.

Courts generally favor an award of fees from a common fund, as called for by the proposed settlement in this case.  As the Supreme Court has explained:

> [T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole. . . .  Jurisdiction over the fund involved in the litigation allows a Court to prevent . . . inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citations omitted).  *See also Blum v. Stenson*, 465 U.S 886, 900 n.16 (1984); *In re Thirteen Appeals*, 56 F.3d 295 (1st Cir. 1995) (awarding attorneys' fees of $68 million out of a $220 million settlement fund).

When awarding fees from a common fund, the "percentage of the fund" method is preferred over the lodestar method.  As the First Circuit observed, the percentage method is less burdensome to administer than the lodestar method.  *In re Thirteen Appeals*, 56 F.3d at 307.  The court also endorsed the percentage method because it is result-oriented, and therefore promotes a more efficient use of attorney time – a loadstar method may give attorneys an incentive to spend as many hours as possible on the litigation and may discourage early settlements.  *Id.*  When using the percentage method, courts routinely approve fee awards that represent approximately one-third of the settlement fund.[8]

An award of one-third of the fund is consistent with the vital role that contingency arrangements play in making legal counsel available to individuals who cannot afford hourly fees. Unlike traditional firms that receive hourly fees on a monthly basis, employment counsel who take cases on contingency often spend years litigating cases (typically while incurring significant out-of-pocket expenses for experts,

---

[8]     There are numerous examples of cases in which a one-third fee was approved, including: *Wilensky v. Digital Equipment Corp.*, C.A. No. 94-10752-JLT (D. Mass. July 11, 2001); *Chalverus v. Pegasystems, Inc.*, C.A. No. 97-12570-WGY (December 19, 2000) (awarding as an attorneys' fee one-third of a more than $5 million recovery); *In re Peritus Software Services, Inc. Sec. Litig.*, C.A. No. 98-10578-WGY (D. Mass. Feb. 28, 2000); *Zeid v. Open Environment Corp.*, C.A. No. 96-12466-EFH (D. Mass. June 24, 1999) (awarding a fee of one-third of a $6 million settlement); *In re Picturetel Corp. Sec. Litig.*, C.A. No. 97-12135-DPW (D. Mass. Nov. 4, 1999) (approving award of one-third of a $12 million settlement fund); *Morton v. Kurzweil Applied Intelligence, Inc.*, C.A. No. 10829-REK (D. Mass. Feb. 4, 1998); *In re Copley Pharmaceutical, Inc. Sec. Litig.*, C.A. No. 94-11897-WGY (D. Mass. Feb. 8, 1996) (awarding one-third of a $6.3 million settlement fund); *In re Gillette Securities Litig.*, C. A. No. 88-1858-REK (D. Mass. Mar. 30, 1994).

transcripts, travel, etc.), without receiving any ongoing payment for their work. Sometimes fees and expenses are recovered; other times, despite hundreds of hours of work, nothing is recovered. This type of practice is viable only if attorneys, having received nothing for their work on some cases, receive more in other cases than they would if they charged hourly fees. Courts have long recognized this reality. *See, e.g.,* *Hensley v. Eckerhart*, 461 U.S. 424, 448 (1983) (noting that "[a]ttorneys who take cases on contingency, thus deferring payment of their fees until the case has ended and taking upon themselves the risk that they will receive no payment at all, generally receive far more in winning cases than they would if they charged an hourly rate"); *In re Union Carbide Corp. Consumer Products Business Securities Litig.*, 724 F. Supp. 160, 168 (S.D.N.Y. 1989) ("Contingent fee arrangements implicitly recognize the risk factor in litigation and that the winning cases must help pay for the losing ones if a lawyer who represents impecunious plaintiffs, or those plaintiffs not so fully committed as to put their own money where their mouth is, will remain solvent and available to serve the public interest.").  Contingency fee arrangements not only make access to the judiciary feasible for most private individuals, it also incentivizes parties to discuss settlement early, thus unburdening the trial courts.  *See Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 188 (W.D.N.Y. 2005) (contingency fees "directly align[] the interests of the class and its counsel and provide[] a powerful incentive for the efficient prosecution and early resolution of litigation").

By permitting clients to obtain attorneys without having to pay hourly fees, the contingency fee system provides critical access to the courts for people who otherwise

would not be able to find competent counsel to represent them. That access is particularly important for the effective enforcement of public protection statutes, such as the wage laws at issue in this case. It is well recognized that "private suits provide a significant supplement to the limited resources available to [government enforcement agencies] for enforcing [public protection] laws and deterring violations." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979).

In this case, Plaintiffs' counsel have expended extensive time and resources, as set forth in more detail in Section I.B, *supra*. Accordingly, Plaintiffs respectfully request that the Court preliminarily approve Plaintiffs' request for attorneys' fees.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court grant preliminary approval of the settlement and the proposed plan of distribution as fair, reasonable, and adequate, and authorize Plaintiffs to send the proposed notice of settlement and claim form to the settlement class. Specifically, Plaintiffs request that the Court issue a preliminary approval order in the form attached to this motion as Exhibit 2.

Respectfully submitted,

JUAN CARLOS MONTOYA,
on behalf of himself
and all others similarly situated,

By their attorneys,

 _/s/ Hillary Schwab_____
Hillary Schwab (BBO #666029)
Rachel Smit (BBO #688294)
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
Tel. (617) 607-3261
Fax. (617) 488-2261
hillary@fairworklaw.com
rachel@fairworklaw.com

Andrew Schmidt, Esq.
        Admitted _pro hac vice_
Andrew Schmidt, PLLC
97 India St.
Portland, ME 040101
Tel. (207) 619-0320
Fax. (207) 221-1029
Andy@MaineWorkerJustice.com

Dated:  December 15, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2020, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to all counsel of record.

 */s/ Hillary Schwab*
Hillary Schwab